# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

VIDEOTAPED DEPOSITION OF
JONATHAN B. WILLIAMS

MELTON WEST,

Plaintiff,

vs. Case No. 5:25-cv-08705

WALETICH CORPORATION D/B/A WALETICH TRANSPORTATION AND JONATHAN B. WILLIAMS,

Defendants.

---

DEPONENT: JONATHAN B. WILLIAMS

DATE: February 25, 2026

TIME: 1:03 p.m.

LOCATION: VIA VIDEOCONFERENCE

REPORTED BY: PAULA MAXWELL
CLARK BOLEN
29 Gamecock Avenue, Suite 200
Charleston, SC 29407
843-762-6294
www.clarkbolen.com
maxwell.paula@outlook.com



A P P E A R A N C E S

(All appearances via videoconference)

ON BEHALF OF PLAINTIFF:

MORGAN & MORGAN, PA
BY: JAMES G. BIGGART, II
4401 Belle Oaks Drive, 3rd Floor
North Charleston, SC 29405

ON BEHALF OF DEFENDANTS:

MOSELEY MARCINAK LAW GROUP, LLP
BY: ROBERT D. MOSELEY, JR.
4324 Wade Hampton Boulevard
Suite B
Taylors, SC 29687

ALSO PRESENT: Genesis Carvajal, videographer



INDEX

| EXAMINATION | PAGE |
|---|---|
| BY MR. KLAASMEYER | 4 |
| CERTIFICATE | 58 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|

(No exhibits marked.)



VIDEOGRAPHER: All right. We are on the record in the video deposition of Jonathan Williams in the matter of Melton K. West versus Waletich Corporation. Today's date is February 25th, 2026. The time is 1:03 p.m. The court reporter is Paula Maxwell. My name is Genesis Carvajal, videographer with Clark Bolen. Will counsel please identify themselves for the record.

MR. KLAASMEYER: Cooper Klaasmeyer here for Melton West, the plaintiff.

MR. MOSELEY: Rob Moseley for Waletich and Mr. Williams.

VIDEOGRAPHER: Court Reporter, please swear in the witness.

JONATHAN B. WILLIAMS,
having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. KLAASMEYER:

Q. All right. Good afternoon, sir. My name is Cooper Klaasmeyer, as you heard just a moment ago. I'm the plaintiff's attorney in this case. Would you please give us your full name for the record?

A. Jonathan Bradley Williams.
Q. All right, Mr. Williams. Have you ever given a deposition before?
A. I have not.
Q. Okay. So what we're doing today is I'm going to be here asking you questions. You just took an oath just a moment ago. It's the same oath you would take if we were in a courtroom. Even though this is a little bit more of an informal setting than that, it's still the same thing as if we were -- if you were giving testimony in a court of law, so just be mindful of that.
Your obligation -- only real obligation here is to tell the truth. I've got a bunch of questions for you about, you know, what happened, stuff like that, and we'll talk all about that in just a moment. But before we do that, I'm going to kind of give you the ground rules so you know what to expect.
MR. MOSELEY: Hey, Cooper.
MR. KLAASMEYER: Yeah.
MR. MOSELEY: Cooper, let me -- you're not on the screen. He can't see you.
MR. KLAASMEYER: Okay.



MR. MOSELEY: You're just a voice from above.
MR. KLAASMEYER: Yeah, that's no good.
MR. MOSELEY: Let me see what I can do.
VIDEOGRAPHER: The time is 1:05 p.m., and we are off the record.
(A recess was held.)
VIDEOGRAPHER: The time is 1:05 p.m., and we are back on the record.
Q. All right. So, yeah, I'm just going to give you the rules so that you know kind of what we -- what we're doing here and what to expect.
First off, if you need a break at any point, just let me know. I will most likely ask you to answer whatever question I just asked, and then I'll be happy to give you a break for as long as you need, for whatever reason. So just let me know if you need one, and I will be happy to oblige.
If you -- if we are on a break, just remember you can't talk to anybody, including your attorney, about the substance of your testimony without me being able to ask about it.



So one of the only times in the -- and -- or it's really the only time in the whole case where that is the case where I can't talk to you about the substance -- or where I can ask you questions about what you and your attorney talked about, so just be mindful of that. And I -- and most likely if we do go on a break, I will ask you, did you talk to anybody? So just, again, keep that in mind.
If -- if you are confused about what question I'm asking you or anything like that, feel free to let me know. You're entitled to a fair question, so if you just don't get what I'm getting at, if you don't understand a word I said, if Zoom cuts out and you didn't hear me, just let me know and I will clarify.
Does that make sense?
A. Yes, sir.
Q. Okay. All right. Let's see. There are some other rules that may come up, and I will be happy to explain those when they come up. The only other main one that will happen -- that will certainly probably happen during the deposition is your attorney may object from time to time. Unless he instructs you specifically not to



answer my question, you will still have to answer the question, but try to let him get his objection out so that it's preserved for the record.
Does that make sense?
A. Yes.
Q. Okay. And then the other thing -- you're doing a great job of it so far. But in terms of answering questions, try to let me finish asking the question, and I will make sure and try to let you answer so that we're not talking at the same time. That helps our court reporter out to keep a clean record.
And then, additionally, try to also keep your answers verbal. You know, if you -- if you nod your head, I will most likely say, is that a yes? I'm not trying to be a jerk. I'm just trying to make sure that it's written down because the court reporter can't really write down head nods or shakes.
Does that make sense?
A. Yes, sir.
Q. Okay. All right. Perfect. So getting into it, how long have you been a truck driver, sir?

Page 9

A. Approximately 14 years.
Q. Okay. Where did you first get your CDL?
A. Where did I get it?
Q. Yes, sir.
A. I got it from the truck driving school in Jacksonville, Florida, called Roadmasters.
Q. Okay. And was that in Florida? Was it a Florida CDL?
A. Yes, sir.
Q. Okay. Have you held a CDL in any other states other than Florida?
A. Also in Georgia.
Q. Okay. And where -- do you currently hold a CDL still?
A. Yes, sir.
Q. Where is that CDL held?
A. In Georgia.
Q. Okay. All right. And you said you've been driving trucks for about 14 years. What kinds of equipment have you operated during your career?
A. Primarily dry van. I have done a little bit of dump truck work, a little bit of reefer work, and a little bit of flatbed work, but primarily dry van.

Page 10

Q. Okay. And on a day-to-day basis, you know, do you drive day cabs? Do you drive sleeper berth trucks? What kind of trucks are you driving?
A. Sleeper berth trucks.
Q. Okay. And on a day-to-day basis, are you kind of over the road, or what -- what sort of role are you driving in?
A. Currently, I am working as a driver trainer.
Q. Okay. And are you still working for -- with Waletich?
A. No, sir.
Q. Okay. Where do you work now?
A. A company called Total Transportation of Mississippi.
Q. Okay. All right. And how long have you been there?
A. Since I think about July.
Q. Okay. Before that -- working for that company since July, where were you before that?
A. A company called Hoosier Air Transport.
Q. Okay. And where is Hoosier Air Transport at?
A. They're located in Columbus, Indiana.

Page 11

Q. The -- and what kind of work do they do?
A. They did reefer work, hauling produce primarily from out west in California and Arizona back to the Midwest area.
Q. And is that what you did for them, drive a -- drive reefers?
A. Yes, sir.
Q. Okay. And prior to that -- that company, the Hoosier company, where were you before that?
A. I had a few small stints with some -- some other companies; one called Four Ways Cargo and another called Pro Source. I wasn't with them really long at all.
Q. Okay. Why -- why were you not with that company for very long?
A. They couldn't seem to keep me busy enough in order for me to pay my bills.
Q. Okay. I understand. All right. And then before that, was that -- do we come upon kind of Waletich?
A. Yes, sir.
Q. Okay. All right. And how long were you with Waletich?
A. A couple years.

Page 12

Q. Okay. When you -- so for -- when -- a couple years, is it more -- more than one year? Fair to say?
A. Yes. More than one year.
Q. More than two years?
A. I think so, yes.
Q. Okay. All right. Just don't know the exact dates?
A. No, sir.
Q. Fair enough. All right. And so when you started with Waletich, what -- what did you do as part of your training process?
A. I don't quite understand training process with Waletich.
Q. So did you -- did you do a road test?
A. Yes, sir.
Q. Okay. And what were your -- what was your kind of job function for them? What kind of equipment were you operating?
A. I was a lease operator with them, a contract driver. I basically hauled their customer freight out and back from Minnesota.
Q. Okay. And when you say you were a contract driver, what does that mean?
A. I essentially was leasing their

Page 13

equipment back to them and hauling freight on their behalf. 1099 employee.
Q. Okay. So do you know what the difference is between kind of that and a company driver?
A. From my understanding, their company drivers were paid via W-2. I guess taxes were already taken out of their check before they got it. I don't.
Q. Okay. I understand. Did you have the option to come on as either a company driver or a contract driver?
A. I don't recall that I had that conversation when I chose to come over.
Q. Okay. All right. Where were you before that?
A. Total Transportation of Mississippi.
Q. Okay. All right. So just so that I understand 100 percent, you started -- or, well, maybe not started because I think we probably got some more years in there. But before you worked for Waletich, you were at Total Transportation of Mississippi, and now you're there in a different function; is that fair to say?
A. Yes, sir.

Page 14

Q. Okay. All right. I understand. How long were you with Total Transportation in the stint that was before your employment with Waletich?
A. I went back to them I believe in sometime early 2018, and I think I left them maybe sometime during Q1 of 2021.
Q. Okay. All right. And what -- what made you leave there from that stint?
A. I wanted to explore different opportunities. I had never tried the -- the whole owner-operator thing.
Q. Okay. All right. And so is it fair to -- or is it my understanding then that you are a company driver with Total Transportation of Mississippi in that stint we're talking about now?
A. Yes, sir.
Q. Okay. And then so from there, you decided that you wanted to be -- you know, try out the owner-operator thing, and then you went and signed up as a contract driver with Waletich?
A. That's correct.
Q. Okay. And so I think based on what you're telling me is you started around 2018 at

Page 15

Total Transportation, and you had your CDL -- or in 2018. You had your CDL for 14 years. We've got -- we've got some other -- other companies you worked for; is that -- is that right?
A. Yes, sir.
Q. Okay. Where did you work before Total Transportation on that -- that stint we were just talking about?
A. I worked a couple of odd jobs around home. I kind of took a little bit of time as a living home -- moving local to home. I did some dump truck work for a company. Kellems Mulch I think is their name, Kellems Mulch in Alcoa, Tennessee. I did some work for PruittHealth Hospice in Macon. I did some work for GEICO at one of their call centers here in Macon, and I worked for Blue Bird, and I also worked for the college.
Q. Okay. All right. And does that kind of get all of your truck driving experience buttoned up there?
A. No, sir. I have more before that.
Q. Okay. Where did you work before that?
A. Before that, I worked again for Total Transportation. I know that I left them in 2016.

Page 16

I don't exactly remember the year that I started with them.
Q. Okay. All right. And so my understanding will be that you've had your CDL since about 2012, which is 14 years?
A. Yes.
Q. And so what did you do kind of before that first -- was that your first stint with Total Transportation?
A. That was my first stint with Total Transportation.
Q. Okay. What did you do before that?
A. I had a small stint with CRST, and I got my CDL initially with -- and went to work for Werner Enterprises.
Q. Okay. All right. I understand. And were you driving dry vans for those employers?
A. Yes, sir.
Q. Okay. All right. Turning now more to the day of this crash, do you take responsibility for causing this crash?
A. I do.
Q. Okay. Was there anybody else who had any sort of contribution to making this crash occur?

Page 17

A. Could you -- could you repeat the question?
Q. Sure. Did anybody else do anything that caused this crash?
A. No, sir.
Q. Okay. All right. So did my -- and to your knowledge -- I know obviously you weren't in the vehicle with my client or anything like that, but to your knowledge, did my client do anything to cause this crash?
A. No.
Q. Okay. And then he was a passenger in the vehicle. Did the driver that -- of the vehicle that my client was riding with, did he -- did he do anything to cause this crash?
A. No.
Q. Okay. All right. All right. And so tell me what happened from your perspective.
A. It was heavy traffic on the interstate. I of course changed lanes a couple of times to get around, you know, slower groups of vehicles. And before I knew it, the vehicle in front of me, the box truck, was coming to a much more sudden stop than I expected.
Q. Okay. And what -- what -- when you

Page 18

first noticed that you were going to have to try and stop or, you know, maybe that a crash was going to occur, how fast were you moving?
A. I really couldn't say. Maybe -- somewhere maybe in the neighborhood of 55 to 65.
Q. Okay. All right. And when the actual impact occurred, had you slowed down at all?
A. Yes, sir. Considerably. I had done everything possible as of the moment that of course I identified that the vehicle was coming to a stop to bring my vehicle as well to a stop.
Q. Okay. So from -- was your -- was your truck equipped with air brakes?
A. Yes, sir.
Q. Was there anything wrong with the air brakes?
A. No, sir. Not to my knowledge.
Q. Okay. All right. Is it fair then to say that, you know, if you did -- as you braked as hard as you could and there was no problem with the brakes, the reason for the crash was -- was simply that there wasn't enough space for you to stop?
A. Yes, sir. It would be fair to say that.
Q. Okay. And would you agree with me that

Page 19

that means that you were following the car in front of -- or the vehicle in front of you too closely?
A. In hindsight, yes, sir, I recognize that.
Q. Okay. I understand. Thank you, sir.
So with the -- what happened next after the -- after the actual impact occurred?
A. Those details are a bit fuzzy for me. I believe I got out of the vehicle and went to check on the occupants of the vehicle in front of me. I don't recall if I was the one who called for emergency services or if it was them.
Q. Okay. Do you remember saying -- or do you remember anything specifically said to you by the driver of the vehicle that you had collided with?
A. I don't.
Q. Okay. Do you remember any -- any sort of conversations or anything that my client said to you?
A. I don't believe that I ever spoke to the passenger of the vehicle. If I did, I just don't remember.
Q. Okay. All right. So the reason why I

Page 20

ask these questions is just to know whether -- you know, whether you would tell a jury that my client said something or that you said something specific to my client. Is it fair to say that you don't remember any conversations specifically on that day?
A. I do not remember any conversations on that day. No, sir.
Q. Okay. Do you remember talking to the driver in a general sense?
A. Asking if they were okay. That's about all I can really remember.
Q. Okay. Do you remember talking to any sort of law enforcement officials following the crash?
A. I did talk to them. I -- I don't recall what I would have said or what the substance of -- of that would have been, but I imagine I would have had to have spoken to law enforcement.
Q. Okay. All right. Do you remember, did -- did -- did anybody come to the scene?
A. Anybody like from the company?
Q. Well, more specifically just like an officer.
A. Yes. There was a law enforcement

Page 21

officer that did arrive. I couldn't tell you his name or even what he looked like now.

Q. Okay. All right. I understand. So as far as you can remember, you think you did talk to an off- -- a police officer or some sort of law enforcement official, but you don't recall the specifics of it?

A. Correct.

Q. Okay. All right. I understand. Did you talk to anybody other than, you know, the driver of the vehicle and any sort of law enforcement officer? Did you talk to anybody else at the scene of the crash?

A. I believe emergency services were the first ones there. They asked me if I was okay. They asked me if I needed to be transported.

Q. Okay.

A. I couldn't really tell you what they looked like or who they were now either, but...

Q. Understood. And did you tell them that -- did you tell them you weren't hurt or anything like that?

A. I did. At the time, I -- I believed I wasn't hurt. I was probably sore the next day. Nothing that I didn't I guess you could say heal

Page 22

from over the coming weeks.

Q. Okay. All right. I understand. All right. And so the -- did you talk to anybody from the company after the crash on the phone or anything like that?

A. I believe I spoke with my safety director, Dave Hensche, of course telling him that, you know, I've been involved in an accident. I couldn't tell you at what point I spoke to Dave. I couldn't tell you if it was five minutes after impact or two hours after impact.

Q. Okay. And was that a -- was that a phone call, or was that a text message? Do you know what I mean?

A. It might have been -- it might have been both. I imagine I would have called. I believe I did text him, but I'm -- I'm unsure really of the -- the details.

Q. Okay. All right. Did you talk to anybody else from the company other than your safety director?

A. Not that I can recall. No, sir, I don't believe I did.

Q. Okay. All right. So when you -- let's

Page 23

talk about the truck you were in on that day. Did the truck you were in have -- I've talked to some truck drivers who if they're -- if they're involved in a crash, they've got a packet with, you know, maybe a disposable camera, a form to fill out, or something -- anything like that. Is there anything like that in your truck on the day of this crash?

A. I believe so. I believe I had to -- there would have been a form for incident reporting. I'm trying to think if there -- there's not a camera, I don't believe. At least I don't recall there being a camera. I think the -- I think the only thing they had was a report form.

Q. Okay. All right. Like an incident form for you to fill out?

A. Essentially.

Q. Okay. I understand. Did you take any pictures on your phone or anything like that?

A. I did.

Q. Okay. Do you still have those pictures?

A. No, sir, I do not.

Q. Okay. What kind -- what kind of phone do you have?

Page 24

A. I have an iPhone.

Q. Okay. At the time did you have an iPhone?

A. Yes, sir.

Q. Okay. What happened to the pictures?

A. I did not save them to my camera roll, and in order to save space on my phone, I've always used a rolling six-month auto delete, so messages that are older than six months without being saved, they just go away. It saves me on a lot of data storage.

Q. Okay. Okay. I understand. So just -- just so that like my -- my, you know, recollection is clear. So, you know, if you open your iPhone and you take it, you might hit the camera button on the -- on your messages, take a picture or something and you send it, and it doesn't necessarily go in your camera roll? That's what happened?

A. It does sometimes go to my camera roll. I'm usually pretty good about deleting it right back out.

Q. Okay. All right. I understand. But they're not in your camera roll as we sit here today?

A. That's correct.
Q. Okay. All right. Who did you text them to?
A. I imagine it would have been Dave.
Q. Okay. All right. I understand. All right. So on the day of the crash, what kind of truck were you in?
A. It would have been a Freightliner. I am unsure of the model. It was not a vehicle that I was leasing. My vehicle was being repaired for engine issues, and so I was kind of renting this as a kind of borrowed vehicle.
Q. Okay. All right. And so it was a Freightliner. Not sure exactly what it was. Was it a day cab or a sleeper berth?
A. Sleeper berth.
Q. Sleeper berth. Okay. Did it have any sort of electronic equipment in it, like a dash camera or a, you know, Lytx device, Samsara device, anything like that?
A. It did have a camera, a forward-facing dash cam.
Q. Okay. Do you know what brand that camera was?
A. I really couldn't tell you.



Q. And you say forward facing. Was there a rear-facing camera?
A. No, sir. Not on that truck.
Q. Okay. Was there an electronic log device?
A. Yes, sir.
Q. Okay. What -- what brand was the ELD device?
A. I believe the service was through Peoplenet. The tablet itself was some Android thing.
Q. Okay. All right. So just so that I understand, it's, you know, a generic Android tablet. You're not sure what it was. And it had a Peoplenet software on it for ELDs?
A. Yes, sir.
Q. Were you familiar with that logging system?
A. Yes, sir.
Q. Okay. Was it the logging system you normally use?
A. Yes, sir.
Q. Okay. All right. And so other than the ELD device and the dash cam that we've already talked about, was there any sort of other



electronic device in the -- in the cab? So, for example, GPS, anything like that?
A. Yes, sir. I did have a GPS.
Q. Was it -- was it an actual like GPS unit, or was it, you know, a phone or something like that that the company provided you or anything like that?
A. An actual GPS unit.
Q. Okay. What brand was it?
A. Garmin.
Q. Garmin. Okay. All right. And what -- did you have any sort of, you know, CB radio or anything like that in the truck?
A. To be honest with you, I don't recall if that truck had a CB in it or not.
Q. Okay. Is that something you use -- or that you personally use frequently when -- when driving trucks?
A. I believe that they are great safety tools, but I don't typically -- I don't typically keep one turned on or -- not one that's permanently installed in the vehicle. It's usually a handheld.
Q. Okay. I understand. Do you ever use any of the apps that have kind of come around now



that sometimes fill the role of what CB radio used to? I -- I can't think of the name of one right now, but I had a driver tell me one time about there's apparently an app where it does some sort of proximity thing and -- and, you know, you can talk to the other drivers around you.
A. I'm not familiar with that app. I mean, there are apps I use to help do my job, but they're more about, you know, locating truck stops --
Q. Okay.
A. -- or a safe place to park.
Q. Okay. Not communicating with anybody?
A. They may have a social function. I've -- I'm, I guess, not social enough to use them.
Q. Understood. I get it. All right. So other than that, were there any other, you know, devices or anything like that in the cab of the truck?
A. Could you repeat the question? I'm sorry.
Q. Sure. Were there any other, you know, electronic devices that may have any sort of information about what was going on at the time

Page 29

in the truck -- in the cab of the truck?
A. No, sir, not that I could think of. No, sir.
Q. Okay. Did the truck have, you know, any sort of collision avoidance system where it would automatically brake for you or anything like that?
A. I don't believe that particular model had that. No, sir.
Q. Okay. What was the damage like to the truck?
A. To their truck or mine?
Q. Your truck, sir.
A. Mine was disabled. It ruptured my radiator and caused some other issues with my EGR cooler.
Q. Okay.
A. The --
Q. Did -- did -- did the Freightliner have, you know, any sort of cattle guard or any -- any -- anything like that on the front of it?
A. To be honest, I don't recall.
Q. Okay. All right. Were -- were any of the lights or anything like that on the front of the truck smashed?

Page 30

A. Not smashed. I think one of them had broken off of a bracket, but it was easily put back in place.
Q. Okay. And when you say the radiator was ruptured, was there -- was there steam and stuff coming out?
A. Yes, sir. And of course liquid on the road.
Q. Okay. All right. Other than the radiator and the other kind of property damage we've already talked about, was there anything else that you noticed about the front of the truck after the crash?
A. Anything else such as?
Q. You know, I asked about cracked lights. Was there any sort of broken glass? Was there any plastic pieces shattered off? You know, things like that.
A. The -- the hood had of course shifted up and back. I don't recall if it cracked the windshield. I guess some of the dust and bugs from the grille had, you know, come off during the impact.
Q. Sure. Okay. So if the truck was disabled, how did you get back to wherever you

Page 31

were going or wherever you needed to be?
A. Initially a tow truck came and towed my vehicle back to their storage yard. It was only after getting there, I guess, that there was a disagreement on what they wanted to charge to fix the vehicle and what my maintenance director was willing to spend to fix the vehicle, and they subsequently had it retowed from their facility to a Love's in Orangeburg for them to complete the necessary repairs for me to get it home.
Q. Man, they must've been -- they must've been trying to charge a ransom then if -- if it was worth having it retowed.
A. I -- they must have. I would have to agree with you on it.
Q. Yeah. Okay. So then what kind of damage did you notice on my client's -- on the vehicle that my client was riding in?
A. I took a little bit of dust off of their liftgate.
Q. Okay. All right. All right. I understand. With the -- the dash cam that was in the truck, was it the kind that you had to hit a button after something happens to -- to stop -- you know, to catch the footage?

Page 32

A. I don't believe it had a button to push. If it did, I was never told about it. From my understanding, it was one of those things that will record, I guess, based on when it detects certain events.
Q. Okay. All right. So it had some sort of AI function to it?
A. I couldn't say if it was AI, but it's -- it's -- it had something.
Q. It had some sort of automatic is I guess what I should say?
A. Yes.
Q. Okay. All right. I understand. Okay. We've -- we've talked kind of now about what -- what happened in the crash or what happened after the crash immediately. Did -- did you leave Waletich as a result of this crash?
A. No, sir. I did not.
Q. Okay. Why did you leave?
A. My time with them, especially as of that, you know, previous six, seven months had been racked with large repair bills, unexpectedly high repair bills, and then of course having to sit as a result of the wreck, it just made things no longer tenable for me to stay.

Page 33

Q. Okay. All right. Is it fair to say that you weren't enjoying kind of being an owner-operator?
A. No, I don't think that -- I don't think I'd characterize it like that.
Q. Okay. How would you characterize it?
A. As far as an OTR job, I think Waletich was the -- the happiest I've ever been working OTR.
Q. Okay.
A. I really enjoyed the people and the situation. It was just market pressures.
Q. Okay. I understand. So, you know, is it fair to say then that the -- the economic forces at pledge made it so that it wasn't -- it wasn't the best option for you at the time?
A. Essentially.
Q. Okay. I understand. Was it -- was it not having enough work, or was it -- was it, you know, as you've described, the cost of maintaining the vehicle and things like that were just making it not -- not work economically?
A. I wouldn't say that it wasn't enough work. I would say that it was definitely freight rates declining. So the work was there; it just

Page 34

didn't pay what it used to.
Q. Okay. Macroeconomic factors?
A. Absolutely.
Q. All right. I understand. All right. So then did you, in between when the crash occurred and when you left, do any sort of a preventability analysis with the people from Waletich?
A. Sorry. Predictability analysis?
Q. Preventability analysis.
A. Oh, preventability.
Q. Did anybody ever talk to you about whether this was -- crash was preventable or not?
A. I don't recall that I had a conversation about preventable or non-preventable. I think I already know the answer to it.
Q. Okay. I understand. And so were you -- did you receive any sort of training as a result of this -- this crash?
A. No, sir. I don't believe I stayed with them long enough to -- for that to even come up in conversation.
Q. Okay. How long after this crash did you leave?
A. Essentially as soon as I made it back to

Page 35

Minnesota, which unfortunately was three -- or two or -- two or so weeks later after having to sit to wait on repairs.
Q. Oh, wow. Okay. So the whole time between the crash and when you got up -- back -- back up to Minnesota, you were waiting on repairs and then obviously going and doing it -- going and driving back?
A. Yes, sir. Yes, sir.
Q. Okay. And so you delivered the equipment back to Minnesota and then you said, you know, This isn't for me, I'm going to find something else?
A. Essentially, yes, sir.
Q. Okay. All right. I understand. And so is it my -- would it be my understanding then that you didn't actually face any disciplinary action as a result of this because, you know, you were gone by that point?
A. I -- I guess you can say that.
Q. Well, tell me more about that.
A. I mean, I'm pretty tough on myself when I make mistakes, so I -- I -- maybe not anything official, but definitely...
Q. Understood. All right. So you were

Page 36

upset with your- -- you were disappointed in yourself because of it; is that fair to say?
A. Yes, sir.
Q. Okay. All right. Did you -- have you ever been involved in any other collisions in a commercial motor vehicle?
A. Collisions? You mean DOT reportables?
Q. Well, let's start there, yeah.
A. Okay.
Q. And actually, I'll even narrow it down for you just so -- for the purpose of making it easier to answer my question. Were you involved in any other collisions while you were -- you know, had -- had a, you know, trucking relationship with Waletich?
A. Oh, just while I'm with Waletich? No -- no -- no DOT reportables.
Q. Okay. Did you have anything that was not a DOT reportable that was still, you know, within a common meaning of collisions at -- you know, did you bump something in a parking lot? Anything like that either?
A. We had a customer accuse me of backing into a fence. I'm not -- I'm usually pretty good about accepting things if I think they're my

Page 37

fault, and I -- I don't believe that happened, but the accusation was made nonetheless.
Q. Okay. I understand. And so is it fair to say then -- just so that we kind of narrow the specific question down, did you have any other collisions with other motor vehicles while you were -- while you were working with Waletich?
A. Collision with a vehicle? Outside of a truck turning too sharply in a parking lot and his bumper messing up my bumper --
Q. Okay.
A. -- no.
Q. Okay. So nothing else that would -- was -- would be characterized as a collision with another -- or a collision involving a commercial motor -- motor vehicle that you were operating; is that fair to say?
A. Correct, yeah.
Q. Okay. All right. Fair enough. Have you ever been involved, prior to your time with Waletich, in a DOT reportable collision with another -- another vehicle? Doesn't have to be a commercial vehicle, it could be any vehicle, or a pedestrian. Anything like that?
A. Any vehicle, basically any -- any crash

Page 38

in my lifetime?
Q. Yes. While you were operating a commercial motor vehicle.
A. While I was operating a commercial motor vehicle. I don't recall any at the moment.
Q. Okay. All right. I understand. Were you cited for this collision?
A. They did give me a citation for driving too fast for conditions.
Q. Okay. All right. Have you ever been cited while driving a commercial motor vehicle prior to this crash?
A. I have received a left lane violation citation in Georgia. I believe I've received a citation for a flat tire in Kentucky. I can't really think of any other citations that I've received in a commercial vehicle.
Q. Okay. And the CDLs that you held, they were in Florida and in Georgia, right?
A. Yes, sir.
Q. So would the best way to know, you know, any sort of citations or anything like that just be to look at your -- at your motor vehicle record for your two CD- -- CDLs?
A. Yes, sir.

Page 39

Q. Okay. All right. Have you ever had -- within -- within the ten years prior to this crash, did you have any sort of moving violations in a non-commercial vehicle?
A. I believe I had a ticket for not wearing a helmet on a motorcycle. I believe there was another instance where I had a ticket for driving too fast for conditions in a car. That's all I can really -- that's all I can recall at the moment.
Q. Okay. All right. I understand. And, again, would -- would looking at your -- at your, you know, motor vehicle record be the best way to determine what violations you may or may not have had?
A. Yes, sir.
Q. Okay. All right. This question is not intended to -- to embarrass you or anything like that, but I have to ask it of everyone I depose. Have you ever been convicted of any crimes?
A. Convicted? No, sir, I've not been convicted or charged with any crimes.
Q. Okay. Have you ever been arrested?
A. No, sir.
Q. Okay. All right. All right. The --

Page 40

when you were waiting in the two-week period there waiting for them to repair your truck, did you have any more conversations with the safety director about what had happened?
A. If I did, I don't recall. The only things I really recall was really just communicating with the operations side of the business trying to find out when -- when we were expecting repairs and, you know, trying to rush this along without, you know, sitting there longer than necessary.
Q. Okay. All right. What -- so when you started with Waletich, how did you find out about Waletich?
A. A friend of mine who also worked for Total Transportation knew somebody there and had basically talked me in to making the move.
Q. Okay. And what was your application process like?
A. I think I applied online.
Q. Okay. So you applied online. I think I kind of asked you this earlier but I'm not sure it was 100 percent clear. Did -- did you do a check ride with Waletich before starting to drive a commercial motor vehicle on their behalf?

Page 41

A. I -- I would imagine so. That's normal -- that's normal for all new employment.
Q. Sure. Sure. And -- but I think -- but my question is just a little bit different, and it -- I guess my question is, do you remember specifically doing -- doing a test ride with Waletich before you started operating vehicles on their behalf?
A. I don't -- I don't think I -- no, sir, I don't remember specifically doing that.
Q. Okay. And you may -- and you very well may have. You very well may have. I just need to know if you remembered or not essentially.
A. Okay.
Q. Okay. And then -- so when you started with them, you know, did you have to tell them about your previous employers?
A. Yes, sir.
Q. Okay. Do you know if they reached out to any of your previous employers?
A. Yes, sir, they did.
Q. Okay. All right. How do you know?
A. I'm still friends with a young lady at Total. I call her a young lady. She's old enough to be my mother. But she -- she is the

Page 42

one that those requests go through, and so that's how I found out it happened.
Q. I gotcha. So she gave you a heads-up?
A. More or less she asked me why I was leaving.
Q. Oh, man. I gotcha. I gotcha. Okay. All right. And so once you began with Waletich, did they provide you with any sort of training?
A. Define training.
Q. Okay. Did -- let's start kind of -- we'll break it down and go -- and go step-by-step. So did they provide you with any sort of classroom instruction regarding their policies and procedures for their drivers?
A. There was definitely some safety videos. I think I was the only person in that orientation.
Q. Okay. All right. So from your memory, you get a classroom -- a classroom orientation when you first started to kind of learn what they wanted you to do?
A. Yes, sir.
Q. Okay. Did you do any sort of behind the wheel training with anybody from Waletich?
A. No. I don't believe so.

Page 43

Q. Okay. How long was your -- how long was the orientation that you were just telling me about?
A. If it was a whole week, it would surprise me. I'd have to say maybe two or three days.
Q. Okay. All right. Did anybody -- did anybody ever give you any sort of, you know, safety briefings or -- or kind of team meetings that you had during your time with Waletich about safe driving?
A. I believe we had some safety -- safety briefings. I don't recall if they -- I don't think they came to us via video. I think they came to us in the form of a flyer and -- with questions at the end to check for understanding.
Q. Okay. All right. So you had some quizzes and stuff like that?
A. Yes, sir.
Q. Did you do any quizzes or anything like that during your orientation?
A. I imagine that -- well, let me back up. Yes, I do believe that some of those safety videos in orientation came with quizzes to check for understanding as well at the end.

Page 44

Q. Okay. And so -- all right. I think I understand. So with Waletich, during your whole time of employment, you had an orientation that was, you know, a week or less; is that fair to say?
A. I think that'd be fair, yes.
Q. Okay. And then during that, there were, you know, videos and -- and possibly some quizzes and stuff, but no -- no behind the wheel training; is that fair to say?
A. Correct. No behind the wheel training.
Q. Okay. And then also you had some safety meetings and some quizzes to check for comprehension and some handouts as well; is that fair to say?
A. Yes, sir.
Q. Okay. Was there any other sort of training that you were given during your time with Waletich?
A. Nothing that stands out in my mind.
Q. Okay. All right. I understand. And that's -- and that's just from your memory, that's what you can remember?
A. Correct.
Q. Okay. All right. All right. Were you

ever confronted with any sort of dash cam footage of a truck you were driving and given sort of, you know, Hey, we noticed there was a hard braking event or something like that and we think -- you know, we want you to know it's important to follow at a bigger distance or anything like that?

A. I may have gotten one of those calls. The calls I remember the most receiving, though, was basically being told that I did a good job after being cut off by a car. I remember getting a couple of those phone calls saying, Hey, you did everything you were supposed to. You did the right thing. Keep up the good work.

Q. Okay. And do you take that to mean that, you know, someone had received an event from the dash cam and that that told them, Hey, I need to review this and then they would call and give you feedback based on what happened?

A. I'm not really sure how the camera system operates, to be honest. But clearly an event had to have been detected somehow and then later reviewed.

Q. Okay. All right. And who would call you on -- when -- for those sort of calls that


you were just describing? Was it the safety director?

A. Yes, sir. Mr. Dave Hensche.

Q. Okay. Did you have any other supervisors at Waletich?

A. I mean, on the operations side of things, Mark -- I think his last name is Prochaska or something like that.

Q. Okay. Other than the safety director, was there anybody else involved in supervising specifically your driving?

A. Supervising my driving? As far as safety is related?

Q. Yes, sir.

A. No, sir.

Q. Okay. And the operations gentleman that you were talking about, was he kind of in charge of schedules and stuff like that?

A. He would have been over the -- the load planning and the -- the freight side of things. That would have been how I would have gotten my assignments was through him and the girls who work for him.

Q. Okay. All right. Let's see. I think -- I think earlier you told me your -- your


current CDL is from Georgia, right?

A. Yes, sir.

Q. When did you -- when did you switch your CDL from -- from -- when did you switch your CDL from Florida to Georgia?

A. I think it would have been sometime in 2016.

Q. Okay.

A. But I'm not sure.

Q. I understand. When you were given -- when you got your Florida -- or sorry. When you got your Georgia CDL, were you given a Georgia CDL Manual?

A. If I was, I don't recall.

Q. Okay. When was the last time you looked at a CDL Manual?

A. State issued, I'd have to say it's been a little while.

Q. Okay. And when you say a little while, do you mean, you know, essentially since you got your CDL? Is that fair to say?

A. I wouldn't say -- I wouldn't say since I got my CDL. I -- I know that I looked at the Georgia CDL Manual while I taught at the college. I -- I really don't remember enough about it to


tell you specifically what the state of Georgia has to say.

Q. Okay. All right. I understand. Do you think that's a good source of information for -- for a driver who wanted to know how to drive safely?

A. I think it's a -- I think it's a good source of knowledge. I wouldn't say it is the end-all be-all of how to drive a truck.

Q. Okay.

A. But the difference basically between theory and practice.

Q. Okay. Would you -- is there any other, you know, kind of resource you would point to and say, That's a good source of information too?

A. A lot of CDL schools have some good publications that they use.

Q. Okay. Were you ever trained on using like the Smith System or anything like that?

A. I can remember hearing about the Smith System. If I received training on the Smith, it would have been with Werner, and I don't remember it.

Q. Okay. From my recollection, I know CRST has -- has some sort of system they use too. You

spent some time driving for CRST; is that right?
A. I did drive for them briefly, and -- but I did not go through any type of training with them. It was -- I came on as a qualified driver.
Q. Okay. When was -- what was the last -- did you -- sorry. That's a terrible start to a question. Let me -- let me rephrase.
Have you ever gone through a training program with a company after you graduated from truck driving school?
A. Training for driving a truck?
Q. Yes, sir.
A. I mean, outside of the standard safety videos and stuff that, you know, they -- different companies release monthly or quarterly. Definitely not anything hands-on.
Q. Okay. All right. Would you agree that, you know, of all the space around your vehicle, the area ahead of you, the space you're driving into, is the most important?
A. Yes, I'd have to agree with that.
Q. Okay. On the date of this crash, was there anything that distracted you in the cab of the truck? So, say, a cell phone or the radio or anything like that?



A. There was a pickup truck traveling just behind my trailer in the passenger lane -- the -- the right-hand lane that was flashing his lights. Usually that's somebody trying to communicate something, trying to get a driver's attention.
Q. Okay. All right.
A. I still don't know what he was flashing about. He probably was wanting to get around me, so...
Q. Yeah. I understand. So is that -- is it -- is it -- you know, especially when we're talking about a rear-end collision, I know you did not obviously mean to drive into the back of my client's vehicle. That's rarely ever the case, if ever.
So is it fair to say that the -- the gentleman flashing his lights behind you distracted you and that's what caused you to run into the back of my client?
A. I would say it was contributory.
Q. Okay. All right. I understand. Give me -- give me just a few minutes here. I will have some more questions for you, but not too many more hopefully, but I just want to review my notes and make sure that I've -- I've kind of



gone through all the stuff. I think I should have you -- have you out of here pretty quickly here.
A. Of course. Would it be all right to take a quick break?
Q. It would be absolutely a great time for you to take a quick break.
A. Awesome. Thank you.
Q. Thanks.
VIDEOGRAPHER: All right. The time is 2:01 p.m., and we are off the record.
(A recess was held.)
VIDEOGRAPHER: All right. The time is 2:07 p.m., and we are back on the record.
Q. All right. Where were you coming from on the day of the crash?
A. I believe it was somewhere in Charleston.
Q. Okay. What were you hauling, do you know?
A. You'd have to refer to the -- my bills -- bill of lading for that day.
Q. Okay. All right. Do you -- well, so let me -- let me ask it this way. Were you -- did you have some sort of -- a load?



A. Yes. My vehicle was loaded.
Q. Okay. All right. And you were coming from somewhere in Charleston, and you were headed back up to Minnesota?
A. Yes, sir.
Q. Okay. All right. I understand. What -- do you remember what day you were on in terms of your duty cycle?
A. I do not, sir.
Q. Okay. All right. When you would go from -- would you go do that route often from Minnesota to Charleston and Charleston to Minnesota?
A. From Charleston to Minnesota, I had done many times. Most of their freight was out and back from Minnesota. I'd take something either down to Florida or to Atlanta, and depending on freight, I'd get sent to Charleston.
Q. Okay. All right. So just so I understand, what -- so where were you -- where were you based out of? Where was home?
A. Home is Byron, Georgia.
Q. Okay. All right. And so, you know, if you were -- if you were starting kind of -- I would assume -- did you spend your days off at

Page 53

home?
A. Some of them. As much as I could.
Q. Okay. And so if you were kind of starting from home, you would go to wherever they needed you to pick the load up and then you'd take it to -- back to Minnesota?
A. Yes, sir.
Q. Okay. All right. I understand. During your -- your whole time with Waletich, did you ever receive any specific training on following distances?
A. If I did, I don't recall.
Q. Okay. All right. Were -- were you driving a 53-foot dry van on that day?
A. Yes, sir.
Q. Okay. All right. What is -- what is your cell phone number, sir?
A. 478-397-1315.
Q. Okay. And who is the carrier?
A. AT&T.
Q. Okay. And are you the account holder?
A. I am not.
Q. Okay. Who is -- who is the account holder?
A. My husband, John Oliver Williams.

Page 54

Q. Okay. All right. Thank you. All right. Would you agree with me that as a -- as a truck driver, you had an obligation to follow the Federal Motor Carrier Safety Regulations?
A. I would agree with that.
Q. Okay. And particularly on the day of this crash, since you had a load and you were headed to Minnesota, would you agree with me that those -- that those relevant regulations applied to you?
A. I would say so, yes.
Q. Do you consider yourself a professional driver?
A. You'd have to define what makes somebody a professional driver.
Q. What -- what -- what would you define as a professional driver?
A. A driver who is safe and courteous, who makes every reasonable attempt to avoid unsafe things.
Q. Okay. All right. And so by that definition, would you consider yourself to be a professional driver?
A. I would have to say that that is what I hope to be.

Page 55

Q. Okay. All right. Is driving a tractor-trailer different than driving a car?
A. How so?
Q. Okay. Is -- is -- why -- is it important to drive a tractor-trailer different than you maybe drive a personal vehicle?
A. I would have to say that -- I mean, there's clearly some big, you know, differences between the two, between weight and, you know, length of vehicle, considerations. So, yes, I guess so.
Q. Is it difficult to drive a tractor-trailer?
A. Difficult how?
Q. Well, are there other kind of additional challenges and considerations that you don't have when driving a car?
A. Well, you often have to understand how your vehicle will react in -- in different driving scenarios in order to better avoid obstacles and other things that you may encounter on the road.
Q. Okay. All right. And that's due to the size; is that fair to say?
A. Size, weight. I mean, there are some advantages from sitting up that high, certainly.

Page 56

Q. Okay. Okay. All right. I understand. Thinking back to the day of this crash, what would you do differently?
A. I would definitely increase my following distance considerably.
Q. Okay. So one of -- one of the -- the -- the causes of action that -- that my client has brought against Waletich is negligent hiring, training, and supervision. Do you think that you were adequately trained when -- when you began with Waletich?
A. I feel like I was.
Q. Okay. All right.
MR. KLAASMEYER: All right. Sir, I do not have any more questions for you. Your attorney may have some, and then I may have follow-ups based on that. But otherwise I don't have anything else for you.
MR. MOSELEY: I don't have any questions.
VIDEOGRAPHER: All right. This concludes the video deposition of Jonathan Williams. The time is 2:14 p.m., and we are off the record.

Page 57

(The deposition was concluded at 2:14 p.m.)

Page 58

CERTIFICATE

I, Paula Maxwell, Notary Public at Large, do hereby certify that the witness in the foregoing deposition was duly sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition took place virtually via video conference. The testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed by computer-aided transcription. The foregoing is a full, complete and true record of the testimony of the witness and of all objections made at the time of the examination.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on February 27, 2026.

PAULA MAXWELL
My Commission expires
November 3, 2031

## WORD INDEX


< 1 >
**1:03** 1:15 4:5
**1:05** 6:8, 11
**100** 13:19 40:23
**1099** 13:2
**14** 9:1, 19 15:2 16:5

< 2 >
**2:01** 51:11
**2:07** 51:14
**2:14** 56:24 57:2
**200** 1:19
**2012** 16:5
**2016** 15:25 47:7
**2018** 14:6, 25 15:2
**2021** 14:7
**2026** 1:14 4:5 58:21
**2031** 58:25
**25** 1:14
**25th** 4:5
**27** 58:21
**29** 1:19
**29405** 2:5
**29407** 1:19
**29687** 2:10

< 3 >
**3** 58:25
**3rd** 2:5

< 4 >
**4** 3:1
**4324** 2:9
**4401** 2:5
**478-397-1315** 53:18

< 5 >
**5:25-cv-08705** 1:8
**53-foot** 53:14
**55** 18:5
**58** 3:4

< 6 >
**65** 18:5

< 8 >
**843-762-6294** 1:20

< A >
**able** 6:25
**Absolutely** 34:3 51:6
**accepting** 36:25
**accident** 22:9
**account** 53:21, 23
**accusation** 37:2
**accuse** 36:23
**action** 35:18 56:8
**actual** 18:6 19:8 27:4, 8
**additional** 55:15
**additionally** 8:14
**adequately** 56:11
**advantages** 56:1
**affixed** 58:21
**afternoon** 4:21
**ago** 4:23 5:7
**agree** 18:25 31:15 49:17, 21 54:2, 5, 8
**ahead** 49:19
**AI** 32:7, 8
**Air** 10:22, 23 18:13, 15
**Alcoa** 15:13
**analysis** 34:7, 9, 10
**Android** 26:10, 13
**answer** 6:17 8:1, 11 34:16 36:12
**answering** 8:9
**answers** 8:15
**anybody** 6:23 7:8 16:23 17:3 20:21, 22 21:10, 12 22:3, 21 28:14 34:12 42:24 43:7, 8 46:10
**app** 28:4, 8
**apparently** 28:4
**appearances** 2:2
**application** 40:18
**applied** 40:20, 21 54:9
**Approximately** 9:1
**apps** 27:25 28:9
**area** 11:4 49:19
**Arizona** 11:3
**arrested** 39:23
**arrive** 21:1
**asked** 6:17 21:15, 16 30:15 40:22 42:4
**asking** 5:6 7:11 8:10 20:11
**assignments** 46:22
**assume** 52:25
**AT&T** 53:20
**Atlanta** 52:17
**attempt** 54:19
**attention** 50:5
**attorney** 4:23 6:24 7:5, 24 56:17
**auto** 24:8
**automatic** 32:10
**automatically** 29:6
**Avenue** 1:19
**avoid** 54:19 55:20
**avoidance** 29:5
**Awesome** 51:8

< B >
**back** 6:11 11:4 12:22 13:1 14:5 24:22 30:3, 20, 25 31:3 34:25 35:5, 6, 8, 11 43:22 50:13, 19 51:14 52:4, 16 53:6 56:3
**backing** 36:23
**based** 14:24 32:4 45:19 52:21 56:18
**basically** 12:21 37:25 40:17 45:10 48:11
**basis** 10:1, 6
**be-all** 48:9
**began** 42:7 56:11
**BEHALF** 2:3, 7 13:2 40:25 41:8
**believe** 14:5 19:10, 22 21:14 22:6, 17, 24 23:9, 12 26:9 27:19 29:8 32:1 34:20 37:1 38:14 39:5, 6 42:25 43:12, 23 51:17
**believed** 21:23
**Belle** 2:5
**berth** 10:3, 5 25:15, 16, 17
**best** 33:16 38:21 39:13
**better** 55:20
**big** 55:8
**BIGGART** 2:4
**bigger** 45:6
**bill** 51:22
**bills** 11:18 32:22, 23 51:21
**Bird** 15:17
**bit** 5:9 9:23, 24 15:10 19:9 31:19 41:4
**Blue** 15:17
**BOLEN** 1:18 4:7
**borrowed** 25:12
**Boulevard** 2:9
**box** 17:23
**bracket** 30:2
**Bradley** 5:1
**brake** 29:6
**braked** 18:19
**brakes** 18:13, 16, 21
**braking** 45:4
**brand** 25:23 26:7 27:9
**break** 6:15, 18, 22 7:7 42:11 51:5, 7
**briefings** 43:9, 13
**briefly** 49:2
**bring** 18:11
**broken** 30:2, 16
**brought** 56:9
**bugs** 30:21
**bump** 36:21
**bumper** 37:10
**bunch** 5:15
**business** 40:8
**busy** 11:17
**button** 24:16 31:24 32:1
**buttoned** 15:20
**Byron** 52:22

< C >

**cab** 25:15 27:1 28:19 29:1 49:23
**cabs** 10:2
**California** 11:3
**call** 15:16 22:14 41:24 45:18, 24
**called** 9:6 10:15, 22 11:12, 13 19:12 22:17
**calls** 45:8, 9, 12, 25
**cam** 25:22 26:24 31:22 45:1, 17
**camera** 23:5, 12, 13 24:6, 16, 18, 20, 24 25:19, 21, 24 26:2 45:20
**car** 19:1 39:8 45:11 55:2, 17
**career** 9:21
**Cargo** 11:12
**CAROLINA** 1:1
**carrier** 53:19 54:4
**Carvajal** 2:12 4:7
**Case** 1:8 4:24 7:2, 3 50:15
**catch** 31:25
**cattle** 29:20
**cause** 17:10, 15 58:7, 18
**caused** 17:4 29:15 50:18
**causes** 56:8
**causing** 16:21
**CB** 27:12, 15 28:1
**CD** 38:24
**CDL** 9:2, 8, 10, 14, 16 15:1, 2 16:4, 14 47:1, 4, 12, 13, 16, 21, 23, 24 48:16
**CDLs** 38:18, 24
**cell** 49:24 53:17
**centers** 15:16
**certain** 32:5
**certainly** 7:23 56:1
**CERTIFICATE** 3:4 58:1
**certify** 58:4, 17
**challenges** 55:16
**changed** 17:20
**characterize** 33:5, 6
**characterized** 37:14
**charge** 31:5, 12 46:17
**charged** 39:22
**Charleston** 1:19 2:5 51:18 52:3, 12, 14, 18
**check** 13:8 19:11 40:24 43:16, 24 44:13
**chose** 13:14
**citation** 38:8, 14, 15
**citations** 38:16, 22
**cited** 38:7, 11
**clarify** 7:16
**CLARK** 1:18 4:7
**classroom** 42:13, 19
**clean** 8:13
**clear** 24:14 40:23
**clearly** 45:21 55:8
**client** 17:8, 9, 14 19:20 20:3, 4 31:18 50:19 56:8
**client's** 31:17 50:14
**closely** 19:3
**college** 15:18 47:24
**collided** 19:16
**collision** 29:5 37:8, 14, 15, 21 38:7 50:12
**collisions** 36:5, 7, 13, 20 37:6
**Columbus** 10:25
**come** 7:20, 21 11:20 13:11, 14 20:21 27:25 30:22 34:21
**coming** 17:23 18:10 22:1 30:6 51:15 52:2
**commercial** 36:6 37:15, 23 38:3, 4, 11, 17 40:25
**Commission** 58:24
**common** 36:20
**communicate** 50:4
**communicating** 28:14 40:7
**companies** 11:12 15:3 49:15
**company** 10:15, 21, 22 11:9, 16 13:4, 6, 11 14:15 15:12 20:22 22:4, 21 27:6 49:9
**complete** 31:9 58:13
**comprehension** 44:14
**computer-aided** 58:12
**concluded** 57:1
**concludes** 56:23
**conditions** 38:9 39:8
**conference** 58:9
**confronted** 45:1
**confused** 7:10
**consider** 54:12, 22
**Considerably** 18:8 56:6
**considerations** 55:10, 16
**contract** 12:21, 24 13:12 14:22
**contribution** 16:24
**contributory** 50:20
**conversation** 13:14 34:14, 22
**conversations** 19:20 20:5, 7 40:3
**convicted** 39:20, 21, 22
**cooler** 29:16
**Cooper** 4:10, 22 5:21, 23
**CORPORATION** 1:9 4:4
**correct** 14:23 21:8 25:1 37:18 44:11, 24
**cost** 33:20
**counsel** 4:8 58:18
**couple** 11:25 12:2 15:9 17:20 45:12
**course** 17:20 18:10 22:7 30:7, 19 32:23 51:4
**COURT** 1:1 4:6, 14 5:12 8:12, 19
**courteous** 54:18
**courtroom** 5:8
**cracked** 30:15, 20
**crash** 16:20, 21, 24 17:4, 10, 15 18:2, 21 20:15 21:13 22:4 23:4, 8 25:6 30:13 32:15, 16, 17 34:5, 13, 19, 23 35:5 37:25 38:12 39:3 49:22 51:16 54:7 56:3
**crimes** 39:20, 22
**CRST** 16:13 48:24 49:1
**current** 47:1
**currently** 9:13 10:9
**customer** 12:22 36:23
**cut** 45:11
**cuts** 7:15
**cycle** 52:8

**< D >**
**D/B/A** 1:9
**damage** 29:10 30:10 31:17
**dash** 25:18, 22 26:24 31:22 45:1, 17
**data** 24:11
**DATE** 1:14 4:4 49:22
**dates** 12:8
**Dave** 22:7, 10 25:4 46:3
**day** 10:2 16:20 20:6, 8 21:24 23:1, 7 25:6, 15 51:16, 22 52:7 53:14 54:6 56:3
**days** 43:6 52:25
**day-to-day** 10:1, 6
**decided** 14:20
**declining** 33:25
**Defendants** 1:9 2:7
**Define** 42:9 54:14, 16

**definitely** 33:*24* 35:*24* 42:*15* 49:*16* 56:*5*
**definition** 54:*22*
**delete** 24:*8*
**deleting** 24:*21*
**delivered** 35:*10*
**depending** 52:*17*
**DEPONENT** 1:*13*
**depose** 39:*19*
**DEPOSITION** 1:*4* 4:*2* 5:*3* 7:*23* 56:*23* 57:*1* 58:*5*, *8*
**described** 33:*20*
**describing** 46:*1*
**DESCRIPTION** 3:*4*
**details** 19:*9* 22:*19*
**detected** 45:*22*
**detects** 32:*4*
**determine** 39:*14*
**device** 25:*19*, *20* 26:*5*, *8*, *24* 27:*1*
**devices** 28:*19*, *24*
**difference** 13:*4* 48:*11*
**differences** 55:*8*
**different** 13:*23* 14:*10* 41:*4* 49:*15* 55:*2*, *5*, *19*
**differently** 56:*4*
**difficult** 55:*12*, *14*
**director** 22:*7*, *22* 31:*6* 40:*4* 46:*2*, *9*
**disabled** 29:*14* 30:*25*
**disagreement** 31:*5*
**disappointed** 36:*1*
**disciplinary** 35:*17*
**disposable** 23:*5*
**distance** 45:*6* 56:*6*
**distances** 53:*11*
**distracted** 49:*23* 50:*18*
**DISTRICT** 1:*1*
**DIVISION** 1:*2*
**doing** 5:*5* 6:*14* 8:*8* 35:*7* 41:*6*, *10*
**DOT** 36:*7*, *17*, *19* 37:*21*
**Drive** 2:*5* 10:*2* 11:*5*, *6* 40:*24* 48:*5*, *9* 49:*2* 50:*13* 55:*5*, *6*, *12*
**driver** 8:*24* 10:*9* 12:*21*, *24* 13:*5*, *11*, *12* 14:*15*, *22* 17:*13* 19:*16* 20:*10* 21:*11* 28:*3* 48:*5* 49:*4* 54:*3*, *13*, *15*, *17*, *18*, *23*
**drivers** 13:*7* 23:*3* 28:*6* 42:*14*
**driver's** 50:*5*
**driving** 9:*5*, *19* 10:*4*, *8* 15:*20* 16:*17* 27:*18* 35:*8* 38:*8*, *11* 39:*7* 43:*11* 45:*2* 46:*11*, *12* 49:*1*, *10*, *11*, *19* 53:*14* 55:*1*, *2*, *17*, *20*
**dry** 9:*22*, *25* 16:*17* 53:*14*
**due** 55:*23*
**duly** 4:*17* 58:*5*
**dump** 9:*23* 15:*12*
**dust** 30:*21* 31:*19*
**duty** 52:*8*

**< E >**
**earlier** 40:*22* 46:*25*
**early** 14:*6*
**easier** 36:*12*
**easily** 30:*2*
**economic** 33:*14*
**economically** 33:*22*
**EGR** 29:*15*
**either** 13:*11* 21:*19* 36:*22* 52:*16*
**ELD** 26:*7*, *24*
**ELDs** 26:*15*
**electronic** 25:*18* 26:*4* 27:*1* 28:*24*
**embarrass** 39:*18*
**emergency** 19:*13* 21:*14*
**employee** 13:*2*
**employers** 16:*17* 41:*17*, *20*
**employment** 14:*3* 41:*2* 44:*3*
**encounter** 55:*21*
**end-all** 48:*9*
**enforcement** 20:*14*, *19*, *25* 21:*6*, *12*
**engine** 25:*11*
**enjoyed** 33:*11*
**enjoying** 33:*2*
**Enterprises** 16:*15*
**entitled** 7:*12*
**equipment** 9:*20* 12:*19* 13:*1* 25:*18* 35:*11*
**equipped** 18:*13*
**especially** 32:*20* 50:*11*
**essentially** 12:*25* 23:*18* 33:*17* 34:*25* 35:*14* 41:*13* 47:*20*
**event** 45:*4*, *16*, *22*
**events** 32:*5* 58:*19*
**exact** 12:*8*
**exactly** 16:*1* 25:*14*
**EXAMINATION** 3:*1* 4:*19* 58:*10*, *16*
**examined** 4:*17*
**example** 27:*2*
**EXHIBIT** 3:*4*
**EXHIBITS** 3:*4*, *8*
**expect** 5:*20* 6:*14*
**expected** 17:*24*
**expecting** 40:*9*
**experience** 15:*20*
**expires** 58:*24*
**explain** 7:*21*
**explore** 14:*10*

**< F >**
**face** 35:*17*
**facility** 31:*8*
**facing** 26:*1*
**factors** 34:*2*
**fair** 7:*13* 12:*3*, *10* 13:*24* 14:*13* 18:*18*, *24* 20:*4* 33:*1*, *14* 36:*2* 37:*3*, *17*, *19* 44:*4*, *6*, *10*, *15* 47:*21* 50:*16* 55:*24*
**familiar** 26:*17* 28:*8*
**far** 8:*8* 21:*4* 33:*7* 46:*12*
**fast** 18:*3* 38:*9* 39:*8*
**fault** 37:*1*
**February** 1:*14* 4:*5* 58:*21*
**Federal** 54:*4*
**feedback** 45:*19*
**feel** 7:*12* 56:*13*
**fence** 36:*24*
**fill** 23:*6*, *17* 28:*1*
**find** 35:*12* 40:*8*, *13*
**finish** 8:*10*
**first** 4:*17* 6:*15* 9:*2* 16:*8*, *10* 18:*1* 21:*15* 42:*20*
**five** 22:*11*
**fix** 31:*5*, *7*
**flashing** 50:*3*, *7*, *17*
**flat** 38:*15*
**flatbed** 9:*24*
**Floor** 2:*5*
**Florida** 9:*6*, *7*, *8*, *11* 38:*19* 47:*5*, *11* 52:*17*
**flyer** 43:*15*
**follow** 45:*6* 54:*3*
**following** 19:*1* 20:*14* 53:*10* 56:*5*
**follows** 4:*18*
**follow-ups** 56:*18*
**footage** 31:*25* 45:*1*
**forces** 33:*15*
**foregoing** 58:*5*, *13*
**form** 23:*5*, *10*, *15*, *16* 43:*15*
**forward** 26:*1*
**forward-facing** 25:*21*
**found** 42:*2*
**Four** 11:*12*
**free** 7:*12*
**freight** 12:*22* 13:*1* 33:*24* 46:*20* 52:*15*, *18*
**Freightliner** 25:*8*, *14* 29:*19*
**frequently** 27:*17*
**friend** 40:*15*
**friends** 41:*23*

**front** 17:22 19:2, 11 29:21, 24 30:12
**full** 4:24 58:13
**function** 12:18 13:24 28:15 32:7
**further** 58:17
**fuzzy** 19:9

< G >
**Gamecock** 1:19
**Garmin** 27:10, 11
**GEICO** 15:15
**general** 20:10
**generic** 26:13
**Genesis** 2:12 4:7
**gentleman** 46:16 50:17
**Georgia** 9:12, 17 38:14, 19 47:1, 5, 12, 24 48:1 52:22
**getting** 7:14 8:23 31:4 45:11
**girls** 46:22
**give** 4:24 5:19 6:13, 18 38:8 43:8 45:19 50:21, 22
**given** 5:3 44:18 45:2 47:10, 12
**giving** 5:11
**glass** 30:16
**go** 7:7 24:10, 18, 20 42:1, 11 49:3 52:10, 11 53:4
**going** 5:6, 18 6:12 18:1, 3 28:25 31:1 35:7, 12
**Good** 4:21 6:4 24:21 36:24 45:10, 14 48:4, 7, 15, 16
**gotcha** 42:3, 6
**gotten** 45:8 46:21
**GPS** 27:2, 3, 4, 8
**graduated** 49:9
**great** 8:8 27:19 51:6
**grille** 30:22
**ground** 5:19
**GROUP** 2:8
**groups** 17:21
**guard** 29:20
**guess** 13:7 21:25 28:16 30:21 31:4 32:4, 10 35:20 41:5 55:11

< H >
**Hampton** 2:9
**hand** 58:20
**handheld** 27:23
**handouts** 44:14
**hands-on** 49:16
**happen** 7:22, 23
**happened** 5:16 17:18 19:7 24:5, 19 32:15 37:1 40:4 42:2 45:19
**happens** 31:24
**happiest** 33:8
**happy** 6:18, 20 7:21
**hard** 18:20 45:3
**hauled** 12:21
**hauling** 11:2 13:1 51:19
**head** 8:16, 20
**headed** 52:3 54:8
**heads-up** 42:3
**heal** 21:25
**hear** 7:15
**heard** 4:22
**hearing** 48:20
**heavy** 17:19
**held** 6:9 9:10, 16 38:18 51:12
**helmet** 39:6
**help** 28:9
**helps** 8:12
**Hensche** 22:7 46:3
**hereunto** 58:20
**Hey** 5:21 45:3, 12, 17
**high** 32:23 56:1
**hindsight** 19:4
**hiring** 56:9
**hit** 24:15 31:23
**hold** 9:14
**holder** 53:21, 24
**home** 15:10, 11 31:10 52:21, 22 53:1, 4
**honest** 27:14 29:22 45:21
**hood** 30:19
**Hoosier** 10:22, 23 11:9
**hope** 54:25
**hopefully** 50:24
**Hospice** 15:15
**hours** 22:11
**hurt** 21:21, 24
**husband** 53:25

< I >
**identified** 18:10
**identify** 4:8
**II** 2:4
**imagine** 20:18 22:17 25:4 41:1 43:22
**immediately** 32:16
**impact** 18:7 19:8 22:11, 12 30:23
**important** 45:6 49:20 55:5
**incident** 23:10, 16
**including** 6:23
**increase** 56:5
**INDEX** 3:1
**Indiana** 10:25
**informal** 5:10
**information** 28:25 48:4, 15
**initially** 16:14 31:2
**installed** 27:22
**instance** 39:7
**instruction** 42:13
**instructs** 7:25
**intended** 39:18
**interested** 58:19
**interstate** 17:19
**involved** 22:8 23:4 36:5, 12 37:20 46:10
**involving** 37:15
**iPhone** 24:1, 3, 15
**issued** 47:17
**issues** 25:11 29:15

< J >
**Jacksonville** 9:6
**JAMES** 2:4
**jerk** 8:17
**job** 8:8 12:18 28:9 33:7 45:10
**jobs** 15:9
**John** 53:25
**JONATHAN** 1:4, 9, 13 4:2, 16 5:1 56:23
**JR** 2:8
**July** 10:19, 21
**jury** 20:2

< K >
**keep** 7:8 8:13, 14 11:17 27:21 45:14
**Kellems** 15:12, 13
**Kentucky** 38:15
**kind** 5:19 6:13 10:3, 7 11:1, 21 12:18 13:4 15:10, 19 16:7 23:24 25:6, 11, 12 27:25 30:10 31:16, 23 32:14 33:2 37:4 40:22 42:10, 20 43:9 46:17 48:14 50:25 52:24 53:3 55:15
**kinds** 9:20
**KLAASMEYER** 3:1 4:10, 20, 22 5:22, 25 6:3 56:15
**knew** 17:22 40:16
**know** 5:16, 19 6:13, 16, 20 7:12, 16 8:15 10:2 12:7 13:3 14:20 15:25 17:7, 21 18:2, 19 20:1, 2 21:10 22:8, 15 23:5 24:13, 14 25:19, 23 26:13 27:5, 12 28:6, 10, 18, 23 29:4, 20 30:15, 17, 22 31:25 32:21 33:13, 20 34:16 35:12, 18 36:14, 19, 21 38:21 39:13 40:9, 10 41:13, 16,

19, 22 43:8 44:4, 8 45:3, 5, 16 47:20, 23 48:5, 14, 24 49:14, 18 50:7, 11, 12 51:20 52:23 55:8, 9
**knowledge** 17:7, 9 18:17 48:8

< L >
**lading** 51:22
**lady** 41:23, 24
**lane** 38:13 50:2, 3
**lanes** 17:20
**large** 32:22 58:4
**LAW** 2:8 5:12 20:14, 19, 25 21:6, 11
**learn** 42:20
**lease** 12:20
**leasing** 12:25 25:10
**leave** 14:9 32:16, 19 34:24
**leaving** 42:5
**left** 14:6 15:25 34:6 38:13
**length** 55:10
**lifetime** 38:1
**liftgate** 31:20
**lights** 29:24 30:15 50:3, 17
**liquid** 30:7
**little** 5:9 9:22, 23, 24 15:10 31:19 41:4 47:18, 19
**living** 15:11
**LLP** 2:8
**load** 46:19 51:25 53:5 54:7
**loaded** 52:1
**local** 15:11
**located** 10:25
**locating** 28:10
**LOCATION** 1:16
**log** 26:4
**logging** 26:17, 20
**long** 6:19 8:24 10:17 11:14, 16, 23 14:2 34:21, 23 43:1
**longer** 32:25 40:11
**look** 38:23
**looked** 21:2, 19 47:15, 23
**looking** 39:12
**lot** 24:11 36:21 37:9 48:16
**Love's** 31:9
**Lytx** 25:19

< M >
**Macon** 15:15, 16
**Macroeconomic** 34:2
**main** 7:22
**maintaining** 33:21
**maintenance** 31:6
**making** 16:24 33:22 36:11 40:17
**Man** 31:11 42:6
**Manual** 47:13, 16, 24
**MARCINAK** 2:8
**Mark** 46:7
**marked** 3:8
**market** 33:12
**matter** 4:3
**MAXWELL** 1:18 4:6 58:3, 24
**maxwell.paula@outlook.com** 1:21
**mean** 12:24 22:15 28:8 35:22 36:7 45:15 46:6 47:20 49:13 50:13 55:7, 25
**meaning** 36:20
**means** 19:1
**meetings** 43:9 44:13
**MELTON** 1:6 4:3, 11
**memory** 42:18 44:22
**message** 22:14
**messages** 24:9, 16
**messing** 37:10
**Midwest** 11:4
**mind** 7:9 44:20
**mindful** 5:12 7:6
**mine** 29:12, 14 40:15
**Minnesota** 12:22 35:1, 6, 11 52:4, 12, 13, 14, 16 53:6 54:8
**minutes** 22:11 50:22
**Mississippi** 10:16 13:17, 23 14:16
**mistakes** 35:23
**model** 25:9 29:8
**moment** 4:23 5:7, 18 18:9 38:5 39:10
**monthly** 49:15
**months** 24:9 32:21
**MORGAN** 2:4
**MOSELEY** 2:8 4:12 5:21, 23 6:1, 5 56:20
**mother** 41:25
**motor** 36:6 37:6, 16 38:3, 4, 11, 23 39:13 40:25 54:4
**motorcycle** 39:6
**move** 40:17
**moving** 15:11 18:3 39:3
**Mulch** 15:12, 13
**must've** 31:11

< N >
**name** 4:6, 22, 24 15:13 21:2 28:2 46:7
**narrow** 36:10 37:4
**necessarily** 24:18
**necessary** 31:10 40:11
**need** 6:15, 19, 20 41:12 45:18
**needed** 21:16 31:1 53:5
**negligent** 56:9
**neighborhood** 18:5
**neither** 58:17
**never** 14:11 32:2
**new** 41:2
**nod** 8:16
**nods** 8:20
**non-commercial** 39:4
**non-preventable** 34:15
**normal** 41:1, 2
**normally** 26:21
**North** 2:5
**Notary** 58:3
**notes** 50:25
**notice** 31:17
**noticed** 18:1 30:12 45:3
**November** 58:25
**number** 53:17

< O >
**Oaks** 2:5
**oath** 5:7, 8
**object** 7:24
**objection** 8:3
**objections** 58:10, 15
**obligation** 5:14 54:3
**oblige** 6:21
**obstacles** 55:21
**obviously** 17:7 35:7 50:13
**occupants** 19:11
**occur** 16:25 18:3
**occurred** 18:7 19:8 34:6
**odd** 15:9
**officer** 20:24 21:1, 5, 12
**official** 21:6 35:24 58:21
**officials** 20:14
**Oh** 34:11 35:4 36:16 42:6
**Okay** 5:5, 25 7:19 8:7, 23 9:2, 7, 10, 13, 18 10:1, 6, 11, 14, 17, 20, 23 11:8, 15, 19, 23 12:1, 7, 17, 23 13:3, 10, 15, 18 14:1, 8, 13, 19, 24 15:6, 19, 23 16:3, 12, 16, 19, 23 17:6, 12, 17, 25 18:6, 12, 18, 25 19:6, 14, 19, 25 20:9, 11, 13, 20 21:3, 9, 15, 17 22:2, 13, 20, 25

23:16, 19, 22, 24 24:2, 5, 12, 23 25:2, 5, 13, 17, 23 26:4, 7, 12, 20, 23 27:9, 11, 16, 24 28:12, 14 29:4, 10, 17, 23 30:4, 9, 24 31:16, 21 32:6, 13, 19 33:1, 6, 10, 13, 18 34:2, 17, 23 35:4, 10, 15 36:4, 9, 18 37:3, 11, 13, 19 38:6, 10, 18 39:1, 11, 17, 23, 25 40:12, 18, 21 41:11, 14, 15, 19, 22 42:6, 10, 18, 23 43:1, 7, 17 44:1, 7, 12, 17, 21, 25 45:15, 24 46:4, 9, 16, 24 47:8, 15, 19 48:3, 10, 13, 18, 24 49:5, 17, 22 50:6, 21 51:19, 23 52:2, 6, 10, 19, 23 53:3, 8, 13, 16, 19, 21, 23 54:1, 6, 21 55:1, 4, 23 56:2, 7, 14
**old** 41:24
**older** 24:9
**Oliver** 53:25
**once** 42:7
**ones** 21:15
**online** 40:20, 21
**open** 24:14
**operated** 9:20
**operates** 45:21
**operating** 12:19 37:16 38:2, 4 41:7
**operations** 40:7 46:6, 16
**operator** 12:20
**opportunities** 14:11
**option** 13:11 33:16
**ORANGEBURG** 1:2 31:9
**order** 11:18 24:7 55:20
**orientation** 42:17, 19 43:2, 21, 24 44:3
**OTR** 33:7, 9
**Outside** 37:8 49:13
**owner-operator** 14:12, 21 33:3

< P >
**p.m** 1:15 4:5 6:8, 11 51:11, 14 56:24 57:2
**PA** 2:4
**packet** 23:4
**PAGE** 3:1, 4
**paid** 13:7
**park** 28:13
**parking** 36:21 37:9
**part** 12:12
**particular** 29:8
**particularly** 54:6
**party** 58:18
**passenger** 17:12 19:23 50:2
**PAULA** 1:18 4:6 58:3, 24
**pay** 11:18 34:1
**pedestrian** 37:24
**pending** 58:19
**people** 33:11 34:7
**Peoplenet** 26:10, 15
**percent** 13:19 40:23
**Perfect** 8:23
**period** 40:1
**permanently** 27:22
**person** 42:16
**personal** 55:6
**personally** 27:17
**perspective** 17:18
**phone** 22:4, 14 23:20, 24 24:7 27:5 45:12 49:24 53:17
**pick** 53:5
**pickup** 50:1
**picture** 24:17
**pictures** 23:20, 22 24:5
**pieces** 30:17
**place** 28:13 30:3 58:8
**Plaintiff** 1:7 2:3 4:11
**plaintiff's** 4:23
**planning** 46:20
**plastic** 30:17
**please** 4:8, 15, 24
**pledge** 33:15
**point** 6:16 22:9 35:19 48:14
**police** 21:5
**policies** 42:14
**possible** 18:9
**possibly** 44:8
**practice** 48:12
**Predictability** 34:9
**PRESENT** 2:12
**preserved** 8:3
**pressures** 33:12
**pretty** 24:21 35:22 36:24 51:2
**preventability** 34:7, 10, 11
**preventable** 34:13, 15
**previous** 32:21 41:17, 20
**Primarily** 9:22, 25 11:3
**prior** 11:8 37:20 38:12 39:2
**Pro** 11:13
**probably** 7:23 13:20 21:24 50:8
**problem** 18:20
**procedures** 42:14
**process** 12:12, 14 40:19
**Prochaska** 46:8
**produce** 11:2
**professional** 54:12, 15, 17, 23
**program** 49:9
**property** 30:10
**provide** 42:8, 12
**provided** 27:6
**proximity** 28:5
**PruittHealth** 15:14
**Public** 58:3
**publications** 48:17
**purpose** 36:11
**push** 32:1
**put** 30:2

< Q >
**Q1** 14:7
**qualified** 49:4
**quarterly** 49:15
**question** 6:17 7:11, 13 8:1, 2, 10 17:2 28:21 36:12 37:5 39:17 41:4, 5 49:7
**questions** 5:6, 16 7:4 8:9 20:1 43:16 50:23 56:16, 21
**quick** 51:5, 7
**quickly** 51:2
**quite** 12:13
**quizzes** 43:18, 20, 24 44:8, 13

< R >
**racked** 32:22
**radiator** 29:15 30:4, 10
**radio** 27:12 28:1 49:24
**ransom** 31:12
**rarely** 50:14
**rates** 33:25
**reached** 41:19
**react** 55:19
**real** 5:14
**really** 7:2 8:19 11:14 18:4 20:12 21:18 22:18 25:25 33:11 38:16 39:9 40:6 45:20 47:25
**rear-end** 50:12
**rear-facing** 26:2
**reason** 6:19 18:21 19:25
**reasonable** 54:19
**recall** 13:13 19:12 20:16 21:6 22:23 23:13 27:14 29:22 30:20 34:14 38:5 39:9 40:5, 6 43:13 47:14 53:12
**receive** 34:18 53:10
**received** 38:13, 14,

17 45:16 48:21
**receiving** 45:9
**recess** 6:9 51:12
**recognize** 19:4
**recollection** 24:14 48:24
**record** 4:2, 9, 25 6:8, 11 8:4, 13 32:4 38:24 39:13 51:11, 14 56:25 58:14
**recorded** 58:11
**reefer** 9:23 11:2
**reefers** 11:6
**refer** 51:21
**regarding** 42:13
**Regulations** 54:4, 9
**related** 46:13 58:18
**relationship** 36:15
**release** 49:15
**relevant** 54:9
**remember** 6:23 16:1 19:14, 15, 19, 24 20:5, 7, 9, 12, 13, 20 21:4 41:5, 10 44:23 45:9, 11 47:25 48:20, 22 52:7
**remembered** 41:13
**renting** 25:11
**repair** 32:22, 23 40:2
**repaired** 25:10
**repairs** 31:10 35:3, 6 40:9
**repeat** 17:1 28:21
**rephrase** 49:7
**report** 23:14
**reportable** 36:19 37:21
**reportables** 36:7, 17
**REPORTED** 1:18
**reporter** 4:6, 14 8:13, 19
**reporting** 23:11
**requests** 42:1
**resource** 48:14
**responsibility** 16:20
**result** 32:17, 24 34:18 35:18
**retowed** 31:8, 13
**review** 45:18 50:24
**reviewed** 45:23
**ride** 40:24 41:6
**riding** 17:14 31:18
**right** 4:1, 21 5:2 6:12 7:19 8:23 9:18 10:17 11:19, 23 12:7, 10 13:15, 18 14:1, 8, 13 15:4, 19 16:3, 16, 19 17:6, 17 18:6, 18 19:25 20:20 21:3, 9 22:2, 3, 20, 25 23:16 24:21, 23 25:2, 5, 6, 13 26:12, 23 27:11 28:3, 17 29:23 30:9 31:21 32:6, 13 33:1 34:4 35:15, 25 36:4 37:19 38:6, 10, 19 39:1, 11, 17, 25 40:12 41:22 42:7, 18 43:7, 17 44:1, 21, 25 45:14, 24 46:24 47:1 48:3 49:1, 17 50:6, 21 51:4, 10, 13, 15, 23 52:2, 6, 10, 19, 23 53:8, 13, 16 54:1, 2, 21 55:1, 23 56:2, 14, 15, 22
**right-hand** 50:3
**road** 10:7 12:15 30:8 55:22
**Roadmasters** 9:6
**Rob** 4:12
**ROBERT** 2:8
**role** 10:8 28:1
**roll** 24:6, 18, 20, 24
**rolling** 24:8
**route** 52:11
**rules** 5:19 6:13 7:20
**run** 50:18
**ruptured** 29:14 30:5
**rush** 40:9

**< S >**

**safe** 28:13 43:11 54:18
**safely** 48:6
**safety** 22:6, 22 27:19 40:3 42:15 43:9, 12, 23 44:12 46:1, 9, 13 49:13 54:4
**Samsara** 25:19
**save** 24:6, 7
**saved** 24:10
**saves** 24:10
**saying** 19:14 45:12
**SC** 1:19 2:5, 10
**scenarios** 55:20
**scene** 20:21 21:13
**schedules** 46:18
**school** 9:5 49:10
**schools** 48:16
**screen** 5:24
**seal** 58:21
**see** 5:24 6:5 7:19 46:24
**send** 24:17
**sense** 7:17 8:5, 21 20:10
**sent** 52:18
**service** 26:9
**services** 19:13 21:14
**setting** 5:10
**seven** 32:21
**shakes** 8:20
**sharply** 37:9
**shattered** 30:17
**shifted** 30:19
**side** 40:7 46:6, 20
**signed** 14:22
**simply** 18:22
**sir** 4:21 7:18 8:22, 25 9:4, 9, 15 10:13 11:7, 22 12:9, 16 13:25 14:18 15:5, 22 16:18 17:5 18:8, 14, 17, 24 19:4, 6 20:8 22:23 23:23 24:4 26:3, 6, 16, 19, 22 27:3 29:2, 3, 9, 13 30:7 32:18 34:20 35:9, 14 36:3 38:20, 25 39:16, 21, 24 41:9, 18, 21 42:22 43:19 44:16 46:3, 14, 15 47:2 49:12 52:5, 9 53:7, 15, 17 56:15
**sit** 24:24 32:24 35:3
**sitting** 40:10 56:1
**situation** 33:12
**six** 24:9 32:21
**six-month** 24:8
**size** 55:24, 25
**sleeper** 10:3, 5 25:15, 16, 17
**slowed** 18:7
**slower** 17:21
**small** 11:11 16:13
**smashed** 29:25 30:1
**Smith** 48:19, 20, 21
**social** 28:15, 16
**software** 26:15
**somebody** 40:16 50:4 54:14
**soon** 34:25
**sore** 21:24
**sorry** 28:22 34:9 47:11 49:6
**sort** 10:7 16:24 19:19 20:14 21:5, 11 25:18 26:25 27:12 28:5, 24 29:5, 20 30:16 32:6, 10 34:6, 18 38:22 39:3 42:8, 13, 23 43:8 44:17 45:1, 2, 25 48:25 51:25
**Source** 11:13 48:4, 8, 15
**SOUTH** 1:1
**space** 18:22 24:7 49:18, 19
**specific** 20:4 37:5 53:10
**specifically** 7:25 19:15 20:5, 23 41:6, 10 46:11 48:1
**specifics** 21:7

**spend** 31:*7* 52:*25*
**spent** 49:*1*
**spoke** 19:*22* 22:*6, 10*
**spoken** 20:*19*
**standard** 49:*13*
**stands** 44:*20*
**start** 36:*8* 42:*10* 49:*6*
**started** 12:*11* 13:*19, 20* 14:*25* 16:*1* 40:*13* 41:*7, 15* 42:*20*
**starting** 40:*24* 52:*24* 53:*4*
**State** 47:*17* 48:*1*
**STATES** 1:*1* 9:*11*
**stay** 32:*25*
**stayed** 34:*20*
**steam** 30:*5*
**stenographically** 58:*11*
**step-by-step** 42:*12*
**stint** 14:*3, 9, 16* 15:*7* 16:*8, 10, 13*
**stints** 11:*11*
**stop** 17:*24* 18:*2, 11, 23* 31:*24*
**stops** 28:*11*
**storage** 24:*11* 31:*3*
**stuff** 5:*17* 30:*5* 43:*18* 44:*9* 46:*18* 49:*14* 51:*1*
**subsequently** 31:*8*
**substance** 6:*24* 7:*4* 20:*17*
**sudden** 17:*23*
**Suite** 1:*19* 2:*9*
**supervising** 46:*10, 12*
**supervision** 56:*10*
**supervisors** 46:*5*
**supposed** 45:*13*
**sure** 8:*10, 18* 17:*3* 25:*14* 26:*14* 28:*23* 30:*24* 40:*22* 41:*3* 45:*20* 47:*9* 50:*25*
**surprise** 43:*5*
**swear** 4:*15*
**switch** 47:*3, 4*
**sworn** 4:*17* 58:*5*
**system** 26:*18, 20* 29:*5* 45:*21* 48:*19, 21, 25*

**< T >**
**tablet** 26:*10, 14*
**take** 5:*8* 16:*20* 23:*19* 24:*15, 16* 45:*15* 51:*5, 7* 52:*16* 53:*6*
**taken** 13:*8*
**talk** 5:*17* 6:*23* 7:*3, 8* 20:*16* 21:*4, 10, 12* 22:*3, 20* 23:*1* 28:*6* 34:*12*
**talked** 7:*5* 23:*2* 26:*25* 30:*11* 32:*14* 40:*17*
**talking** 8:*12* 14:*16* 15:*8* 20:*9, 13* 46:*17* 50:*12*
**taught** 47:*24*
**taxes** 13:*7*
**Taylors** 2:*10*
**team** 43:*9*
**tell** 5:*15* 17:*18* 20:*2* 21:*1, 18, 20, 21* 22:*9, 10* 25:*25* 28:*3* 35:*21* 41:*16* 48:*1*
**telling** 14:*25* 22:*7* 43:*2*
**ten** 39:*2*
**tenable** 32:*25*
**Tennessee** 15:*14*
**terms** 8:*9* 52:*7*
**terrible** 49:*6*
**test** 12:*15* 41:*6*
**testified** 4:*18*
**testify** 58:*5*
**testimony** 5:*12* 6:*25* 58:*9, 14*
**text** 22:*14, 18* 25:*2*
**Thank** 19:*6* 51:*8* 54:*1*
**Thanks** 51:*9*
**that'd** 44:*6*
**theory** 48:*12*
**thereof** 58:*19*
**thing** 5:*11* 8:*7* 14:*12, 21* 23:*14* 26:*11* 28:*5* 45:*14*
**things** 30:*18* 32:*3, 24* 33:*21* 36:*25* 40:*6* 46:*7, 20* 54:*20* 55:*21*
**think** 10:*19* 12:*6* 13:*20* 14:*6, 24* 15:*13* 21:*4* 23:*11, 13, 14* 28:*2* 29:*2* 30:*1* 33:*4, 7* 34:*15* 36:*25* 38:*16* 40:*20, 21* 41:*3, 9* 42:*16* 43:*14* 44:*1, 6* 45:*5* 46:*7, 24, 25* 47:*6* 48:*4, 7* 51:*1* 56:*10*
**Thinking** 56:*3*
**three** 35:*1* 43:*5*
**ticket** 39:*5, 7*
**TIME** 1:*15* 4:*5* 6:*7, 10* 7:*2, 24* 8:*12* 15:*10* 21:*23* 24:*2* 28:*3, 25* 32:*20* 33:*16* 35:*4* 37:*20* 43:*10* 44:*3, 18* 47:*15* 49:*1* 51:*6, 10, 13* 53:*9* 56:*24* 58:*10, 15*
**times** 7:*1* 17:*20* 52:*15*
**tire** 38:*15*
**today** 5:*5* 24:*25*
**Today's** 4:*4*
**told** 32:*2* 45:*10, 17* 46:*25*
**tools** 27:*20*
**Total** 10:*15* 13:*17, 22* 14:*2, 15* 15:*1, 6, 24* 16:*9, 10* 40:*16* 41:*24*
**tough** 35:*22*
**tow** 31:*2*
**towed** 31:*2*
**tractor-trailer** 55:*2, 5, 13*
**traffic** 17:*19*
**trailer** 50:*2*
**trained** 48:*18* 56:*11*
**trainer** 10:*10*
**training** 12:*12, 13* 34:*18* 42:*8, 9, 24* 44:*10, 11, 18* 48:*21* 49:*3, 8, 11* 53:*10* 56:*10*
**transcribed** 58:*12*
**transcription** 58:*13*
**Transport** 10:*22, 24*
**TRANSPORTATION** 1:*9* 10:*15* 13:*17, 22* 14:*2, 15* 15:*1, 7, 25* 16:*9, 11* 40:*16*
**transported** 21:*16*
**traveling** 50:*1*
**tried** 14:*11*
**truck** 8:*24* 9:*5, 23* 15:*12, 20* 17:*23* 18:*13* 23:*1, 2, 3, 7* 25:*7* 26:*3* 27:*13, 15* 28:*10, 20* 29:*1, 4, 11, 12, 13, 25* 30:*13, 24* 31:*2, 23* 37:*9* 40:*2* 45:*2* 48:*9* 49:*10, 11, 24* 50:*1* 54:*3*
**trucking** 36:*14*
**trucks** 9:*19* 10:*3, 5* 27:*18*
**true** 58:*14*
**truth** 5:*15* 58:*6, 7*
**try** 8:*2, 9, 11, 14* 14:*20* 18:*1*
**trying** 8:*17, 18* 23:*11* 31:*12* 40:*8, 9* 50:*4, 5*
**turned** 27:*21*
**Turning** 16:*19* 37:*9*
**two** 12:*5* 22:*11* 35:*2* 38:*24* 43:*5* 55:*9*
**two-week** 40:*1*
**type** 49:*3*
**typically** 27:*20*

**< U >**
**understand** 7:*14* 11:*19* 12:*13* 13:*10,*

19 14:*1* 16:*16* 19:*6* 21:*3*, *9* 22:*2* 23:*19* 24:*12*, *23* 25:*5* 26:*13* 27:*24* 31:*22* 32:*13* 33:*13*, *18* 34:*4*, *17* 35:*15* 37:*3* 38:*6* 39:*11* 44:*2*, *21* 47:*10* 48:*3* 50:*10*, *21* 52:*6*, *20* 53:*8* 55:*18* 56:*2*
**understanding** 13:*6* 14:*14* 16:*4* 32:*3* 35:*16* 43:*16*, *25*
**Understood** 21:*20* 28:*17* 35:*25*
**unexpectedly** 32:*22*
**unfortunately** 35:*1*
**unit** 27:*5*, *8*
**UNITED** 1:*1*
**unsafe** 54:*19*
**unsure** 22:*18* 25:*9*
**upset** 36:*1*
**use** 26:*21* 27:*16*, *17*, *24* 28:*9*, *16* 48:*17*, *25*
**usually** 24:*21* 27:*23* 36:*24* 50:*4*

**< V >**
**van** 9:*22*, *25* 53:*14*
**vans** 16:*17*
**vehicle** 17:*8*, *13*, *14*, *22* 18:*10*, *11* 19:*2*, *10*, *11*, *16*, *23* 21:*11* 25:*9*, *10*, *12* 27:*22* 31:*3*, *6*, *7*, *18* 33:*21* 36:*6* 37:*8*, *16*, *22*, *23*, *25* 38:*3*, *5*, *11*, *17*, *23* 39:*4*, *13* 40:*25* 49:*18* 50:*14* 52:*1* 55:*6*, *10*, *19*
**vehicles** 17:*21* 37:*6* 41:*7*
**verbal** 8:*15*
**versus** 4:*3*
**video** 4:*2* 43:*14* 56:*23* 58:*8*
**VIDEOCONFERENCE** 1:*16* 2:*2*
**videographer** 2:*12* 4:*1*, *7*, *14* 6:*7*, *10* 51:*10*, *13* 56:*22*
**videos** 42:*15* 43:*24* 44:*8* 49:*14*
**VIDEOTAPED** 1:*4*
**violation** 38:*13*
**violations** 39:*3*, *14*
**virtually** 58:*8*
**voice** 6:*1*
**vs** 1:*8*

**< W >**
**W-2** 13:*7*
**Wade** 2:*9*
**wait** 35:*3*
**waiting** 35:*6* 40:*1*, *2*
**WALETICH** 1:*9* 4:*4*, *13* 10:*12* 11:*21*, *24* 12:*11*, *14* 13:*22* 14:*4*, *22* 32:*17* 33:*7* 34:*8* 36:*15*, *16* 37:*7*, *21* 40:*13*, *14*, *24* 41:*7* 42:*7*, *24* 43:*10* 44:*2*, *19* 46:*5* 53:*9* 56:*9*, *12*
**want** 45:*5* 50:*24*
**wanted** 14:*10*, *20* 31:*5* 42:*21* 48:*5*
**wanting** 50:*8*
**way** 38:*21* 39:*13* 51:*24*
**Ways** 11:*12*
**wearing** 39:*5*
**week** 43:*4* 44:*4*
**weeks** 22:*1* 35:*2*
**weight** 55:*9*, *25*
**well** 13:*19* 18:*11* 20:*23* 35:*21* 36:*8* 41:*11*, *12* 43:*22*, *25* 44:*14* 51:*23* 55:*15*, *18*
**went** 14:*5*, *21* 16:*14* 19:*10*
**we're** 5:*5* 6:*14* 8:*11* 14:*16* 50:*11*
**Werner** 16:*15* 48:*22*
**WEST** 1:*6* 4:*3*, *11* 11:*3*
**We've** 15:*2*, *3* 26:*24* 30:*11* 32:*14*
**wheel** 42:*24* 44:*9*, *11*
**WILLIAMS** 1:*4*, *9*, *13* 4:*3*, *13*, *16* 5:*1*, *2* 53:*25* 56:*24*
**willing** 31:*7*
**windshield** 30:*21*
**within-entitled** 58:*7*
**witness** 4:*15* 58:*4*, *9*, *14*, *20*
**word** 7:*14*
**work** 9:*23*, *24* 10:*14* 11:*1*, *2* 15:*6*, *12*, *14*, *15*, *23* 16:*14* 33:*19*, *22*, *24*, *25* 45:*14* 46:*23*
**worked** 13:*21* 15:*4*, *9*, *17*, *24* 40:*15*
**working** 10:*9*, *11*, *20* 33:*8* 37:*7*
**worth** 31:*13*
**wow** 35:*4*
**wreck** 32:*24*
**write** 8:*19*
**written** 8:*18*
**wrong** 18:*15*
**www.clarkbolen.com** 1:*20*

**< Y >**
**yard** 31:*3*
**Yeah** 5:*22* 6:*3*, *12* 31:*16* 36:*8* 37:*18* 50:*10*
**year** 12:*2*, *4* 16:*1*
**years** 9:*1*, *19* 11:*25* 12:*2*, *5* 13:*21* 15:*2* 16:*5* 39:*2*
**young** 41:*23*, *24*

**< Z >**
**Zoom** 7:*15*