# EXHIBIT 3

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION

VIDEOTAPE DEPOSITION OF DAVID HENSCHE
30(b)(6) WALETICH CORPORATION

MELTON K. WEST,
Plaintiff,
vs. CASE NO. 5:25-cv-08705-MGL
WALETICH CORPORATION, d/b/a WALETICH TRANSPORTATION and JONATHAN B. WILLIAMS,
Defendants

DEPONENT: DAVID HENSCHE
DATE: MARCH 25, 2026
TIME: 10 AM
LOCATION: VIA REMOTE VIDEOCONFERENCE
REPORTED BY: RONDA K. BLANTON, RPR
CLARK BOLEN
CHARLESTON, SC 29415
843-762-6294
WWW.CLARKBOLEN.COM

Page 2

A P P E A R A N C E S
(All Appearances via Videoconference)

ON BEHALF OF THE PLAINTIFF:
MORGAN & MORGAN
BY: COOPER KLAASMEYER, ESQ.
4401 Belle Oaks Drive, Suite 300
North Charleston, SC 29405
Cooper.klaasmeyer@forthepoeple.com

ON BEHALF OF THE DEFENDANTS:
MOSELEY MARCINAK LAW GROUP
BY: ROBERT D. MOSELEY, JR., ESQ.
4324 Wade Hampton Boulevard, Suite B
Taylors, SC 29616
864-248-6025
Rob.moseley@momarlaw.com

ALSO PRESENT: Arthur Daugomah, Videographer
Clark Bolen

\- - -

Page 3

INDEX

EXAMINATION
BY MR. KLAASMEYER 4
BY MR. MOSELEY 143
BY MR. KLAASMEYER 144
CERTIFICATE OF REPORTER 150

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: We're on the record in the video deposition of Dave Hensche, Rule 30(b)(6) Waletich Corporation in the matter of Melton K. West versus Waletich Corporation, d/b/a Waletich Transportation.

Today's date is March 25, 2026.

The court reporter is -- the court reporter is Ronda Blanton. My name's Arthur Daugomah, videographer with Clark Bolen. The time is now 10:15.

Will counsel please --

MR. KLAASMEYER: Cooper Klaasmeyer here on behalf of Melton West, the plaintiff.

MR. MOSELEY: Moseley for Waletich and Jonathan Williams.

THE VIDEOGRAPHER: All right. Ronda -- Ronda, can you please swear in the witness.

DAVID HENSCHE,
having been first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. KLAASMEYER:

Q. Good morning. As you just heard, my

Page 5

name's Cooper Klaasmeyer. I'm here; and I'm the attorney representing the plaintiff in this action, Mr. Melton West.
What is your name, sir?
A. My name?
Q. Yes, sir.
A. Okay. David Hensche.
Q. All right. Good morning, Mr. Hensche. Have you ever given a deposition before?
A. Yes.
Q. Okay. So you've, obviously, gone through this before. In South Carolina we have some fairly -- or some specific rules that I am required to read you. I'll explain the basics of deposition; and then we'll get into the substance, if that's okay with you.
A. Yes.
Q. All right. So now that the deposition has begun, if you have any questions about what I'm asking you, if there are, you know, if I use a word you don't understand or just didn't hear 'cause Zoom cut out, if, you know, if you lose me for a second because of connection, if you just don't really get what I'm asking, please look to me for clarification. I will happily clarify my

Page 6

question or make it more specific, reform it, whatever I need to do so that you understand what is being asked. Just let me know. All right?
A. Yes.
Q. Okay. If you need a break at any time, please let me know. I'm happy to give you a break and as many breaks as you need for as long as you need.
If you do need that break, just let me know; and I will -- we'll go off the record as soon as I've -- as you've answered whatever the last question I asked was. Is that fair?
A. Yeah.
Q. All right. We've got a court reporter here today taking down everything you and I say. Unlike a normal conversation -- and so we have to do our best to try to avoid talking over each other. That can be hard 'cause in normal conversation, we might do that a lot; but we'll try our best.
Does that sound good?
A. Yes.
Q. Okay. Then the other thing is -- and you're doing a great job with it so far so I appreciate that -- is you -- if you do any sort

Page 7

of kind of nonverbal response, you know, head nod, head shake, thumbs up, something like that, I might say is that a yes, is that a no, whatever it is, so that we can clarify and keep our record clear.
Does that make sense?
A. Yes.
Q. Okay. All right. I think that covered the main substantive rules.
The other thing that may happen in this deposition is that your attorney may object from time to time. May say something like object to the form. Form. Objection. Anything like that.
Unless you're specifically instructed not to answer, you will still have to answer that question; but go ahead and let your attorney get his objection out and then -- and then we will -- you'll know at that point whether to answer or not.
Is that fair?
A. Yes, that's fair.
Q. Okay. All right. I think I've covered everything now, and so we'll proceed with the substance of the deposition.
Is there any reason that you would not

Page 8

be able to tell the full truth today or give a deposition fairly?
A. No. No reason.
Q. Okay. Is there, you know, have you consumed any alcohol or drugs prior to this -- to this deposition today?
A. No, I have not.
Q. Okay. All right. Have you reviewed the notice of deposition for this case or for your deposition today?
A. Yes.
Q. Okay. All right. And as -- as a -- kind of was announced in the beginning of this, this is a 30(b)(6) deposition.
Do you understand what a "30(b)(6) deposition" is?
A. Well, this. I mean, I don't have the legal term for it but --
Q. Fair enough.
Do you understand that you're here today representing the corporation?
A. Yes.
Q. Okay. Who's -- what -- how do you have the authority to speak for the corporation today?
A. How do I have the authority?

Page 9

Q. Yeah. Who told you that you were going to be doing this?
A. The two owners, Brian and Mark.
Q. Okay. All right. Are those -- those two owners that -- that kind of gave you the go ahead to do this today, are they the only owners of the corporation?
A. They are the only owners. It's part of the job.
Q. Okay. All right. And have you given a -- a deposition such as this one where you were speaking on behalf of the corporation before?
A. Yes.
Q. Okay. What is your -- do you work for Waletich Corporation?
A. Yes.
Q. Okay. And what is your position there, sir?
A. Safety director.
Q. Okay. How long have you been the safety director for Waletich?
A. Just shy of five years.
Q. Okay. What are your duties as safety director?
A. Well, primarily kind of monitor the

Page 10

driving habits of the drivers, try to -- there are a series of reports I have to go through. I help with the on-boarding process. I make sure I take them out for a test-drive after they've completed everything, make sure that they can drive. Reporting to the owners, setting up insurance claims such as this, and then, of course, representing the company.
Q. Okay. And during your time with Waletich, have you held any other positions other than safety director?
A. Yeah. I was a driver and independent contractor with them for 11 years prior to moving into the office.
Q. Okay. Okay. All right. So you started out as a driver with them for 11 years; and then for the last five years, you've been the safety director?
A. Correct.
Q. Okay. Have there been any other positions you've held with Waletich?
A. No.
Q. All right. Why did you move into the -- into the office?
A. Mostly I was always good with talking

Page 11

with the drivers, getting what needed to be done done. When we -- some of us booked our own loads. So when the opportunity came up, Mr. Waletich offered me the job; and I thought I'd be able to do it.
Q. Okay. All right. And you said before that you've given a deposition such as this one where you were tapped to speak on behalf of -- or on behalf of Waletich.
How many times have you done that?
A. This will be the third time. Twice before.
Q. Okay. And were those for instances such as this one? Truck crashes?
A. Yeah. Truck crashes, yes.
Q. Okay. When was the last time you gave testimony on behalf of Waletich?
A. I don't remember the date. I believe it was -- I believe it was last year.
Q. Okay.
A. I don't -- I don't keep track of the date on that. It was either last year or the year before.
Q. Okay. All right. I understand.
And that's fine. You know, if you -- if

Page 12

you -- if I ask a question ever and you're not 100 percent certain of the answer, please, you know, please tell me, you know, oh, I don't -- I'm not 100 percent certain because that'll make sure that you're -- what you're saying is clear.
Is that fair?
A. Yeah, that's fair.
Q. Okay. And then I appreciate that. I definitely understand not being able to recall the exact date. That's -- that's 100 percent reasonable.
All right. So it's about some time in -- about a year ago is what we think. Was -- what kind of crash was that for? Do you remember?
A. The driver was leaving the parking lot and the trailer, when it side step -- or side walked as he went around the corner, caught the a -- was it -- yeah, driver's rear quarter panel.
Q. Okay.
A. So there was -- there was that.
Q. Okay. All right. Getting into, kind of, what we are talking about today, what is -- do you know when this incident occurred that

Page 13

we're talking about today?
A. Yes. Again, I don't really remember the exact date on the top of my head so --
Q. Okay. What is your -- what is your recollection of, you know, the time period in which this may have occurred?
A. My recollection?
Q. Oh, what do you know is what I should have said.
A. It was in '24. I believe February; but, again, I don't remember the exact date.
Q. Okay. That's fair enough.
So I'll represent to you that we're here talking today about a motor vehicle crash that occurred on February 23, 2024. Is that -- that what --
A. That sounds okay.
Q. Okay. All right. And do you know where this incident occurred?
A. Not the highway, but it was in South Carolina.
Q. Okay. All right. And so what have you done ahead of today to prepare to give this deposition other than speaking with your attorneys?

Page 14

A. Nothing.
Q. Okay. Did you review any documents to prepare for this deposition today?
A. Did I review any documents?
Q. Yeah.
A. I've -- I'm afraid I have not.
Q. Okay. Did you speak to anybody other than your attorneys to prepare for this deposition today?
A. No. Nobody else.
Q. Okay. All right. Did you -- have you reviewed the notice of deposition for this deposition?
A. Yes.
Q. Okay. Let's look at the notice together. All right. Is this the deposition notice that you reviewed, sir? (Indicating.)
A. That's -- yes.
Q. Okay. All right. And did you review this Exhibit A, these topics of examination?
A. Yes.
Q. Okay. And then I'll -- we'll talk more about those in a little bit; but did you review this Exhibit B, documents to be produced?
A. Yes.

Page 15

Q. Okay. All right. And other than this document, is it your testimony that you did not review any other documents in preparing for your deposition today?
A. Specific for this deposition, no.
Q. Okay. All right. Do you understand that your testimony today is binding upon the corporation? So binding upon Waletich?
A. Yes.
Q. Okay. And do you understand that, unless I'm specifically asking, you know, about you yourself, that your answers are supposed to represent all of the knowledge known by Waletich and that is reasonably available to Waletich?
A. Yes.
MR. MOSELEY: Object to the form.
Q. Okay. All right. So let's turn to the first topic of examination listed in the 30(b)(6) notice.
So the first topic is defendant's corporate structure, organization, operations of management, including the nature of defendant's business operations including interstate trucking activities governed by the Federal Motor Carrier Safety Administration.

Page 16

So starting with that topic, what have you done to prepare to speak on that topic?
A. To prepare to speak on that topic?
Q. Yes, sir.
A. Well, are you asking if I made notes?
Q. Well, no. I'm just asking you what you did to prepare to speak on that topic.
A. I --
MR. MOSELEY: Did you have to do anything to prepare for that -- that issue or did you already have that knowledge?
A. I already have that knowledge.
Q. Okay. All right. And so that's fine. If you're leaning on your prior knowledge, that's okay; but I still just need to know if that's the only thing you did, if that makes sense.
A. Yes.
Q. Okay. All right. So other than -- other than, you know, you know that throughout the -- you know, from your experience and working with the company, is there anything else you did to prepare to talk about that?
A. How far back are we talking? Because, obviously, I had to go through all that stuff, you know, in order to prepare the documents for

Page 17

this lawsuit.
Q. Sure, sure. Well, that's fine.
A. If you're talking about --
Q. You can include that as well. And that's -- that's -- that's kind of why the question is so broad. Because I need to know everything you've done that you consider in preparation to talk about that topic.
A. Okay. There is no timeline. It's from when we got notice? Is that what you're saying?
Q. Sure.
MR. MOSELEY: Hey, let me -- let me help, Cooper.
Dave, he's asking you, what did you do to prepare for No. 1? Okay. Which is about corporate structure of the company. So if you didn't do anything to prepare for that other than your day-to-day job, you can say that. But the -- the -- but he's just wanting to know, did you do anything beyond just your five years in the office to prepare for that question?
THE WITNESS: No.
Q. Yeah. And that's fine. Some of this stuff that you may have -- you may have done something more. If not, that's okay. I just

Page 18

need to know, if that makes sense. It doesn't matter necessarily if you did or didn't. It's just I need to know what -- what you did, if anything.
Is that fair?
A. Yes. I understand.
Q. Okay. All right. All right. So tell me what is -- what is the corporate structure starting with yourself? So how many employees do you manage?
A. Of course, the amount of drivers we have will fluctuate; but right now we have about 130. Somewhere between 130 and 140.
Q. Okay. And are you the safety director above all of those drivers?
A. Yes. I'm the -- I'm the safety director for everyone, yeah.
Q. Okay. Do you have any -- any intermediate employees between you and the drivers who would supervise the drivers?
A. No. That's almost specifically my job is to talk to the drivers.
Q. Okay. So some trucking companies I talk to will have something like, you know, a shop manager where, you know, they have a few drivers

Page 19

or, you know, ten drivers, whatever it is, and then they -- they're broken out into teams like that.
Does Waletich have anything like that?
A. The shop manager or the -- the different managers take care of their departments. When it comes to talking to the drivers directly, that is almost always delegated to me.
Q. Okay. Did Jonathan Williams at the time of this crash have any supervisor other than yourself?
A. Well, there's a head of dispatch.
Q. Okay.
A. So, obviously, that would be considered a supervisor; and then there's no one particular dispatcher. So whoever was dispatched -- whoever dispatched him the load would be the person he talked to directly.
Q. Okay. All right. So other than yourself, people who would be responsible for supervising Mr. Williams would be -- there's, obviously, a head of dispatch is indirectly responsible for, you know, dispatch in general. And then you've got a dispatcher -- a specific dispatcher who would have dispatched him for that

Page 20

load?
A. Yes.
Q. Okay. Is there anybody else, other than you, the head of dispatch, and the dispatcher specifically who would be responsible for managing Mr. Williams on the day of this crash?
A. Directly? No.
Q. Okay. Do you have any -- any, you know, safety subordinates? So anybody who works in safety with you under you?
A. We all -- a lot of the different -- a handful -- well, there's only about 15 of us that work in the office.
Q. Okay.
A. So a lot of times the tasks will get shared.
Q. Okay.
A. So I do have people that will produce reports for me or oversee the upkeep and the updates on insurance policy -- or claims but they don't directly work in my office.
Q. Okay. Who -- who produces reports for you? What is their job title?
A. Don't have a title.
Q. Okay.

Page 21

A. Bruce Waletich makes a PC report. The guy that's not behind the front desk, he makes a report.
Q. What is -- what is that guy's report? What is that about?
A. Blake. We do weekly to biweekly -- depends on how busy it is. We'll pull a report and shows the on-duty status of every driver for the week. We'll flag the ones that look like maybe there should be -- be some corrections. And then one of us will go back through that driver's logs just to make sure they're compliant.
Q. Okay. All right. So Bruce Waletich pulls a PC report? So what is a "PC report"?
A. Personal conveyance.
Q. Okay. What is that? What is that? If I -- if I, you know, if a jury didn't know what that was, what do you tell them?
A. Personal conveyance is driving the -- the commercial motor vehicle in an off-duty status. There's very specific rules to that so --
Q. Okay. So Bruce Waletich will pull a personal conveyance report. Blake -- and then I

Page 22

don't think you said his last name -- would pull just kind of the on-duty status report?
A. Yes. It's Blake Waletich.
Q. Waletich. Okay.
All right. Blake Waletich will pull a general on-duty status report. Are there any other reports you would get?
A. The -- the other reports, typically, the other main report that is generated in the office, I make myself.
Q. Okay. And what's that report?
A. It just observes their speeding, if there is any, how much it would be based off observations; and we just post it to let drivers know how well they're doing.
Q. Okay. And how do you know? What are you -- what are you monitoring to see that?
A. It's a web -- a company called SpeedGauge sends a -- a report every week. I only -- but the report I make comes from a -- three different ones. Two of them I have to look up from their website.
Q. Okay. And so SpeedGauge has that data available. How do they have that data?
A. It's -- I don't know the technical

Page 23

exact. It's part of the -- the PeopleNet system. So that's our on-board e-logs.
Q. Okay. All right. Okay. Do you -- well, let's go back to, kind of, what the topic is. So Bruce Waletich, I assume, is that one of the owners?
A. No.
Q. Okay. All right. Is that one -- maybe an owner's family member?
A. Yes.
Q. Okay. All right. And what -- so Bruce does not have a title. Is that --
A. I think in the website, they call him the PC compliance manager or something like that that -- it's Brian Waletich's dad.
Q. Okay. All right. And so maybe we should start there and go -- go upwards rather than downwards at first.
So who's -- you know, who's the top -- top authority of the company?
A. Brian Waletich is the -- the -- end -- end of the line as far as who has the most say.
Q. Okay. And that's one of the owners?
A. Correct.
Q. Okay. In terms of the two owners, is --

Page 24

is Brian, you know. Does Brian own a larger share, or has he had a title that gives him special authority to say he's the No. 1 guy?
A. I don't -- I don't know the shared -- how it's divvied up. That's never been discussed. He's the president. Mark Prochaska is the other owner. He's the vice president.
Q. Okay. All right. I understand. All right. So Brian Waletich is the president; and because of that, he's the No. 1 authority of the company.
A. Right.
Q. And then Mark is the -- is -- it sounds like No. 2. Is that fair to say?
A. That would be correct.
Q. And he's also a co-owner?
A. Yes.
Q. Okay. He's vice president and a co-owner. All right. So is there anybody directly below Mark?
A. Jessica Dickmeyer is chief administration officer.
Q. Okay. Is -- is Jessica -- is Jessica the head of the -- or is she above you?
A. We don't really operate like that. I'll

Page 25

be honest with you. She -- we work together. So if she has more authority than me, I -- I don't know if I would ever say she's flexed it.
Q. Sure. Sure. And -- and the -- the reason I ask is just to understand what the corporate structure is.
And so would you consider yourself on the same level of, you know, the -- if you -- if we were drawing a tree to, you know, for a corporate diagram, would you consider --
A. I understand.
Q. -- yourself at the same level?
A. As Jessica? Well, she's got the better title, I guess. So maybe not.
Q. Okay. All right. So it's a little bit ambiguous. Is that fair to say?
A. Right. We -- we work -- we all work together to try and accomplish what needs to be done. So who's in charge of who doesn't come up.
Q. Sure. All right. All right. And so would you -- would you say that you report directly to Mark?
A. Whenever I have to report anything of significance, I report to Mark, Brian, Jessica all at the same time.

Page 26

Q. Okay. All right. I understand.
All right. Would -- is there anybody else that -- that kind of works under that triumvirate of Brian, Mark, and Jessica and would report directly to them like you do?
A. Ashley Olson. But me and her are -- she's -- I don't even know what her title is, to be perfectly honest with you. I just know she has one. We don't interact anything other than if I have to talk to a driver. She's part of dispatch.
Q. Okay. Is she the head of dispatch?
A. No. No. Mark is.
Q. Okay. So what does Ashley do?
A. Other than dispatch, I know -- I suppose -- I don't even know. I don't know. These -- these -- these are things that just don't come up in conversation all that much. Like I said, there's a handful of us there. We all work together.
Q. Sure. I understand.
But -- so you don't -- on a day to day, she works in dispatch. Is there any -- any other responsibilities that you know she has?
A. No. I -- I don't ask. It's not -- it

Page 27

doesn't affect me in any way.
Q. Okay. Would you agree with me that Ashley Olson knows what she does?
A. She's been there longer than me. So I would -- I would expect she's pretty good at her job by now.
Q. Okay. Would you agree with me that Jessica knows what Ashley does?
A. Well, yeah. I mean -- yeah, I wouldn't -- I would -- I would probably say she would probably be able to answer that.
Q. Okay. Would you --
A. Specifically.
Q. All right. I understand.
Would you agree with me that Mark knows what Ashley does?
A. I would agree.
Q. Okay. And would you agree with me that Brian knows what Ashley does?
A. I would agree.
Q. Okay. And is -- is it also fair to say that you did not talk to Brian, Mark, or Jessica to prepare for this deposition today?
A. No. I didn't talk to anyone other than the lawyer. I mean, again, you'd have to give me

Page 28

a timeline for me to give you a completely honest answer 'cause you can't -- I can't say I never talked to them about this claim.
Q. Sure. Okay. Well, let me -- let me specify this.
So did -- did you talk to Brian, Mark, or Jessica about what Ashley Olson does to prepare for this deposition today?
A. No.
Q. Did you talk to Ashley about what Ashley does to prepare for this deposition today?
A. No.
Q. Okay. Would you agree with me that that information is -- is known to or reasonably available to Waletich?
A. Everybody in the corporation or -- I'm going to need you to be a little more specific sometimes.
Q. Sure.
Well, so that's -- one -- one of the points of the exercise we're doing here today where I'm deposing you on behalf of Waletich is that you are -- have an obligation to be prepared to testify about all the information known or reasonably available to Waletich on the topics in

Page 29

the notice of deposition, which I understand is a very lawyerly and legal explanation. But I'm trying to ascertain whether you're prepared to talk about the things that we've noticed the deposition for today.

And so my question, then, is: Would you agree with me that what Ashley does is information that's available to the corporation Waletich?

A. Yeah -- yes. If I was to ask, they would tell me.

Q. Okay. All right. All right. So as we've, kind of, talked about, Ashley reports to the same kind of triumvirate of Brian, Mark, and Jessica.

Is there anybody else that is in the same kind of level as you and -- and Ashley that reports directly to Brian, Mark, and Jessica?

A. Everybody reports directly to Brian, Mark, and Jessica. That's what I keep telling you is we don't have a structure where it's a hierarchy like in the military.

Q. Do the -- do the drivers report directly to Brian, Mark, and Jessica?

A. I thought we were talking about the

Page 30

office staff.

Q. Well, that's why I'm clarifying, just to -- just to understand. So the --

A. They -- they -- they are -- or they're free to talk to them. They, you know, some of them will text them. Some of them -- well, Mark is available on the phone 'cause he works in dispatch; but, yeah, some of the drivers do regularly speak with Mark and Brian.

Q. Okay. All right. Okay. I understand. All right.

Other than Ashley and yourself, I know that there's some other members of the office 'cause seems like it's about 15 people in the office: Brian, Mark, Jessica, Ashley, yourself. That leaves some other ones.

Is there anybody there that -- that deals directly with the drivers or has a role in -- in managing Mr. Williams specifically?

A. Are we talking about people that they would call to do settlements? To -- to get paid?

Q. Like for -- for -- for loads -- for hauling loads.

A. Dispatch deals with the loads.

Q. Okay. Dispatch deals with the loads;

Page 31

and then you deal with safety, obviously, as the safety director.

A. Yes.

Q. And is there -- there somebody that we'd talk to about getting paid to -- to move the loads?

A. After they move the loads, when they're -- get paid?

Q. Sure.

A. Yeah. Yeah. There's multiple people, and that will adjust depending on who's at work that day or who has the day off.

Q. Okay. So they would just respond to -- or talk to, essentially, sounds like maybe payroll or accounting directly?

A. We don't -- we don't have those departments. We have -- like I said earlier, a lot of people, their jobs overlap. That's why we don't have specific titles for anyone.

Q. Okay. All right.

A. Well, obviously, we have one for the president and vice president.

Q. Sure. Fair enough. And then yourself also as safety director?

A. Uh-huh, correct.

Page 32

Q. Okay. All right. And so I think -- I think you clarified for me a second ago. Mark on top of being a VP and co-owner is -- is the head of dispatch as well; is that right?

A. Yes.

Q. Okay. Or was it earlier when you were talking about head of dispatch, is there a different head of dispatch?

A. No. There's not that there's a different head of dispatch. Yeah. No. There's -- he would be the head of dispatch; but Ashley, I suppose, would be his second.

Q. Okay. All right. I got you.

All right. What does Waletich do?

A. Commercially haul freight for hire.

Q. Okay.

A. Van loads particularly.

Q. Sorry. I apologize. I did not mean to interrupt you. I did the thing that I -- that I -- that I warn you not to.

So you said what kind of loads specifically?

A. Freight for hire. Van loads specifically.

Q. Okay. So when you say "van loads," you

mean like dry vans?
A. Yes.
Q. Okay. Are there any other kinds of, you know, load you would haul, like, reefers or --
A. We have a couple of guys that pull reefer and a handful that pull flatbed.
Q. Okay. All right. So drive-ins, reefer, flatbeds. Any other kinds of load?
A. No.
Q. Okay. Do y'all operate any tankers?
A. No.
Q. Any HAZMAT?
A. No.
Q. Any -- any intermodal?
A. No. By definition. Once in a while maybe a flatbed will haul a container from Point A to Point B but I -- that's -- you're not hauling the -- you're not pulling that intermodal type trailer. So it's still a flatbed load.
Q. Okay. So not -- not like a chassis and trailer situation, like a dredge kind of thing or anything like that?
A. No, nothing like that.
Q. All right. I understand. All right.
Do you -- do you guys specialize in



any -- any particular type of loads? For example, sometimes I talk to someone for a company; and they will say, "All we do is haul steel beams" or something like that.
A. No. We have contracted freight, but it's -- it's not something as specific as steel beams or Sheetrock --
Q. Okay.
A. -- or something like that.
Q. Okay. How many different states do you operate in?
A. The lower 48.
Q. Okay. All right. So you guys will contract to haul loads all over the lower 48?
A. Well, not deliberately all over. But if we need to go to a state, we have that ability.
Q. I understand.
Do you -- do you ever haul any loads into the Canada or Mexico?
A. Not Mexico. I don't believe they do anymore, but I know of -- the years back that I don't remember exactly how many, we did take a couple -- a couple of the flatbedders took a couple of loads up to Canada.
Q. Okay. All right. So that's something



you have the capability to do. It just doesn't happen that often?
A. I don't think they changed that, but I don't know. Again, that was almost a decade ago.
Q. Fair enough.
All right. Tell me about -- we're going to talk now about Topic 2. So we're going to talk about defendant's corporate safety policies, procedures, driver handbooks, and manuals in effect on the date of the collision. And so that date, again, is 2/23/2024.
What corporate safety policies were in place on the date of that collision?
A. They would be in the handbook. I -- I couldn't -- I couldn't spout them back to you verbatim. I'd have to use the handbook to read them.
Q. Okay. Okay. And just so I understand, do you have a -- a commercial driver's license still?
A. Yes.
Q. Okay. All right. And have you -- have you had a commercial driver's license for -- for the entire time you've worked with Waletich in either role?



A. The license? Yeah, yeah.
Q. Okay. When was the last time you hauled a load?
A. Oh, about five years ago. Maybe a shade longer.
Q. Okay. Okay. I wasn't sure if there was ever a time where you -- you had to pinch hit or something like that, you know, for -- for somebody?
A. No.
Q. All right. I understand. All right.
So then you said that all the corporate safety policies would be contained in -- in the manual. Is that -- is that fair?
A. Let's see. The -- the safety -- the safety procedures that I have to oversee are in that handbook.
Q. Okay. All right. Does that handbook address, you know, any -- any sort of policy about reviewing those reports, like the personal conveyance report, the on-duty status report, or the SpeedGauge report?
A. Do they -- it doesn't -- it doesn't mention the reports, but there's -- there can be consequences to speeding, be it a citation. If

Page 37

you get a citation for misuse of PC, typically, it's referred to as falsified logs. Yes, that's covered under the -- in the handbook.

Q. Okay. All right. So is it fair to say that that handbook contains policies that are driver facing? So the policies that the drivers have to abide by?

A. Yes. That's what it's there for.

Q. Does it -- does it contain any policies that -- that, you know, that the management -- so you or anybody else who's involved in management at Waletich has to abide by? For example, reviewing the reports in a certain amount of time or anything like that?

A. Not -- it doesn't -- I don't know if it specifically says that management will at any specific time other than the consequences, if there's something goes awry and there's a citation or management finds something that is inappropriate.

Q. Okay. Are there policies in place regarding when you should review the SpeedGauge reports, the on-duty status reports, or the personal conveyance reports?

A. I have never seen anything that says I

Page 38

am required to look at it every week. I can't imagine not doing it.

Q. I got you.

So is it -- is it fair to say that that -- while it is some sort of policy or procedure, it's not written down anywhere?

A. Not that I'm aware of.

Q. Okay. All right. Other than the handbook, are -- are you aware of any policies that would affect safe operations that are written down anywhere else?

A. Outside the handbook, I -- yeah. The on-boarding paperwork.

Q. Okay. All right. And that's for the drivers?

A. Yes.

Q. Okay. Are there any written management procedures or policies? So anything written about how management should -- should be run?

A. So something that Mark would hand me saying, "This is how I'm supposed to do my job" or --

Q. Sure.

A. -- somebody else?

I've never seen anything written down.

Page 39

That was --

Q. Okay.

A. Yeah. I -- I -- sorry. I don't know if I've ever seen anything written down.

Q. Okay. That's fine.

Is there a -- other than the -- the -- the handbook that we've already talked about -- or, well, let's go back to that.

The handbook we were just talking about a second ago, is that a -- is that a driver handbook? What is that?

A. Yeah. Yes, it -- it's issued to them when -- when -- during their orientation process.

Q. Okay. And that handbook, does it contain, you know -- does it contain information about safe driving; or is it just company policies about, you know, what would happen if they did something wrong or stuff like that?

A. Well, that's what the policies are for is promote safe driving. It also explains bonuses. The bonus for getting a clean inspection. So categorize that how you need to.

Q. Sure. And let me ask a more clear question 'cause I think maybe my question wasn't 100 percent clear.

Page 40

So does it -- does it -- does that handbook have any information about how to actually drive safely? For example, any sorts of guidance on following distances or things like that?

A. No. That -- that -- no. There's nothing in there that says specifically you are supposed to keep, you know, X amount of distance. You're supposed to turn under these certain circumstances. That's not in the handbook.

Q. Okay. And does Waletich have anything like that that exists in any other document?

A. That specifically tells them how to drive the truck?

Q. Yes, sir.

A. Other than, like, I explained with the policies in the handbook, no.

Q. Okay. Does Waletich provide any sort of, you know, Smith System manual or state DOT, CDL manual, anything like that to its drivers?

A. Well, everybody gets the little green federal regulation book.

Q. Okay. And that's -- that's -- just so that I understand, that's Federal Motor Carrier Safety Regulations green book. Is that fair?

Page 41

A. That FMCSA green book, yes.
Q. Okay. Other than the FMCSA green book and then the -- the handbook that we've already talked about, does Waletich provide to its drivers any sorts of other, you know, safety policies, procedures, driver handbooks, or manuals?
A. Well, we -- we do. They're called quarterly quizzes. Ongoing training sort of stuff on quarterly quizzes, monthly topics that they have to review, sign, and send back.
Q. Okay. All right. And we'll talk -- we can definitely talk more about those in just a little bit.
But do you do some sort of -- so is that -- is that a policy that -- that you do those quarterly quizzes?
A. I'll be honest with you. I don't know if it's written down anywhere, but we do -- we do -- I don't believe it's written down that they're mandatory but we -- we make sure that they get done by every driver every month and quarter.
Q. Okay. All right. And so would you -- I -- I understand you say it's not written down.

Page 42

Do you -- do you believe it's a policy, though, that you do do it?
A. Yes. I mean, we make -- yes. We make sure that every driver does it to the best of our ability.
Q. Okay. All right. I understand.
And so how -- so that's an unwritten policy. Are there any other unwritten policies that have to do with safety? So two that we've already talked about is, you know, your review of those reports and then now the -- the quarterly quizzes.
Are there any other unwritten policies that have to do with safety?
A. Oh -- no, if they're -- I do believe that, other than the overall making sure -- well, that's not a policy for the drivers. So, no, not that I can think of off the top of my head. Not that I can recall.
Q. Okay. Okay. And so would you agree with me, since those policies are unwritten, the only way for me to find out about those kind of policies is to talk to somebody like you that's involved?
A. Okay. I -- yes.

Page 43

Q. Okay. All right. And to the knowledge of Waletich -- so all the information available -- reasonably available to Waletich or known by Waletich, those are the only two unwritten policies having to do with safety?
A. Well, again, I don't -- I know it's -- it says in the handbook that there's -- they're -- they're -- they're supposed to do those. It being absolutely mandatory that we'll chase after them, I -- again, I don't think that is specifically in there.
The quarterly quiz -- request to do the quarterly quizzes and the -- the monthly topics, that would be -- that paperwork would be -- 'cause they're -- they get those in the on-boarding prac -- sorry. They get a quarterly quiz and a monthly topic, at least one, during the on-boarding practice.
Q. Okay.
A. So I -- I apologize. I thought we were talking about the handbook.
Q. No worries. Yeah. I think -- so just to make sure and kind of reframe and get back on the same page.
So -- so the topic we're discussing

Page 44

right now is specifically defendant's corporate safety policies, procedures, driver handbooks, and manuals. Obviously, you know, you being at Waletich, you know what exists. I don't know being an outsider. You know what I mean? So I'm just trying to figure out what does and what does not exist.
A. I understand. 'Cause I was thinking too narrowly when you asked the question. It was -- it's part of the on-boarding process.
Q. Okay. So it's in some sort of on-boarding packet?
A. Yeah. There's a series of videos. I don't -- I don't specifically do that part of it. I only go in and do orientation speech on safety procedures or our -- our policies and then how to operate the electronic log.
Q. Okay. All right. I understand.
All right. We may come back to this one; but for now, we're going to move on to the next topic.
The next topic is Waletich's procedure for the screening, hiring, qualification, and training of commercial drivers, including the defendant driver, and defendant's compliance with

Page 45

the Federal Motor Carrier Safety Administration's requirements.

So how does Waletich find its drivers?

A. Our primary goal is to get drivers that are referred to us from current either employees or independent contractors.

Q. Okay. All right. I understand.

So you primarily rely on the other drivers -- the drivers that you do have finding more talent for you all. Is that fair?

A. Yeah. Referrals, correct.

Q. Okay. Do you give your drivers any sort of bonus for, you know, if they bring somebody in?

A. Yes.

Q. Okay. What -- what would that look like?

A. It's usually a credit to their account, and it will fluctuate depending on if we need drivers or not.

Q. Okay. Bigger bonus if you need more drivers. Smaller if you're kind of not full -- but I'm sure you always need drivers -- but smaller bonus if it's less of a pressing need?

A. Yeah. It doesn't fluctuate that much

Page 46

but, yeah.

Q. Okay. I understand.

All right. So let's say, you know, if I was a driver for you. I refer somebody in. What would they go through? How would they -- how would they be screened for a job at Waletich?

A. Well, after they fill out the application, typically done online, the gal who's in charge of on-boarding would start running background checks, running a PSP report, Saamba, HireRight, and then trying to get -- to fill up the -- the work timelines. It's complete so there's no gaps. It's a big deal. And then checking referrals, checking, make sure that they worked in places they worked at, et cetera.

Q. Okay. All right. So there's a background check, a PSP, something about Saamba. I -- I'm familiar with HireRight.

A. Yes.

Q. Is there any other kind of portal or platform that you use to get information upon a candidate driver?

A. I forgot. We have to look up the ClearingHouse too. I apologize.

What do you mean? So what do you mean

Page 47

by "oral"? Could you just define that a little bit better for me?

Q. Sure. I think -- I think you maybe misheard.

Is there any other, you know, portal, like -- like platform? So, for example, like HireRight has a -- has a platform for pulling information about candidates.

So is there any other platform you use to find out stuff about the -- about the -- about the --

A. Right. So we'd have to go through the ClearingHouse. We do PSP, which is a different website, and HireRight. And then --

Q. Okay.

A. -- we'll do a Saam -- a search on the Saamba as well --

Q. Okay.

A. -- which is very similar to HireRight.

Q. How do you pull the -- the driver's motor vehicle records?

A. I don't do that. I couldn't tell you.

Q. Okay. Would you agree with me that somebody at Waletich knows how to do that --

A. Oh, yeah.

Page 48

Q. -- and that -- how that -- how that works?

A. Absolutely.

Q. Okay. All right. So after all of that happens, after you get pulled and -- everything pulled from the platforms that you use, what happens next?

A. If the person in charge of the on-boarding feels that they're a good candidate, she'll release the information to, again, myself, Jessica, Mark, Brian and say, "This is who I'm looking at. I feel like this is a good -- a good fit."

And then if anybody has any questions -- not all the time. Some -- some drivers will come in, and they have an outstanding record; and she'll just let us know that they have an outstanding record.

Sometimes they want -- other than herself, they'll want me to call the driver and do a -- a verbal -- or a -- a phone interview.

Q. Okay. All right. And so after this -- so when -- when you do a phone interview, what does that look like?

A. Well, it depends on what the question on

Page 49

their application is. So it'll be based around whatever data doesn't look right.

Sometimes, as an example, no one specific, a company -- a driver will get into an accident. It'll go on his record as a non -- as a preventable accident.

But when you call the driver and you get the information, you find that, yes, it's on his record as a non prevent -- or as a preventable accident but only because the company that he worked for at the time -- or they, I should say -- didn't have a data queued and removed, and it was eligible for that.

So sometimes the data that we get is not as accurate as we'd like it to be.

Q. Okay. All right. And then who does the -- reaches out to the former employers and stuff like that?

A. Same person that does the on-boarding.

Q. Okay. Who was that person for Jonathan Williams?

A. I don't know. I wasn't in the office then.

Q. Okay. All right. Would you agree with me that somebody at Waletich knows that

Page 50

information?

A. Yes. Somebody knows, yeah.

Q. Okay. All right. So assuming somebody gets hired, what does the training process look like for a driver?

A. Again, as I earlier mentioned, when they come in, they have to do videos. They'll have to do quarterly quiz. I know there's at least one, and I believe there's one or two safety topics --

Q. Okay.

A. -- plus -- plus the training for the people that -- to know how to operate our ELD systems.

Q. Okay. Does it -- does -- the drivers that you hire get any behind-the-wheel training other than the check ride that they have to do as part of the hiring process?

A. If they were needing behind-the-wheel training, we wouldn't hire them. That's why we do the check ride.

Q. Okay. So Waletich only hires drivers who have experience?

A. Yes.

Q. Okay. All right. And Waletich does not do any sort of behind-the-wheel training of its

Page 51

drivers when they're hired other than the federally required check ride?

A. One, I don't believe it's federally required; but we do -- do a -- yes, we do a road test, yeah.

Q. Okay. Is it -- it's your understanding that the -- the test ride is not -- is -- the road test is not federally required?

A. It's irrelevant if it is. We're going to do it anyway.

Q. All right. Okay. I understand.

What -- what sorts of things would disqualify a driver from being hired by Waletich?

A. Well, that's a very broad question.

If they can't drive the truck properly, if they had too many accidents in the -- the timeline depends on the severity of the accident. If they've had too many violations, depending on the violations. If they, you know, as an example, a DWI or if -- specifically if they're on the SAT program, we won't hire anybody on the SAT program until the -- that's the -- what else?

Oh, if they've had -- if the -- if it comes back on -- on the previous employers that they may have not been such a good fit for, you

Page 52

know, like three or four of them the last couple years, it's possible they wouldn't be a good fit for us either. That's why we have to do that extra call.

Q. Okay. Is there any specific policy regarding what qualifications would disqualify a driver?

A. We have on-board -- best practices, yes.

Q. Okay. Are those written down anywhere?

A. Yes.

Q. Okay. All right. What do those on-boarding best practices say about -- about what would disqualify a driver?

A. I'm not going to be able to read them back to you from memory, but I can give you the -- it's things like if they've had a DWI, a careless or reckless driving, they're a no hire for five years. If they've had too many moving violations in three years, I believe it's -- I believe it's two in one year, three in three years. Or two years. That sort of thing.

Q. Okay. All right. Okay. All right. Let's -- moving on to -- to Topic No. 4. Defendant's practices for --

MR. MOSELEY: Is this -- is this a

Page 53

good time for a break?

MR. KLAASMEYER: Oh, yeah. Great time for a break. Before -- I'm sorry. Before we go off, though, I just want to make sure and instruct.

If you talk to anybody, including your attorney, about the substance of your testimony while the deposition is going on, I do have the right to ask about that; and I will.

So just know that if -- if you -- if you talk to anybody about -- about the substance of your testimony while we're on the break, I will ask about it. Is that fair?

THE WITNESS: Yeah. That's fair.

THE VIDEOGRAPHER: All right. Time is now 11:14. We're off the record.

(A recess was taken.)

THE VIDEOGRAPHER: All right. Time is now 11:20. We're back on the record.

BY MR. KLAASMEYER:

Q. All right. We just took a break. Did you talk to anybody about the substance of your testimony during the break?

A. No, sir.

Q. Okay. All right. Going back to the

Page 54

topics list now. So No. 4 is -- and we kind of talked about this a little bit already, but we'll go ahead into some detail.

Is defendant's practices for conducting background checks, reviewing motor vehicle records, and evaluating prior employment of commercial drivers, including defendant driver.

I think you told me about Waletich's policies and that they are written down in a best practices manual somewhere; is that right?

A. No. I -- we just -- it's just referred to as "best practices." It's a term. It's in -- in the -- we don't have a manual. Let me rephrase. We don't have a manual that says "best practices."

Q. Okay. I understand.

But is -- is it -- are those best practices memorialized in writing anywhere?

A. I'm sorry. Not -- I need you to repeat that, what your question was.

Q. Sure.

Are -- are those best practices written down anywhere?

A. That -- for the hiring?

Q. Yes, sir.

Page 55

A. Yes. We've got -- on-boarding officer has a checklist.

Q. Okay. All right. Was one of -- one of those checklists filled out for Mr. Williams?

A. Yes, I do believe so.

Q. Okay.

A. I would be -- I would be very surprised if they didn't. I couldn't -- again, I wasn't in the office at the time; but to my knowledge, that's always been a thing.

Q. Okay. Would that checklist be made part of the driver's file?

A. Yeah. I turned over their entire -- his entire file, yes.

Q. Sure. But I think my question is just a little bit different though.

My question is would that checklist be made a part of the file?

A. Let's see. That would go in the termination file. I don't know. I would have to find out.

Q. Okay. Is that checklist -- is that checklist that you were talking about actually filled out, or is it just referred to?

So, for example, I might have a list of

Page 56

things that I need to do for something written down; but I may not actually fill it out. Or is it a checklist that actually gets filled out?

A. Again, I -- I wasn't in the office at the time. I don't know the practices from five, six years ago. So if they actually filled it out and put it in, I -- I couldn't tell you.

Q. Okay. Is -- is that information available to somebody at Waletich?

A. Yes.

Q. Okay. All right. When -- when you use HireRight or something like that, is a report generated?

A. Yes.

Q. What about the Saamba system?

A. Yes.

Q. Okay. And then do those reports get saved to the driver's file?

A. We -- there's an on-boarding file and -- I can only -- again, I can only speak to how things are done now. After a driver is no longer with our company, everybody -- everything gets put into one giant PDF and then saved.

Q. Okay. And I think you referred to that earlier as a -- as a -- as a termination file.

Page 57

A. Yes.
Q. Okay. All right.
A. No. Again --
Q. Is Mr. Williams still employed by Waletich?
A. Jonathan Williams is no longer in our employment. Employment, no.
Q. Okay. Why was Jonathan Williams terminated?
A. He wasn't. He quit.
Q. Okay. Do you know why he quit?
A. What he told me was he was having issues with money. He didn't get into great detail on that.
Q. Okay. All right. And so when Jonathan Williams quit, did he submit a formal resignation or anything in writing saying he was quitting?
A. Not that I ever seen.
Q. Okay. Does Waletich, generally, have anybody do any sort of exit survey or anything like that?
A. No.
Q. Okay. What -- what happens when a driver quits?
A. Well, like I said, they'll -- I guess it's a very broad question. So I'm -- if I miss something, it's because I'm not sure where to aim here.

Page 58

So if somebody quits, they'll end up doing their last settlement. So all their debt is put together, figured out what's owed, not owed. Find them a way home. We pay for all of that.
The paperwork is put into a term file and then saved.
Q. Okay.
A. Not everything is in the same file. Of course, the drugs and alcohol, any information, that's completely different -- separate so --
Q. Okay. And that -- that drug and alcohol information, that's -- that's the information that goes into the ClearingHouse system?
A. Right.
Q. Okay.
A. We have to keep it for an audit so -- but that's --
Q. All right. And is anything -- when a driver leaves, is anything deleted?
A. That -- I mean, just phone number from the general list. We have a list of all the drivers and their phone numbers. It'll be taken off of that list. Other than that, it just gets moved into a -- a different file with a different name on it so --

Page 59

Q. How long --
A. -- so -- so his truck would be -- say his truck is truck 123, it won't be called 123. All that information will be saved -- Williams 123.
Q. Okay. And so when -- when somebody quits, how long does Waletich hold onto that -- that file for? That termination file?
A. Well, typically, it's five years or more.
Q. Okay. All right. Getting into -- into now kind of more specifically about Mr. -- Mr. Williams and his truck, what sort of equipment did Mr. Williams operate?
A. The specific make, model, and it was -- it was a commercial motor vehicle and a dry van.
Q. Okay. Does Waletich use any sort of dash cam or telematics device, like a Samsara, Lytx, or Motive device?
A. Forward facing cameras are from PeopleNet.

Page 60

Q. Okay. PeopleNet. Forward facing cameras from PeopleNet. Does Waletich utilize any rear facing cameras?
A. Inward facing cameras? You had -- you have mirror cameras that face rear.
Q. Okay. I understand.
Does -- does Waletich use any driver facing cameras?
A. Yes. Under certain circumstances.
Q. Okay. Was Mr. Williams' truck equipped with such a camera on the day of this crash?
A. That -- well, that was a -- he was renting that truck. No. No, it wasn't.
Q. What situation would you use a driver facing camera?
A. Typically, probation if they did something we're not happy about. Something -- they've already got a violation, and we need to know for sure that they're following through on what they said they were going to do.
Q. Okay. So for a rear face -- or sorry. A driver facing camera, that's a remedial measure you would use?
A. Yes.
Q. Okay. Why not -- why not always have a

Page 61

driver facing camera in the truck?
A. Why not always? Very difficult to get drivers to agree to it.
Q. Okay. How do other companies get -- get drivers to agree to having inward facing cameras?
A. I don't know. I don't work for them.
Q. Okay. Are you aware that other companies do do that?
A. Yes, I am aware.
Q. Okay. All right. And so it's your -- your testimony that -- that you don't do inward facing cameras because it's difficult to get drivers to agree to it?
A. That's certainly one of the reasons.
Q. Okay. What other reasons are there?
A. Well, they're owner-operators. They'd have to pay for it, which is why they wouldn't necessarily want to agree to it.
Q. Do they pay for the front facing dash cameras?
A. They're -- the -- the independent contractors have to pay for the equipment, yes.
Q. Okay. Including the front facing dash cameras?
A. Yes.

Page 62

Q. Okay. All right. All right. So they would have to pay for it. Do they get any say in what the -- the truck is equipped with?
A. You're going to have to be -- when they order the truck or --
Q. Yeah. Like, could -- could a driver tell you, "I don't want a front facing dash camera in the truck"?
A. No, no. That's requirement.
Q. Okay. Would you agree with me that it could be a requirement that there was a rear facing -- driver facing dash camera?
A. Anything is a "could be." I mean, I -- that -- yes, it could be.
Q. Okay. So I guess what I'm trying to figure out is if, you know, if a driver can't disagree and say, "No, I don't want the front facing dash camera," then why would a driver disagreeing about a rear facing dash camera prevent you from using those?
A. You would have to ask that driver.
Q. Okay. All right.
A. Every driver's going to have their own reasons. We've had drivers quit over the installation of an inward facing camera. So I

Page 63

can't speculate on what every single driver would think of it. I --
Q. Okay. All right. So has Waletich ever tried to implement a program of every driver having an inward facing camera?
A. Just mandatory? No.
Q. Yeah. Okay. All right.
And so it's your testimony also that you've had drivers quit when you told them that you were going to force them to have inward facing cameras?
A. I'm sorry. I'm -- I -- I didn't hear that.
Q. You -- I think you told me a moment ago that -- that you before have had drivers quit over being forced to use an inward facing camera?
A. That is correct. I have had that happen.
Q. Okay. All right. When was the last time that that happened?
A. I believe it was two weeks ago.
Q. Okay. All right. Does the PeopleNet system and the -- the -- the forward facing dash cameras give you any sort of -- or give Waletich, more specifically, not you, but Waletich -- any

Page 64

real time notifications, alerts, reports, or video clips generated by the system?
A. Yeah. It'll -- excuse me. It'll -- if the parameters -- if -- if something happens outside the set parameters -- sudden deceleration, something to that effect, depending on the equipment that it's installed in -- it will send a video as an alert 20 seconds. 10 before. 10 after.
Q. Okay. Do you know if such an alert was generated in this case?
A. Yes.
Q. Okay.
A. I didn't use the word "alert." It sends a video.
Q. Okay. All right. Was such a -- a video generated in this case?
A. Yes.
Q. Okay. All right. For Mr. Williams, are there any other videos generated by that system that you are aware of?
A. So as an example, in that particular truck he was driving, it -- it's a -- it's what's called a Glider. So the data packages, as it comes into the e-log, it comes in in chunks.

Page 65

Okay?
Q. Yeah.
A. The PeopleNet system when Mr. Williams was working with us -- they're updating everything now so it's getting better, a lot better -- had a bad habit of requiring information, more than what the factory ECM would give.
So that means when you were looking at the speedometer on the dashboard of the video, it would -- it would -- it would drop, like, this. In little chunks. (Indicating.)
So -- and because the computer doesn't know the difference between the data package coming in in an untimely manner versus somebody stabbing the brakes, it would generate videos that were completely unfounded.
Q. Okay. All right. So sometimes it would generate false positives, essentially?
A. Yes.
Q. Okay. All right. And is every video or, you know, event that -- that gets noted by the system reviewed manually?
A. Yeah. Yes, they are.
Q. Okay. All right. And -- and is it

Page 66

always the same person who reviews that?
A. No. Usually unless I'm gone, it's me.
Q. Okay. So under ordinary circumstances, it's you. Who is it if it's not you?
A. Right now I -- we don't -- I just -- a -- the gal named Naomi does, but very rarely.
Q. Okay. What's Naomi's position?
A. Doesn't really have a position name. She helps out with dis -- not dispatch. She helps out with settlements, paperwork. She's just a -- does whatever job needs to be done.
Q. Okay. In this -- in this instance of this video that was generated from this, the -- did you review the video, or was that Naomi?
A. No. She didn't do any -- she wasn't even working for us back then.
Q. Okay. Did you review the video?
A. Yes.
Q. Okay. All right. I understand.
What -- what happened in the video that you reviewed?
A. The -- our driver was in the left-hand lane, and there was a sudden stop in front of him. He wasn't capable of stopping in time.
Q. Okay. Would you agree with me that --

Page 67

that your driver was responsible for causing the collision that we're talking about here today?
A. Yes.
Q. Okay. And -- and, specifically, just to make sure that question is 100 percent clear, one of the things that we can ask the corporation about through you is your contentions in this case.
And so the -- the question is probably better asked as: Is it Waletich's contention that -- that Mr. Williams was the cause of this crash?
A. Yeah. It was in -- yes. The driver had an at-fault accident.
Q. Okay. All right. Is it Waletich's contention that any -- anybody else other than Mr. Williams caused this crash?
A. No, sir.
Q. Okay. All right. Did Waletich do a preventability analysis after this crash?
A. He never made it back -- he came back to the yard and then immediately tendered his resignation.
Q. Okay. All right. So preventability analysis was not done because he quit?

Page 68

A. There was no point in -- there was -- he was -- the video shows that he was at fault. Doing part of that analysis is doing an interview with the driver. I did that on the phone. He wasn't there to -- to complete it. So as far as we got -- we didn't complete the analysis.
Let me rephrase it. We didn't complete the analysis 'cause he quit. It was, you know. Obviously, the video's reviewed. His statement was taken. It was turned into the insurance company, who also reviewed it; but it wasn't completed.
Q. All right. And -- and, again, that's just because he quit; and so, you know, it's not like you could do anything to retrain the guy afterwards. Is that fair to say?
A. Right. Retrain or if there was -- if the -- or even terminate if that was the decision. I mean, he already quit.
Q. Sure. I understand, yeah.
So, essentially, there could be no repercussions to the driver because the driver left.
A. Correct.
Q. All right. I understand. And that's

Page 69

why the analysis was not completed.
A. Correct.
Q. Okay. All right. Obviously, like, we just talked about, there was no -- there was no remedial action taken against the driver in this case.
Can you -- are you prepared to testify today about any disciplinary remedial actions taken against Mr. Williams from -- arising from any prior safety incidents?
A. Disciplinary action outside of just conversation?
Q. Well, if that would -- if that would be considered disciplinary action, then that would count as what I'm talking about.
But, you know, I'm talking about anything. So whether it's just we had a conversation with him or it was, you know, we took him off the road and retrained him, anything like that.
A. We -- we had -- and I couldn't give you the exact dates, but I know we had had -- as I do with every driver -- conversations about better practices in using personal conveyance; better practices in, say, driving habits, from any

Page 70

videos and then in -- let's see. Personal conveyance. I think we talked once about his -- oh, no, of course, we did.
He had a -- a maintenance violation. One that I can remember directly. We talked about how to better -- or at least attempt to -- air leaks in tires, lights, these things fail when you're driving down the road. So we would have a conversation. If somebody gets a violation like that, we would have had a conversation about how to better potentially catch that quickly.
Q. Okay. And so the -- with him, do you know about each instance where -- where remedial action was taken in regard to a safety incident?
A. I couldn't speak to it at 100 percent.
Q. Okay. Are those -- are those -- all such instances of that documented by Waletich somewhere?
A. Yeah. The -- if the driver has an instance, I believe -- no, I don't -- let me rephrase that.
If a driver has an instance where coaching is necessary, we put it on a report card.

Page 71

Q. Okay. All right. All right.
MR. MOSELEY: That's the thing I sent you last night, Cooper.
MR. KLAASMEYER: Sure, yeah, yeah. And I appreciate you sending that to me, Rob.
Q. Okay. So that goes on a report card. Would that contain all such -- all instances where a driver was -- something happened and it resulted in a driver being coached?
A. If something happened that they specifically needed to be spoken to about it, correct.
Q. Okay. All right. Would that -- would that contain any sort of false positives? So a situation like we talked about earlier where just because of the, you know, whatever happened with the data relay, you know, it goes off.
Would that contain anything like that?
A. Yes and no. Not the data that you're talking about. I don't report false positives. The thing would be pages long.
If a driver gets a call-in complaint from another vehicle, we will -- we will investigate it. And if we find through the video and the interview with the call-in complaint and

Page 72

the driver that it is unsubstantiated, we will also record that.
Q. Okay. All right. I understand.
How -- how soon -- let's say a Waletich driver did something that drew my -- my irritation 'cause I was behind them or something like that. How long from that moment would I have to call in to where you would be able to look at the video?
A. Kind of depends on the truck. Not all -- all the DVRs have exactly the same amount of recording storage. Typically, four days.
Q. Okay. All right. I think you told me earlier that this -- this truck in question was a Glider. What does that mean?
A. Used to be a program where you could buy a rolling chassis, and then you could put whatever motor and transmission and differentials you wanted in it.
Q. Okay.
A. To my knowledge, all of those programs have been discontinued. We're getting rid of any of the Gliders we have left with newer trucks so --
Q. Okay. What would be the advantage of

Page 73

getting a Glider?
A. At the time we bought them? At the time we bought them, the DD15 had just came out; and there was a lot of problems with everything that was modern.
So the biggest advantage to the Glider was it -- you could put a 60 series Detroit in it, which was one of the highest-produced motors in history, short of the two-stroke. Very simple to work on. Very cheap to maintain, and got reasonably decent fuel mileage.
Q. Okay. I understand.
So, basically -- basically, you could -- you could have a new chassis or whatever that -- that you could put, you know, whatever engine or mechanical stuff you wanted in it to -- and that offered advantages because it simplified maintenance and stuff like that?
A. Yeah. It reduced operating costs.
Q. Okay. I understand. Okay. I got you.
All right. Let's see. I'm going to pull up that score card we were talking about here. Give me one second.
Did each driver only have one score card? (Indicating.)

Page 74

A. Yes.
Q. Was that score card created by you; or was that score card created by some, you know, some other company?
A. Again, it's a collaboration, as with most things in our corporation. I had brung it to one of the other officers in the -- in the office that -- I don't remember exact -- exact conversation.
But I had brought up the idea of tracking -- making it easier to track for the annual reviews. About a month or two later -- again, I don't know the exact dates -- that was produced and has been slightly tweaked since here and there to make it usable but --
Q. Okay. All right. And so just so that I understand and I can clarify and make sure this -- this doesn't exist or anything like that.
So some -- some dash cam companies and, like, telematics devices like Lytx or Samsara, they generate a score card automatically; and they can, you know. You may not know that because I don't think you all use Lytx or Samsara, but they do -- I'll represent to you that they make their own report cards and score

Page 75

cards.
But this document we're about to look at, this is something that you produced; correct?
A. Correct. Saamba has an entire website of reports you can pull. One of them is called a score card; but in that particular case, the only thing it scores is their CSA points. Their individual inspections.
Q. Okay.
A. So this one --
Q. So the Saamba system is not tied to their actual driving. It's just tied to, you know, their --
A. Their history.
Q. -- inspection reports, out of service, things like that.
A. Yes. Their history.
Q. Okay. I understand.
Does -- does Saamba, like, notify you -- let's say a driver in a personal vehicle gets a ticket or something like that or, you know, worse, gets a DUI or something like that, does Saamba let you know?
A. That would be on their MVR. Those only get -- those don't get notified. If they got

Page 76

that same thing in a -- in a semi and it would generate a driver vehicle examination report, it generated CSA points or didn't generate CSA points, then we get notification as soon as the officer puts it into the system; but that can vary depending on the officer.
Q. Okay. Does the -- does the device that's in the trucks at all generate any sort of report about driver safety? So the -- specifically the inward facing -- or the outward facing dash camera?
A. No. It -- it will generate the videos.
Q. Okay. So it does not generate any sort of -- of event history or score card or anything like that?
A. No, no, sir.
Q. Okay. All right. Let's look at this.
MR. KLAASMEYER: And, Rob, I just want to make sure. I don't think so because it's not marked as it, but this score card is not one of the confidential documents; right?
MR. MOSELEY: No, it's not.
MR. KLAASMEYER: Okay. All right. I just wanted to make sure before I put it up on the screen.

Page 77

Q. Let's see. All right, sir. Can you see my screen? (Indicating.)
A. Yes, sir.
Q. Okay. All right. So -- and this is the -- the driver score card that we've been talking about so far; right?
A. That's a report card. Not a score card, but, yeah.
Q. My apologies. Okay. Driver safety report card for Jonathan Williams.
This -- are you familiar with this document?
A. Yes, sir.
Q. Okay. And did you help create this document?
A. Again, I -- I was part of the -- of it. But I didn't create it by myself, by no means.
Q. Okay. All right. And is this something that Waletich keeps in its ordinary course of business?
A. We do now.
Q. Did you keep this at the time of this -- of this incident as part of your normal course of business?
A. I -- I believe we had just implemented

Page 78

it in '23. So I don't remember exactly when -- how long he was working with us when we started filling these out. As you can see, the -- the information goes back before the inception of the report card.
Q. Okay. All right. I understand.
But on the date of this crash, this was a policy that y'all had, to keep this as part of your normal business?
A. It's -- we do that, yes. It's not a written policy.
Q. Okay. All right. And the only reason I'm asking is I just -- I just want to, you know. There's certain documents that -- that will be -- possibly be put into evidence at trial of this case. And one of the qualifications is if this is a business record, essentially. If this is just something you guys make, you know, not for the litigation but just keep in the course of running Waletich.
Is this one of those documents?
A. Yes. It's -- it's a means to keep track of how the driver's been doing over the course of their employment.
Q. Okay. All right. So here it looks like

Page 79

on July 11, 2021, there was a backing incident where he struck a fence, gate, and post.
A. Yeah.
Q. Okay. And it's -- it was determined there that he was -- that the incident was at -- at fault and that it was preventable?
A. Yep. He was backing.
Q. Okay. So what does this field mean here? (Indicating.)
A. Oh, a little thing popped up.
Q. Oh, sorry.
A. Yeah. So this -- this is some of the stuff that's been added. Like I said, we -- this isn't its original configuration. We've added more information to it as we've, you know, wanted to keep more accurate -- so had it been an at-fault accident, there would have been a prevention plan. Accident prevention plan. Possibly a -- a write-up, depending on the severity or the circumstances; and then had there been a cargo claim or not.
As you can see, that with -- that's not wrote down there because at the time, it wasn't part of this. It was just added.
Q. Okay. When did these three things get

Page 80

added to the form?
A. I don't keep track of those dates.
Q. Would you agree with me that somebody at Waletich knows that information?
A. I doubt it. I mean, nobody keeps track of the dates. They could probably give you the year.
Q. Okay. Could you give me the year?
A. No, sir. I suspect it was somewhere in '23 or the beginning of '24.
Q. Okay.
A. Again, you're asking me to speculate.
Q. Sure.
All right. And so these -- it's your understanding anyways, as best as you can tell, that this -- these three fields were added some time in '23 or early '24?
A. Well -- and then the other thing too is that top -- that top one's not an auto liability claim. So it wouldn't have been filled out that way anyhow.
Q. This one? (Indicating.)
A. Correct.
Q. Okay. All right. Was this -- do these three fields get added to the form before or

Page 81

after this crash?
A. I -- I don't know.
Q. Okay. All right. Would you agree with me that somebody at Waletich knows whether these were added before or after this crash?
A. I don't know.
Q. Okay. Did you do anything to try to find that information out?
A. That -- to be specific there, I'm sorry. Find what information out?
Q. Well --
A. If there was an accident prevention plan or --
Q. Yeah.
A. Again, I just explained. That top one was not an auto liability. It was a backing. The accident prevention plan is going to say, "Don't back into somebody." So the -- I -- there wouldn't have been one generated for that.
Q. Okay. All right. And then these two, would there have been one generated for them, given that they were not at fault?
A. No. They're not at fault.
Q. Okay. For this one, would an accident prevention plan have been created had he stayed?

Page 82

A. That's -- that would be correct.
Q. What is an "accident prevention plan"?
A. It -- it just states the circumstances around the accident, what would help him -- help prevent further instances of that nature. And then if there's anything in there that would suggested -- well, what suggested so -- and then anything in there that suggested if it has something that's going to take more than whatever time period. It would state the time period we would like to see the driver -- or we would require the driver to complete it in.
Q. Okay. And is "postaccident event," is that referring to, like, a drug test or alcohol test?
A. We don't really even use that anymore. So at one point, we were doing -- oh, let me rephrase that.
So what that was originally for, we don't necessarily do. In this particular case with Jonathan, that would be if he would have -- he would have probably been wrote up for something like following too close or something to do with his driving habit that we found at fault.

Page 83

He would have had a written warning for that, had he -- had it been determined that we were going to keep him and the -- of course, the determination that he was at fault. Then that paper write-up would be recorded right there.
Q. Okay. All right. And so going down to the probation area here. (Indicating.) This -- this document states that he would have been placed on probation had he stayed?
A. Yeah. Yeah.
Q. Okay.
A. That would -- that -- that got filled out and then, you know, he quit so --
Q. Okay. All right. And so it looks like, based on this date, that what is intended to happen with probation plan is that there's a follow-up in three months. I can extrapolate and think --
A. Yes.
Q. -- that it's follow-up at six months, nine months, and then a year?
A. Yes.
Q. Okay. And is this -- does this mean that he would have been given an inward camera had he stayed?

Page 84

A. If -- if we determined he was going to stay, there would -- that would have been mandatory; and then he would have chose whether or not he wanted to, which we already know the answer.
Q. Did -- is that why he quit?
A. He -- all he told me -- again, the conversation wasn't long. To my understanding from that conversation was that he was having issues with the -- the money he was generating.
Q. Okay. All right. For this -- this addresses any sort of road -- roadside inspections?
A. Yeah.
Q. Okay. All right. This -- this one here, 8/9/2023, failure to keep in proper lane. The name QORTA, yes, fine and verbal coaching.
So explain to me what happened here.
A. I don't know the details, but what usually happens is -- so a fine is -- what I can tell you is what the fine is. The fine is for a truck being in a no truck lane.
Q. Okay.
A. Now, the reasoning why he was in there, that conversation was covered on 8/9/23. I

Page 85

couldn't remember it specifically. We -- we have rules against being in the no truck lane. As you can see, he was fined; and then we had a conversation about it.

Q. Okay. What's "QORTA" mean, Q-O-R-T-A?

A. I'm sorry. Where did you -- oh, I didn't put that in there. That -- this doesn't necessarily get filled out by myself. Sometimes other -- again, some people help when I'm extremely busy. QORTA, that's Saamba.

Q. Okay. All right. I understand. All right.

A. All that -- all that note is saying that it showed up on the report.

Q. Am I -- can I take this to mean, this part yellow section here, that he never had any sort of over hours or log violation that you could ascertain in this time period that this report covers?

A. Nope. Not that we were ever made aware of.

Q. Okay. All right. And then this one here -- this one here regards speed incidents. Is that fair to say?

A. Okay. You got it split. There it is.

Page 86

Yes. So we -- we have -- if a person is -- has got too high a percentage, then -- then they'll be called and given a -- a verbal conversation about it.

Q. Okay. Does Waletich have any policy for, you know, when this would be -- rise to the level of -- of -- well, let me -- let me go back actually.

How many speeding tickets can a driver get before they are fired?

A. It depends on the length of time. You get two in two years, you're -- you're pretty much on the brink of -- you'll be on probation; and if you mess up again, you'll be gone.

Q. Okay. So two speeding tickets in two years would be enough to get a driver fired?

A. Would be the limit, yeah.

Q. Okay. All right. And what does this percentage indicate?

A. Well, that's one of the SpeedGauge reports that gives that percentage. That's a percentage of miles driven over -- so -- and that -- the one where your cursor's on, it's saying that at 21 -- 21.3 percent of that week's driven miles were over the posted speed limit

Page 87

so --

Q. Okay. So what is the difference between a driver speeding and getting caught and a driver speeding and not getting caught?

A. So speeding is speeding is what you're saying?

Q. I guess -- that's kind of what I'm asking, I guess. What is the difference?

A. Would the -- outside of the -- the financial repercussions for the driver and the -- the CSA points?

Q. Sure.

A. You can't possibly have a no -- no speeding -- an absolute zero tolerance no speeding policy. Nothing's absolute in this world.

Q. So if there was a situation where a driver -- is there a percentage of miles that a driver would have to speed for before that results in termination?

A. Well -- and see, that's the other thing. It's -- that's a percentage so --

Q. Sure.

A. Let me -- let me -- are you saying -- I'm not quite getting the question.

Page 88

Q. Yeah. Let me rephrase.

So is there a percentage here, like this one, you know, 21.3 is this percentage; but is there a percentage that this could reach which would automatically result in the termination of a driver?

A. I -- their percentage that could be reached. I mean, it would only happen once; and they'd be wrote up if it was something as extreme as what you're suggesting.

Q. Sure.

But I -- I guess my question, you know. On here, we see that in -- on this report -- on the 4/12/2021 report, this indicates that -- that Mr. Williams was speeding 40 percent of the miles that he drove.

Is that fair to say?

A. That's fair to say, but I can't tell you how many miles it is because that's not recorded. So if that was 100 miles, he drove 40 percent of them over the speed limit.

Q. Okay.

A. Right. So I don't -- what we don't record is -- this is, yeah, so this is a percentage of the miles driven, not, you know,

Page 89

like 40 percent of the week or 40 percent of the month.
Q. Yeah. It's by miles.
A. Right.
Q. So, you know, if he drove 10 miles and he sped for 4 of them, that would be 40 percent; right?
A. Right, yeah.
Q. So it's just -- you're -- what you're saying is that here, we don't know what that 40 percent sample size is.
Is that fair to say?
A. Yeah. So, again, when -- the reason that's there, if we see something that we don't particularly like that needs to be adjusted, a lot of -- and you can see that that was when he first started with us. A lot of the -- not a lot.
Sometimes you'll have a new driver come on; and because it's their first time being owner-operator, they kind of feel a freedom they shouldn't and I -- let me read down through here.
Yeah. Okay. So right here. Called and told him he'll get a fine -- $250 fine next time this happens again. So -- and then as you can

Page 90

see, he, essentially, stopped. He just needed coaching.
Q. Well, all right. And we'll talk about that a little bit more too.
Where does this data come from?
A. That would be one of the -- one of the SpeedGauge reports I was telling you about.
Q. Okay. All right. Is that data still in the SpeedGauge system?
A. Those are weekly. They get emailed to me. After the week is gone, that information's gone.
Q. What do you do with those emails?
A. Nothing really.
Q. Okay. Do you delete those emails?
A. Sometimes they get deleted but not deliberately.
Q. Okay. All right. Don't delete any more of those emails that -- that have to do with Mr. Williams.
A. Yeah. If -- if -- yeah. No. Right. Well, yes. I would have to look at -- and I don't know for sure if that -- if that's a link. I've never had to go back any -- any real serious amount of time but --

Page 91

Q. Right. Is there a -- so is there a -- any policy of Waletich which would say, you know, for example, if -- we don't know how many miles this is based off this report here, this 4/12/21 report.
But is there any policy at Waletich which would say, you know, "If he was speeding an X percent of miles and it's over a certain mileage, that -- that the driver would automatically be fired"?
A. No. There's no specific rule that outlines an exact number.
Q. Okay. All right. But there is a specific policy that says if they get two tickets -- two moving violations within -- one year or two years? I forgot what you said. Sorry.
A. If they get more than two speeding violations in two years --
Q. Okay. So that --
A. -- that could lead to termination.
Q. Okay. So that would be three then. Is that fair to say? Three would result --
A. If they were to get three, yes. Then -- then it could lead to termination.

Page 92

Q. Two would not?
A. It depends. It depends on how egregious.
Q. Okay.
A. If they are 20 over -- if you're getting it 20 over, you most likely will be terminated immediately.
Q. Okay. All right. I understand.
So if -- and is that a policy that's written down anywhere that if you get a 20 over, that would most likely result in immediate termination?
A. Not specifically in those words.
Q. Okay. It's just that's a general guidance from your experience as safety director?
A. Yes. And that -- all the drivers, I do my best to make sure they're aware that their speeding is of utmost importance to minimize.
Q. Okay. All right. Would a violation of ten over result in the same thing?
A. No. A five to ten, no.
Q. Okay. So --
A. Six to ten. I'm sorry.
Q. Oh, yeah. Sorry. Yeah, and let's do it that way. We'll start from, you know, zero to

Page 93

five. If a -- if a driver gets one zero to five, would that be enough to say, "We need to terminate this guy"?

A. Nope.

Q. Okay. Six to ten.

A. If it's just the one and it's the only one on their record, no.

Q. Sure, yeah. And for this -- for this purposes -- for these purposes, it's just -- it's just one. All right.

And then 11 to 15? Is one ticket enough?

A. One, no.

Q. Okay. But -- all right. So then 15 to 20?

A. Now you're starting to get into where we have to -- and that's what it states in our paperwork is their performance at the company would be reviewed if -- if -- if there was something that we felt we could coach or not.

Q. Okay. If there was a violation that was 20 or above -- so, let's say, you know, less than 21 or above, just to keep it clean. If somebody gets a ticket, and it's 21 -- let's just say all the way up to 30, would that -- would that

Page 94

automatically result in termination?

A. Well, you're -- I would be speculating, but I would -- I would -- I would personally, as the safety director, not want to see them work there any further. That is a -- it's -- that's pretty egregious.

Q. Okay. And just so that I know. You're the guy; right? You're the one who would make that decision.

Is that fair to say?

A. Right.

Q. Okay. All right. And there's nobody better situated to make that call.

Is that fair to say?

A. Right.

Q. Okay. All right. So -- all right. I understand now. All right. Thank you.

I notice that this -- this section's completely filled. What would happen if you needed more room here?

A. Well, I mean, in theory, it's just an Excel sheet. You could add it, but the whole point is to not have to add it.

I mean, they start out with only, I believe, two lines on them. If -- again, so

Page 95

if -- if he had gotten another violation or if he had gotten a violation recently from that last one, the most likely, would have been wrote up and had anything -- he would probably -- and anything -- I don't know how to phrase this.

If he had been "wrotten" up -- written up and then any kind of continuance of that behavior, there wouldn't be a need for another line.

Q. Okay. What day did this incident -- this one right here occur? 'Cause we see February 20, but we don't have the --

A. Yeah. I'm -- I'm afraid I have no way to recover that information.

Q. Okay.

A. I seen that too.

Q. Okay. All right. So here it looks like there was a call in; and so from what I understand, this is somebody, you know. I saw that sign. You see a lot about it on a lot of trucks about how's my driving, and they called in and reported them?

A. Yes.

Q. Okay. All right. Does -- does the telematics device, the camera, and -- and

Page 96

SpeedGauge system, does it -- does it notify you when driver is speeding?

A. In real time, I would have -- I can look in the PeopleNet system on the tracker. SpeedGauge only gives me reports post. Right. End of the week. End of the month.

Q. Do you often --

A. Or I have to go in and find it myself. So I don't get -- I don't get a notification at the moment they're speeding.

Q. Okay. Do you know if that's a setting?

A. It is not a setting.

Q. Okay. So explain -- this -- this was a little bit confusing to me when reviewing this.

So it says, "While driving on I-694, Jonathan was speeding confirmed by SpeedGauge and moving from lane to lane." And then in the corrective action section, it says, "Spoke with Jonathan. Explained he had sideswiped a car. It could lead to termination."

What does that mean?

A. I don't have any recollection of the -- the specific conversation. But what I would gather from the information in front of me, is that he was probably going slightly faster than

Page 97

traffic and he was passing a car or maybe passed more than one car, again, complete speculation.
And the conversation any time a driver switches lanes more than necessary is if you sideswipe a vehicle and/or rear end them, it could lead to termination as -- as experienced by this 'cause he quit.
Q. Okay. All right. What's -- and so I -- I think now I understand that PC. I didn't know what this meant before.
A. Okay.
Q. Before you. But this is personal conveyance?
A. Yes.
Q. Okay. And so on this incident, he forgot to take himself off personal conveyance and drove down?
A. If you -- well, yeah. That should have been expanded. It probably said "drove down to yard" or something to that effect.
Q. Okay. But we don't -- we don't know based on this?
A. The drivers will sometimes -- yeah. Drove down -- he drove somewhere he wasn't supposed to be on PC. That's all I can tell you

Page 98

from that text.
Q. Is that a log violation?
A. If he was to get -- be caught before he contacted me and I fixed it or he fixed it, yes. But it is -- it is his right to screw that up and then go back and adjust it and put that drive time on the drive line where it belongs.
Q. Okay. All right. I understand.
All right. So here I've got -- I've got "coachable training event." What does this mean?
A. Well, remember those write-ups that I was telling you about?
Q. Uh-huh.
A. Yeah. So --
Q. Okay.
A. It's -- it's -- it's a little superfluous, if you ask me; but it's there. I think mostly it's -- because, again, I don't necessarily fill these out anymore. It's to get a better description than that little itty-bitty box in the corner like you seen earlier.
Q. Okay. And so should these incidents, should these be down here? (Indicating.)
A. No. Those are write-ups.
Q. Okay. Did this --

Page 99

A. The ones I've talked to the driver, they are the verbal coaches where I talked to them and we explained the position of the company, explained the -- what needed to be explained.
Q. Okay. All right. When did he quit?
A. About two weeks after he was in that accident.
Q. Okay. Let's let -- I think we need to look in the documents quickly and see exactly when he was -- when he did quit. Let me look at that quick. Because I think that's important.
Sorry. Trying to find that information.
There -- actually, while we're on that, it's been about an hour since we took a break. Let's take a break real quick. We'll -- we'll come back.
THE VIDEOGRAPHER: All right. Time is now 12:17. We're off the record.
(A recess was taken.)
THE VIDEOGRAPHER: Time is now 12:28, and we're back on the record.
BY MR. KLAASMEYER:
Q. All right. Did you speak with anybody during your break about the substance of your testimony?

Page 100

A. No, sir.
Q. Okay. I am trying to track down what the date of -- of -- the date of the end of the relationship between Waletich and -- and Jonathan Williams is.
Would you agree with me that somebody at Waletich knows when the end of that relationship formally was?
A. Yes.
Q. Okay. And would you agree with me that you -- that you do not know as you sit here today?
A. The exact date, no.
Q. When -- when -- when -- let me ask it a different way.
You say you don't know the exact date. What is your knowledge of when he did terminate that relationship?
A. My memory, he was down waiting for the truck to get repaired; and the download on the ECM took somewhere around a week, and then the -- the following week, I believe, towards the end of it, he returned to the yard and quit.
Q. Okay. All right. Do you -- so how many weeks would that have been from the crash, then,

Page 101

based on your estimate?
A. To my -- I'm, again, just speculating but I -- I believe it was two weeks or very -- very close to that.
Q. Okay. All right. So on the -- going back to the -- the sheet here, the quarterly safety topics, did you guys not do quarterly safety topics in 2023?
A. For a while they weren't something that -- it was something that was allowed to be voluntary. It was requested of them. Since then that is not the case.
Q. Okay. And then here under "annual review," what is this meant to document?
A. Let's see. Driver review. Saamba. Well, that's what you're looking at now; and then at the time we used to generate the Saamba score cards, which has their CSA points, hence the CSA points after the comma.
Q. Do you know why there's two annual reviews in 2023?
A. I believe the reason is we had just started the program, and so we wanted to -- let's see. What are the dates here?
Yeah. I couldn't explain that.

Page 102

There -- when we first started the program, it wasn't -- it was -- that first year there, some of the drivers got kind of bunched together for doing both of them the previous year and that year.
Q. Okay. And then do you know why there's no annual review in 2022 on here?
A. We -- I have -- we didn't do them in '22. Not in this form.
Q. Okay. All right. And then in 2024 -- I think I know the answer to that -- but why -- why is there no 2024 annual review on this sheet?
A. I would speculate because he quit before we had a chance to do it.
Q. Okay. All right. How would you know when somebody was up for annual review?
A. We do everybody at the -- towards the end of the year after the mid of the year so it's not a matter of knowing when. It's just that's when we do them.
Q. Okay. All right. So it's just -- it's just a fourth quarter end of the year thing?
A. Yes.
Q. Okay. All right. I think we're done with that for now.

Page 103

Where would -- what document would have the date that -- that Mr. Williams terminated his relationship with Waletich in?
A. I don't know the official document.
Q. Would -- would it be documented somewhere?
A. It would be documented somewhere, yes.
Q. Okay. But as you sit here today, you are not prepared to tell me what document that would be in?
A. Exactly what document, I don't know where that gets wrote down specifically.
Q. Okay.
MR. MOSELEY: Cooper, if you're looking for something, it's 451.
MR. KLAASMEYER: Sorry. Say that again.
MR. MOSELEY: 4-5-1, 451.
MR. KLAASMEYER: Okay. Perfect.
Let's see. Sorry. I'm scrolling too. It's just a big PDF. So it's, like, taking a second to load when I scroll.
Okay. Here we go. Thank you for that. I appreciate that, Rob.
Q. All right. Can you see my screen, sir?

Page 104

(Indicating.)
A. Here we go. Okay. Yeah.
Q. All right. So it looks like this -- this is a -- one of y'all's documents, 451 here; and this appears to be a termination and driver quit checklist.
And so I see termination date here of 3/11/2024 is what that reads to me. Would you agree with that?
A. Yeah. That's what it says.
Q. Okay. All right. And is it -- to your knowledge, is that date accurate of -- of when -- of when Mr. Williams terminated his relationship with Waletich?
A. As I said, from my memory, I don't remember the exact date. If that's what it says, then I -- I can tell you that's when that -- that paperwork was filled out.
Q. Okay.
A. Other than that, I can't tell you exactly from my memory.
Q. Okay. And did you review this document prior to coming to testify today?
A. No, I did not.
Q. Okay. Did you review any of these

Page 105

documents in here in anticipation of your testimony today?
A. Anticipation of testimony. So in a recent timeline, no.
Q. Okay. And let's see. Stop my share for a second.
All right. What are the -- what are -- what's the training system you use? I know you said the drivers watch videos and do quizzes.
What is this system called?
A. I'm sorry. Could I -- what was that again?
Q. What is that system called, like, you know, how do you get those videos to the drivers?
A. No. They come in, and I show it to them on the -- the computer.
Q. Okay. So their training happens in office?
A. The -- all right. Okay. Are you talking about the ones that the PeopleNet camera generator or the training?
Q. No. I'm sorry. The training videos.
A. No. They're in the orientation room when they on-board.
Q. Okay. What about those -- those monthly

Page 106

trainings that were documented in that -- in that -- in the report card we were just looking at?
A. The quarterly quizzes? You -- you were just looking at one of them.
Q. Oh, let's see. Okay. This -- this guy right here? Hold on. I'll pull it up.
A. They're accident, counter measure. Yep. That -- the headers are very similar. So some of them, if they're just signed at the bottom, would be a monthly topic; and then there's some of them that are multiple pages that -- and then there's a questionnaire they fill out at the back side. That would be a quarterly quiz.
Q. Okay. All right. Would you agree with me that there's no quiz attached to this specific one?
A. No what?
Q. Quiz. Oh, wait. No, there is. Never mind. I apologize. All right. Let's see. Okay. All right. I understand.
A. Yeah. There's a topic.
Q. I got you.
All right. And so where do they complete these at?

Page 107

A. If -- it's the driver's prerogative. They can come in and do them in the office or they -- or we -- those are emailed to them, and they can fill them out outline; and as you seen, that one was e-signed.
Q. Okay. And how do the drivers e-sign these?
A. It's a PDF. Adobe.
Q. Okay. Do all the drivers -- or do all of these -- these -- these quarterly quizzes, do they all -- or let me put it this way:
Do all these safety topics, do they all have a quiz associated with them?
A. A what associated?
Q. A quiz.
A. No. Those would be the quarterly quizzes.
Q. Okay. I -- I apologize. I think I'm -- I think I'm in the -- a little -- having a little bit of confusion about which is which.
A. Okay. So the quarterly quizzes come out quarterly. Monthly topics, which are the shorter ones, they come out every month.
Q. Okay. All right. So let's see. Hold on. Let me find one.

Page 108

So would the -- one of the quarterly quizzes always be in January?
A. Yeah. Typically, they're released at the beginning of a quarter.
Q. Okay. And do they -- are the quarterly quizzes, like, in the same kind of form as a -- as the monthly topics, just they have a quiz with them?
A. I just -- I've never received one, but I would expect -- I would expect so.
Q. Okay. You -- you don't receive the quarterly quizzes?
A. Through the emails? From our own office? No.
Q. Okay. Do you -- who reviews those to make sure that, you know, that's what should be going out?
A. Well, Casey, the same gal that does the on-boarding, sends them out --
Q. Okay.
A. -- now.
Q. And is Casey responsible for making sure that the substance of them is something you guys want to publish to your drivers?
A. The substance? Well, there's -- we

Page 109

receive them through our captive.
Q. Through your captive. Like your insurance company?
A. Yes.
Q. Okay. All right. I understand.
So -- and that -- is that the -- when you say "the captive," are you talking about Cottingham Butler?
A. Brown, yes.
Q. Brown. Okay. All right. And so they are responsible for -- for giving you that -- that safety first newsletter that we looked at a second ago?
A. I'm -- on the regular, yes.
Q. Okay. Other than that, is there any other safety materials that you disseminate to your drivers?
A. Yes. Or I'm sorry. No. That's what -- that's what we send out regularly.
Q. Okay. So all of the -- all of the safety material that you provide your drivers, that comes from the captive Brown?
A. Correct.
Q. Okay. All right. I understand.
All right. This document here that

Page 110

we're looking at -- let's see if I can rotate it correctly. Is this a -- what is this? (Indicating.)
A. That -- that would be a score card from Saamba.
Q. Okay. So this is the Saamba score card that you were telling me about earlier?
A. Yes, yeah.
Q. Okay. All right. And this just captures the results of FMCSA or, you know, DOT inspections, stuff like that?
A. Right. You saw -- yeah, that's -- and it's the -- the report is -- the -- that clip page below it as well. There we go.
Q. All right. I got you.
All right. And so what is this that we're looking at here? (Indicating.)
A. Well, you're not going to get much from that because it's -- it's -- they're referred to as root cause, but what they're trying to do is explain the cost of your driver having X amount of CSA points in the different categories. He didn't really have any. So there's not much there to read.
Q. Okay. I understand.

Page 111

So they're saying, you know, essentially, if your driver inspects his truck better, then it would be in service more amount of time; and then the more it's in service, the more money you'll make because, you know, it's hauling loads rather than sitting on the sidelines waiting to be repaired?
A. Essentially, yes.
Q. Okay. I understand.
And, like you said, I mean, there's not much here. It looks like $250 according to this calculation.
A. Yeah. That's how much he theoretically lost.
Q. Yeah. And then that's as a result of just being out of service based on equipment?
A. The violations.
Q. Okay. All right. All right. And in this case, that -- that's the equipment, it looks like.
A. Yeah.
Q. All right. So let's see. All right. So earlier we were talking about the -- on the score card that percentage of time -- time that -- or not time, rather. Percentage of miles

Page 112

that it records as that driver was speeding.
What would be the threshold for it to have to make that report?
A. It makes that report. There's no threshold. Zero.
Q. Okay. So 1 percent would make that report?
A. Well, even zero makes that report.
Q. Okay. Well, okay. Let me -- let me phrase it differently.
I -- I think when you -- when you say "report" there, I believe you're referring to the SpeedGauge report. Is that fair to say?
A. Yeah. That's what I thought we were talking about.
Q. Yeah. Sorry. I meant the report card.
A. The -- the one we just were looking at?
Q. Yeah. Let me -- and I'll put it up on the screen to avoid any --
A. Okay. So that generates a report. All they have to do is have an inspection of any kind in the last three years.
Q. Yeah. I apologize. We're definitely talking about different things. Let me just -- let me put it up to clarify.

All right. This report here.
(Indicating.)
A. The -- yeah. That's what I was saying.
Q. Oh, okay.
A. But even if you have zero percent, it's still going to generate a number for -- your name's still going to be on it.
MR. MOSELEY: What he's asking you is in that blue section there, what -- what triggers the corrective action --
THE WITNESS: The corrective action?
MR. MOSELEY: -- from the SpeedGauge? Where -- where you say -- it's got "corrective action."
THE WITNESS: That's what I took. That's what I did.
MR. MOSELEY: Okay. But I'm saying he -- what he's asking is how -- how many -- what percentage do you have to do to -- to get on the list?
THE WITNESS: So the list is generated starting at zero. There is no -- so we -- we --
MR. MOSELEY: That's the SpeedGauge



list. What do you do --
THE WITNESS: This is the SpeedGauge list.
MR. MOSELEY: Okay. But -- all right.
MR. KLAASMEYER: Yeah. I -- I appreciate it, Rob. I see what you're -- where it didn't -- I'm trying to do the same thing.
Q. So here's what we're saying, Dave. So the -- on this list, obviously, we don't see, you know. This list starts in 2021 some time; and, you know, we don't see every month from 2021 to when he -- when he starts --
A. You're asking why -- when I would put that on there?
Q. Yeah. Yes, sir. That's what we're asking.
A. Okay. Yeah. So what I was saying was, the -- the report gives us that -- that number from zero to anything for everybody. Anything over 20 percent would go on there. That's my decision.
Q. Okay. Okay. All right. So if -- if a driver is speeding more than 20 percent of the miles, it would be noted on this report. That's



what you're telling me?
A. Right.
Q. Okay. All right. I understand.
And I -- I guess one thing that's confusing me about that is that, my understanding is that this report here -- this report here, I think you said you started using this form in 2023. Is that -- or some time in 2023.
Is that fair to say?
A. I do believe that is correct.
Q. Okay. To the best of our knowledge, this report started being used in 2023.
Is it -- would you agree with me, then, to put these 2021 incidents of -- of -- of high speeding percentages on here, that you would have had to get that data from somewhere?
Is that fair to say?
A. Yes.
Q. Okay. All right. And is it fair to say, though, then, that when you created this report -- or whoever it was that created this report at Waletich -- when this report was created in 2023, at that time Waletich had the ability to go back and find the data from 2021 regarding speed percentages?



A. Yes.
Q. Okay. Is it fair to say that Waletich still has that same ability?
A. I don't know if they kept the file or not. I wasn't the one who filled these out.
Q. Okay.
A. Who filled them, I mean.
Q. Okay. All right. I understand.
What -- where would they have gotten that data back in 2023 when this report was created?
A. I don't know right off the top of my head.
Q. Okay. Would you agree with me that you're not prepared to answer that question right now?
A. That -- yeah, that question, no.
Q. Okay. All right. Would you agree with me that somebody at Waletich knows the answer to that question?
A. I would agree.
Q. Okay. All right. All right. We -- we were talking earlier and you kind of -- you skipped ahead of me a little bit, and I kind of addressed it.

Page 117

But going back to it, I asked you a question earlier about, you know, what would be enough in terms of speeding tickets to -- to result in somebody's termination?

And then I asked a question also about if there was a percentage here that would result in somebody's termination.

Do you remember that?

I think you answered the question, but we didn't hear it.

A. I said yes.

Q. Yes. Okay. All right. All right. And so my -- my question now is what is the difference between a situation where a driver is speeding and the company knows about it through SpeedGauge versus a situation where a driving (SIC) is speeding and you only find out about it through a violation?

A. Well, I believe I answered you with we can't have a zero tolerance policy. So there's always going to be some for some reasons, and that's why we monitor it.

Q. Okay. Would you agree with me that a driver speeding who does not get caught by, you know, local authorities, DOT, whoever it is, is

Page 118

engaging in the same unsafe driving through -- as one who is caught by local authorities, DOT, whoever it may be?

A. Yes.

Q. Okay. Would you -- would you agree with me that Waletich has a responsibility to monitor its drivers and determine whether they are engaging in those unsafe driving behaviors?

A. Yes. We monitor it, as you can see.

Q. Okay. All right. But just so that I get a 100 percent clear answer, would you agree with me that Waletich has a responsibility to monitor that unsafe driving behavior?

A. We certainly -- I mean, yeah. Of course, we monitor it. It's -- it's our responsibility to keep the drivers compliant with the laws to the best of our abilities.

Q. Okay. All right. All right. I understand that.

And -- and so in this instance, when you see a driver who -- who was speeding for 40 percent of the miles that he drove for this time -- relevant time period, you know, is it -- would you agree with me that that is a -- that is pretty significant evidence of unsafe driving?

Page 119

A. Well, as we talked about it before, that doesn't reflect how many miles; but that's why it's there, and that's why he was coached. So I would agree --

Q. Sure.

A. -- that that was needed to be addressed.

Q. Sure.

Would you agree with me that while, you know, sitting here looking at this report, we can't say how many miles this was at the time that this report was, you know, generated, you would have had his logs. So somebody could have gone back and looked and saw how many miles he drove.

Would you agree with that?

A. I agree.

Q. Okay. And do you -- you still get these reports from SpeedGauge. Is that fair to say?

A. Yes.

Q. Okay. So, you know, if you get a report -- if you got an email with a report today and it said a driver was speeding for 40 percent of their miles, you would have the ability to go back and look and see, "Oh, and he drove this amount of miles in that period"?

Page 120

A. Yes.

Q. Okay. All right. And have you had that ability to do that from the time of -- of Jonathan Williams' start of his relationship with Waletich to the time that he terminated his relationship with Waletich?

A. Yes.

Q. Okay. All right. I understand.

So why don't these result in a formal, like, written write-up? 'Cause I see -- I know you told me earlier that this is -- this is informal. You call them and that this would be a written write-up down here. (Indicating.)

Why do these incidents not result in a written write-up?

A. Because that's what it says. It's a coaching event. So if -- if their behavior isn't -- doesn't become adjusted, they get wrote up. The write-up is the prelude to either probation or termination.

Q. Okay. So just so that I understand. Having a high percentage of speeding per miles is not enough alone to get a write-up at Waletich?

A. Again, you would have to -- it would depend on the driver.

Page 121

Q. Would you agree with me that -- that four incidents in this case here, in a -- in a pretty short time period, within a month, was not enough to get him a write-up?
A. I -- that was what was explained on that last one there.
Q. Okay.
A. So every --
Q. So four was not enough?
A. I'm sorry. What?
Q. You would agree with me that four was not enough to get a -- a written write-up.
Is that fair to say?
A. In this -- in this particular case, no.
Q. Okay. All right. Prior to your deposition today, would you agree with me that you had the ability to go into PeopleNet and -- and look at data about Mr. Williams?
A. Prior to today?
Q. Yeah. Prior to today.
A. You're going to have to be more specific because yes and no.
Q. Okay. Let me -- let me -- let me ask a more -- a better question. I appreciate what you're saying.

Page 122

Would you agree with me that between when this notice of deposition for the deposition you're giving right now was issued and the time, you know, as of right now, that you had the ability to go into PeopleNet and look at relevant data about Mr. Williams? Is that fair to say?
A. Again, yes and no. I apologize, but that is actually a true answer.
The logs are only -- they're only archived for a few months. Right. The GPS report you have has a longer archive. So depending on the length of time and which subject you're talking about would factor the answer.
Q. Okay. So just to make sure I understand. The answer is yes and no because some of the data is still available in PeopleNet, but some of the data is not available in PeopleNet?
A. Yes. I believe even now the GPS report is still available.
Q. Okay. All right. And my question is: Ahead of the deposition from the time the deposition was noticed and this very moment, did you do that?
A. Pull up the GPS report?

Page 123

Q. Pull up anything in PeopleNet to look and see if there was relevant information.
A. Not since I -- not since -- no.
Q. Okay. All right. Would you agree with me that -- that -- that -- let me strike it and restart and rephrase.
Would you agree with me that some of that information would probably affect your testimony today?
A. If -- I would -- I would -- if I was to pull up his GPS report, I would have to be looking for something specific to give you an answer to a question.
Q. Sure.
But would you agree with me that reviewing the data that's available to Waletich, specifically in PeopleNet or SpeedGauge or whatever electronic data management system y'all used for a given topic, that that data would -- would help you answer my questions today?
MR. MOSELEY: Object to the form.
A. Yeah. I mean, I'd have to memorize all of it; and you're talking about thousands of lines of data. I -- I don't know how I could have done that.

Page 124

Q. Okay. But you didn't -- you didn't look at it at all. Is that fair to say?
A. To -- to review, no.
Q. Okay. All right. All right. So we talked about a lot of the -- the training and -- and compliance stuff that y'all do in terms of checking the logs, reviewing cameras, things like that.
Are there any other steps we haven't talked about that you -- that Waletich takes to ensure compliance with Federal Motor Carrier Safety Regulations?
A. What were the things that you've listed?
Q. So we've talked about -- we talked about what you do with the logs and -- and that there's a -- that a personal conveyance review and a DOT -- or duty status review of the logs. We've talked about what you do to train your drivers.
What other steps other than those do you take to ensure that your drivers are compliant with the Federal Motor Carrier Safety Regulations?
A. Well, as we have talked about, whenever a video is generated, that's reviewed. We're looking for driver habits specifically. Not a

Page 125

single issue, but a general habit.

Do they present themselves with good driving habits that will prepare them for the unknown, put them in the -- as you had mentioned earlier, the Smith System. You know, are they leaving enough distance? Are they making sure they have an out? Are there situational awareness which actually covers two of the Smith lines.

And if we see -- if I see or somebody brings to my attention, like, say, a call-in, that behavior will be looked at; and then the driver will be contacted either on the phone when they're not driving, you know, during their break or when they come into the office. Those -- those habits are tried -- are -- we try to adjust them.

Q. Okay. All right. I'm going to run through some of our -- our topics list items quickly, and I would -- what I want is to know kind of what -- what you know about these topics.

Do you know anything about Waletich's actions taken to preserve evidence relevant to this collision?

A. Yes.

Page 126

Q. Okay. What actions were taken to preserve evidence?

A. The list was given and I -- I collected as much data on that list as I could find.

Q. Okay.

A. And I -- I put it in a file; and when it was asked to be turned over, I turned it over.

Q. Okay. Did you -- did you save the stuff that was in PeopleNet at the time?

A. Yes.

Q. Okay. All right. Did that include the email reports you get from SpeedGauge?

A. No.

Q. Okay. All right. I understand.

All right. What -- what do you know about the insurance policies that -- that Waletich carries?

A. Liability, phys dam, and cargo. I know we have a million dollar limit on the auto liability and we -- I -- what else are you looking for?

Q. Okay. Do you know if Waletich -- other than that million dollar liability policy that you just told me about, do you know if Waletich carries any other excess or umbrella coverage

Page 127

for -- that would cover something like this?

A. No, they don't.

Q. Okay. So it's just the million dollar liability policy?

A. That's -- yes.

Q. Okay. All right. We've talked about -- about how there was a -- a partial preventability analysis done in this crash. Was there any other sort of investigation into what happened after that?

A. After he got back, we were going to do paperwork and have a face-to-face interview. None -- now that the moment had passed, and he had a minute to calm down. Most people are wound up, and then it never happened so --

Q. Okay. And that's 'cause he quit; right?

A. Correct.

Q. Okay. All right. What did -- who -- who told the insurance company that -- that there had been an incident?

A. I -- I reported it.

Q. Okay. What did you tell them?

A. So my initial email was something to the effect of name of our driver and a short description of what happened. Typically,

Page 128

whatever photos or whatever I can send. In this case it would have probably been that short video will get forwarded to them.

Q. Okay. When -- when did you first learn -- or I should say, when did Waletich first learn that -- that it had been sued?

A. By the -- paperwork showed up. I don't have -- I don't keep track of dates in my head like that.

Q. Okay. How long is the -- is the data regarding the percentage of miles a driver is speeding for, how long is that kept?

A. I suppose as long as -- if it's still in the emails. I've never gone back and had to pull it. So I don't know.

Q. Okay. Have you ever tried to do that?

A. No.

Q. Okay. Has anybody from Waletich that you're aware of tried to do that?

A. Not that I'm aware of.

Q. Okay. All right. What was --

MR. MOSELEY: What was that? We were trying to get data from where?

THE WITNESS: Once a week --

MR. MOSELEY: I'm sorry. I missed

Page 129

that.

THE WITNESS: Yeah. Once a week the -- the percentage that he's seen is generated and sent to me.

MR. MOSELEY: The SpeedGauge.

THE WITNESS: Yeah. It's just a report. I don't know if -- I don't remember -- I've never looked into it. That's just a link. You just click on it. Pulls up a sheet. You read through it, you -- blah, blah, blah.

MR. MOSELEY: Okay. Thank you.

THE WITNESS: It's, you know, it's important but it's -- it's very regular.

Q. Okay. So other than the ELDs, obviously, and then the -- the camera with the little clips that get sent to you and the SpeedGauge report, what -- and -- and call-ins as well, what other steps does Waletich take to monitor driver performance, location, hours, or safety events?

A. Assuming a driver exceeds the drive time or one of the -- one of the hour rules, PeopleNet would generate a -- a report stating such.

MR. KLAASMEYER: Okay. All right. Okay. I think we are almost done here. I need just a few minutes just to make sure I've hit everything.

Page 130

I definitely have some more questions for you, but they're kind of wrap-up questions after this; but I need to go through my notes for just a minute. Let's take a break, and we'll come back; and we'll hopefully try to wrap this thing up.

THE WITNESS: All right.

THE VIDEOGRAPHER: The time is now 1:10. We're off the record.

(A recess was taken.)

THE VIDEOGRAPHER: Time is now 1:19. We're back on the record.

BY MR. KLAASMEYER:

Q. All right. What is -- what is Waletich's DOT safety rating?

A. Right now we're -- the satisfactory.

Q. Okay. Has -- has Waletich ever -- or let me say -- let me caveat that actually.

Prior to this crash within five years, had Waletich been audited by the Federal Motor Carrier Safety Administration?

A. I can't give you the date. I do know that -- I know at one point they did have an audit and found to be our current status, satisfactory.

Page 131

Q. Okay. And I know you said you couldn't give me the date. When approximately was that?

A. Maybe 2018.

Q. Okay. All right. And that was prior to you being a safety director. Is that fair to say?

A. That is correct.

Q. Who was the safety director before you?

A. My predecessor was Amanda Ann Burton.

Q. Okay. And why did she leave?

A. I never talked to her other than a handful of times.

Q. Okay. Somebody at Waletich knows why she left; right?

A. Yes.

Q. Okay. Okay. Would you agree with me that on the day of this crash, Jonathan Williams was a statutory employee of -- of -- of Waletich?

MR. MOSELEY: We're not disputing that.

MR. KLAASMEYER: All right. That's good enough.

Q. All right. And would you agree with me, then, that Waletich had a nondelegable duty and that they were responsible for the training of Mr. -- of Mr. Williams?

Page 132

A. Nondelegable. I mean, if he was to be trained, it would have been our responsibility, correct.

Q. Okay. Would you agree that Waletich had a -- had a duty to supervise Mr. Williams?

A. Yes. We are -- we are required to supervise our drivers.

Q. Okay. Would you agree with me that you're required to make sure that your drivers know and follow the Federal Motor Carrier Safety Regulations?

A. Drivers are -- the drivers are required to know the regulations. If we see them operating outside of the regulations or -- yes, well, we would inform them and whatever follow-up action's needed.

Q. Okay. But just -- just to make sure 'cause I think there's a little bit of a difference between doing something and -- and being responsible for doing it. Does that make sense?

So, for example, if I see, like, an

Page 133

elderly person and they're having trouble crossing the street, I don't have a responsibility to help them; but I might do it anyways.
Does that make sense?
A. We have a responsibility to -- to keep them as compliant with the rules and regulations as possible.
Q. Okay. Do you agree that -- that your responsibility is to make sure that they know what those rules and regulations are?
A. Yes.
Q. Okay. All right. Who -- who signed the OP1 submitted by Waletich to the Federal Motor Carrier Safety Administration?
A. I'm sorry. What was that again?
Q. Who signed the OP1 submitted by Waletich to the Federal Motor Carrier Safety Administration?
A. I -- I don't know that.
Q. Okay. All right. Since that DOT audit we already talked about, have there been any other DOT actions involving -- involving Waletich?
A. The -- the DOT FMCSA, they have -- no.

Page 134

Q. Okay. How do your drivers do DVIRs?
A. The PeopleNet system has a spot where you can put inspection, flag that time. If in that time they find an issue, they would report it back to primarily the shop manager for guidance. Sometimes they'll ask whoever they get a hold of, and maybe they're redirected.
Q. Okay. I think you told me earlier that there was an DVR download of the -- of the truck, like, right when the crash happened.
Is that -- is that true?
A. Yeah. That was submitted.
Q. Okay. All right. I think we've talked a little bit about the Smith System throughout the deposition a couple different times. Is that system formally used by Waletich?
A. Formally? No.
Q. Okay. Do you give your drivers a Smith System manual?
A. I'm sorry? What was that again?
Q. Do you give your drivers a Smith System manual?
A. A Smith System manual? No.
Q. Okay. Do you -- do you think that Waletich's policy regarding the number of

Page 135

speeding tickets a driver can receive or -- or not just speeding tickets but moving violations -- a driver can receive per year is in conflict with its policies regarding what it does with the data regarding the percentage of the time a driver -- or percentage of miles a driver is speeding for? Do you think those two policies conflict in any way?
A. No.
Q. Why not?
A. One is driving habits. One is consequential. So they're not the same.
Q. Is it equally dangerous to speed regardless of whether you get caught or not?
A. Yes.
Q. Okay. Is there a difference between Waletich catching its drivers speeding and a government entity catching its drivers speeding?
A. Yes. We will try to adjust their driving habits, which includes speeding, versus an officer pulling somebody over who cares only about in that exact moment.
Q. Okay. But -- but in terms of -- of trying to make sure that we're operating safely, would you agree with me that there's -- there is

Page 136

no difference between someone who's speeding and gets caught and someone who's speeding and doesn't get caught?
A. Again, are you -- if you're saying speeding is unsafe, I would agree. There's a difference between having a written citation from a government official than us trying to adjust their habits so that doesn't happen.
Q. Let me -- let me rephrase. I'll try to make it more simple.
Why -- why would you fire a driver over a speeding ticket if, ordinarily, you would just instruct them to stop speeding?
A. As we talked about earlier, it depends on the driver. It depends on their record.
Q. Okay. All right. But you do agree that there are scenarios where you would catch a driver speeding via the data, the -- the percentage data that you get from SpeedGauge, and you wouldn't terminate them. But if that driver received, you know, three tickets in a year, you would terminate them.
Would you agree with that?
A. Yeah. In that exact statement.
Q. Say that again.

Page 137

A. Yeah. As stated.
Q. Okay. All right. So I guess my -- my question, then, sir, is -- is why would you fire one driver who got caught speeding by a government entity and not fire a driver that you yourself caught speeding?
A. Again, one has got to do with driver habits. Pre -- proactive training. The other is the -- the officer does not care about anything other than in the moment. At that exact moment, he could see they were speeding. That's the end of it. There is no conversation.
Q. Sure. But then --
A. I'm sorry. I didn't mean to cut you off.
Q. No worries. You can finish your statement, if you like.
A. No, no. It's -- it's probably -- it's not relevant.
Q. So I -- I guess what I -- what I -- do you understand what I'm getting at here? I guess what I'm trying to understand is: If you have two drivers and they were doing the exact same thing but one of them gets cited by the police and one of them does not, why wouldn't -- why

Page 138

would the citations be grounds for termination but just knowing that the driver speeds would not be grounds for termination?
A. As I -- as I -- as I stated, the driver might have a good work history. Might have -- exhibit good driving habits and made a mistake versus driver has habits that need to be corrected.
Q. Okay. So let's -- let's narrow it down a little more.
If -- if we had two drivers. One of them gets a report for speeding 30 percent of the miles that they drove; and you've got another driver, and they also get a report for 30 percent of the miles that they drove speeding but that driver gets three citations within a year.
What is the difference between those two drivers?
A. I'm afraid we're probably going to end up circling this forever.
The guy with three citations in two years exceeded the policy -- the company policy limits. That's -- that's nonnegotiable.
And the other guy would have -- just a hypothetical, like yours, what if that's the only

Page 139

time that's ever happened?
Q. Okay.
A. In, say, 400 weeks of employment, that was the only time that it happened --
Q. Okay.
A. So --
Q. All right. I think that answered the question.
So, essentially, because the policy says that the violations are a fireable offense but there is no policy that says that a certain speeding percentage is too much.
Is that fair to say?
A. In a single event, correct.
Q. Okay. All right. So on Mr. Williams' report card that we looked at before, you know, there were four or five reports that -- of, you know, essentially excessive speeding.
Would you agree with that?
A. Yeah.
Q. Okay. All right. And so if he had been cited for each of those incidents, if a -- if an officer had cited him, would he have been terminated?
A. If he had been cited for every one of

Page 140

them, correct.
Q. Okay. All right. That's -- that makes sense. I understand.
And -- and you agree with me that he was not terminated as a result of those four.
A. Correct.
Q. Okay. Would you agree with me that -- that speeding is pretty closely interrelated with space management?
A. Habits that follow speeding can result in space management issues.
Q. Okay.
A. But I wouldn't draw a one-to-one line with that.
Q. Okay. All right. But they're related. You would agree with that?
A. Depending on the driver, yes.
Q. Okay. All right.
A. And the location.
Q. Would you agree with me that this crash was caused by space management?
A. Yes. I would agree.
Q. Okay. And speed management?
A. I -- I guess I don't remember if he's speeding at that time; but had he been, that

Page 141

would be a correct statement.
Q. Okay. All right. So if he was speeding, that would mean that -- that this statement is correct that it was about speed management?
A. Yeah. Yes.
Q. Okay.
A. Well, space management specifically.
Q. Okay. All right. I understand.
What's Waletich do to ensure that drivers are not on their phones while -- while operating their commercial motor vehicles?
A. Well, we have a policy. I know that's not the answer. We -- yeah.
Q. Well, that's -- I mean, that's certainly an answer. I mean, yeah --
A. Yeah. There's policies against it. You know, pretty -- pretty severe punishment if it proves to be the case.
Q. Okay. Would you agree with me that a driver operating a mobile phone while driving, that's dangerous?
A. Texting and driving is -- is distractive -- yes, that's not -- that is not a safe habit.

Page 142

Q. Would you agree with me that -- that it's not just texting and driving, though. It's kind of, you know. Any -- it's really just distracted driving. Is that fair to say?
A. Talking on the phone with a handsfree headset?
Q. Well, not that. Not that. 'Cause I -- I think that, you know, that -- that is -- I think that probably does fall into the definition of distracted driving. But that's all I'm asking about. So let me ask a more clear question.
Would you agree with me that operating, you know, using any sort of device where your hands are not on the wheel, that that is -- that is dangerous driving?
A. It -- it's -- it can be distractive if used at the wrong time. You said any device. That could include the radio.
Q. Yeah. Okay. Fair enough.
Or -- and so let me maybe -- maybe get it more -- more, you know, right on -- on to what I'm asking.
Operating a device for any, you know, extended period of time rather than just, you know. I think most people agree that a radio can

Page 143

distract you; but it's not, you know, a huge distraction unless you're fiddling with it, like, continually.
So my question is: Would you agree with me that operating any sort of device where your hands are off the wheel for -- for, you know, more than just a moment or two, that would be dangerous?
A. Yeah. That would be -- yeah. I would agree with that.
Q. Okay. All right. Would you agree with me that having inward facing cameras would help monitor for that kind of activity?
A. I would agree.
MR. KLAASMEYER: Okay. All right. All right. All right. I do not have any more questions for you, sir. Your attorney may have some, and I may have follow-ups based on that.
THE WITNESS: Okay.
MR. MOSELEY: I've just got one question.

EXAMINATION

BY MR. MOSELEY:
Q. You -- you mentioned that the truck Mr. Williams was driving at the time of the

Page 144

accident was a rental?
A. Correct.
Q. All right. And -- and does that mean his regular truck was out of service?
A. Correct.
Q. Okay. It was in the shop?
A. Yes.
MR. MOSELEY: Okay. That's all the questions I have.
MR. KLAASMEYER: Okay. I -- I have a follow-up based on that. I think it's going to be fairly quick.

REEXAMINATION

BY MR. KLAASMEYER:
Q. But did -- did his normal truck have an inward facing camera in it?
A. No.
Q. Did his normal -- was his normal truck, you know, substantively different? So was it, you know, different in any major way from the truck he was leasing?
A. Well, professional drivers will argue there's huge differences; but I think people like me and you would say they're -- they're very, very similar.

Page 145

Q. Okay. What -- well, just so that I understand. How are they different?

A. Drivers are very -- a good driver is very in tune with the truck. It might pull left. It may pull right. It might not accelerate the way you would expect. It might not -- there's the subtleties that we would never notice.

Well, not me, but you. Well, I'm sorry. Not you. But drivers who spend time, you'll hear them argue all the time about this truck is better than that truck.

Q. Okay. I understand.

Just like anything, you know, there's -- there's a -- the eye of the beholder and the untrained eyes is a little bit different where it's, you know, a professional driver, as you said, is -- is, you know, more in tune to the -- the issues than somebody like I would be, for example.

A. The nuances of a truck, correct.

Q. Do you think that the difference in the truck affected this crash?

A. It should not have.

Q. Should not have. Okay.

Is it -- is it dangerous for a driver to drive a truck that they are unfamiliar with?

Page 146

A. It would have to be an extremely different truck; but in this particular case, I would -- I would say no.

Q. Would you agree with me that if a driver is in a truck that they're not 100 percent familiar with, that they should just take extra caution in operating it?

A. I -- I -- I don't believe that the differences in this instance would -- would need extra caution as they were both very similar trucks.

Q. Okay. But just -- just to answer the -- my question: Do you think that a driver driving a vehicle that they're not as familiar with as maybe their normal vehicle, do you think that person should take extra caution?

A. As -- as somebody who had been driving and had hundreds of thousands of miles on them, I -- I don't think in this case that he would have had -- the differences in his ability to control the vehicle would have been negligible.

Q. Okay. And, again, I just -- I think it's a little bit different than the question I'm asking though. 'Cause I -- you're applying it to our situation, which is fair enough; but I think -- I think your position on that is pretty clear.

Page 147

The question, though, is -- is should a driver who's driving a vehicle that they're less familiar with take extra precautions?

A. You're -- you're -- you're kind of applying somebody who is inexperienced to the situation. Somebody who's driven a lot, had a substantial amount of miles in trucks of the same make, model, and power train, they're not going to notice the difference in performance as far as their ability to safely drive it.

Q. Okay. All right. I understand.

So your position is that they -- that he did not need to use extra caution for being in a truck that's unfamiliar to him?

A. It should not have -- if he was a good driver, it would not have worried him to be in a very similar truck to the one that he normally drove.

Q. Okay. All right. I understand.

All right. Is there anything else that we have not talked about today that you think is important for a jury to hear?

Page 148

MR. MOSELEY: Object to form. Go ahead.

A. I guess I'm going to say no. I'm -- you have -- you were pretty thorough.

Q. Okay. All right. All right. Let's see. Trying to think if there's anything else, but I don't think so.

MR. KLAASMEYER: Thank for your time today, sir. I appreciate you coming here. I think they're going to ask a couple questions of you just like wrapping it up here or give you some instructions; but I do appreciate you coming and talking to me today.

THE WITNESS: Okay.

THE VIDEOGRAPHER: All right. This concludes the video deposition of Dave Hensche 30(b)(6) Waletich Corporation. Time is now 1:43, and we're off the record.

MR. MOSELEY: All right. Ronda, I'll take a copy and the synced video; and we'll waive reading and signing.

MR. KLAASMEYER: I'll take the original, obviously, and then the sync copy and an etran. Sorry. Let me get that out.

THE REPORTER: You want the

Page 149

original printed and sealed now?

MR. KLAASMEYER: Actually, we'll wait -- we'll wait on that to see what happens.

(The deposition concluded at 1:44 p.m.)

- - -

Page 150

CERTIFICATE OF REPORTER
STATE OF SOUTH CAROLINA
COUNTY OF HORRY

I, Ronda K. Blanton, a Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the witness in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and location therein stated; that the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed by computer-aided transcription; that the foregoing is a full, complete, and true record of the testimony of the witness and of all objections made at the time of the examination; that this deposition was taken via videoconference and may contain misinterpreted words; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

Should the signature of the witness not be affixed to the deposition, the witness shall not have availed himself/herself of the opportunity to sign or the signature has been waived.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal on April 8, 2026, at Myrtle Beach, Horry County, South Carolina.

Ronda K. Blanton
NCRA REGISTERED PROFESSIONAL REPORTER, RPR
Notary Public,
State of South Carolina at Large
My Commission expires:
May 15, 2028.

**WORD INDEX**

< $ >
**$250** 89:*24* 111:*11*

< 1 >
**1** 17:*15* 24:*3*, *10* 112:*6*
**1:10** 130:*11*
**1:19** 130:*14*
**1:43** 148:*17*
**1:44** 149:*4*
**10** 1:*15* 64:*8*, *9* 89:*5*
**10:15** 4:*11*
**100** 12:*2*, *4*, *10* 39:*25* 67:*5* 70:*16* 88:*20* 118:*11* 146:*6*
**11** 10:*13*, *16* 79:*1* 93:*11*
**11:14** 53:*16*
**11:20** 53:*19*
**12:17** 99:*18*
**12:28** 99:*21*
**123** 59:*7*, *9*
**130** 18:*12*, *13*
**140** 18:*13*
**143** 3:*3*
**144** 3:*4*
**15** 20:*12* 30:*14* 93:*11*, *14* 150:*24*
**150** 3:*5*

< 2 >
**2** 24:*14* 35:*7*
**2/23/2024** 35:*11*
**20** 64:*8* 92:*5*, *6*, *10* 93:*15*, *22* 95:*12* 114:*21*, *24*
**2018** 131:*5*
**2021** 79:*1* 114:*11*, *12* 115:*14*, *24*
**2022** 102:*7*
**2023** 101:*8*, *21* 115:*8*, *12*, *23* 116:*10*
**2024** 13:*15* 102:*10*, *12*
**2026** 1:*12* 4:*7* 150:*17*
**2028** 150:*24*
**21** 86:*24* 93:*23*, *24*
**21.3** 86:*24* 88:*3*
**22** 102:*9*
**23** 13:*15* 78:*1* 80:*10*, *17*
**24** 13:*10* 80:*10*, *17*
**25** 1:*12* 4:*7*
**29405** 2:*5*
**29415** 1:*19*
**29616** 2:*9*

< 3 >
**3/11/2024** 104:*8*
**30** 93:*25* 138:*12*, *14*
**30(b)(6** 1:*4* 4:*4* 8:*14*, *15* 15:*18* 148:*17*
**300** 2:*4*

< 4 >
**4** 3:*3* 52:*23* 54:*1* 89:*6*
**4/12/2021** 88:*14*
**4/12/21** 91:*4*
**40** 88:*15*, *20* 89:*1*, *6*, *10* 118:*21* 119:*22*
**400** 139:*3*
**4324** 2:*8*
**4401** 2:*4*
**451** 103:*15*, *18* 104:*4*
**4-5-1** 103:*18*
**48** 34:*12*, *14*

< 5 >
**5:25-cv-08705-MGL** 1:*4*

< 6 >
**60** 73:*7*

< 8 >
**8** 150:*17*
**8/9/2023** 84:*16*
**8/9/23** 84:*25*
**843-762-6294** 1:*19*
**864-248-6025** 2:*9*

< A >
**abide** 37:*7*, *12*
**abilities** 118:*17*
**ability** 34:*16* 42:*5* 115:*24* 116:*3* 119:*23* 120:*3* 121:*17* 122:*5* 146:*21* 147:*13*
**able** 8:*1* 11:*5* 12:*9* 27:*11* 52:*14* 72:*8*
**absolute** 87:*14*, *15*
**absolutely** 43:*9* 48:*3*
**accelerate** 145:*5*
**accident** 49:*5*, *6*, *10* 51:*17* 67:*14* 79:*17*, *18* 81:*12*, *17*, *24* 82:*2*, *4* 99:*7* 106:*8* 144:*1*
**accidents** 51:*16*
**accomplish** 25:*18*
**account** 45:*18*
**accounting** 31:*15*
**accurate** 49:*15* 79:*16* 104:*12*
**action** 5:*3* 69:*5*, *11*, *14* 70:*15* 96:*18* 113:*10*, *12*, *15*
**actions** 69:*8* 125:*23* 126:*1* 133:*23*
**action's** 132:*19*
**activities** 15:*24*
**activity** 143:*13*
**actual** 75:*12*
**add** 94:*22*, *23*
**added** 79:*13*, *14*, *24* 80:*1*, *16*, *25* 81:*5*
**address** 36:*19*
**addressed** 116:*25* 119:*6*
**addresses** 84:*12*
**adjust** 31:*11* 98:*6* 125:*16* 135:*19* 136:*7*
**adjusted** 89:*15* 120:*18*
**Administration** 15:*25* 24:*22* 130:*23* 133:*15*, *19*
**Administration's** 45:*1*
**Adobe** 107:*8*
**advantage** 72:*25* 73:*6*
**advantages** 73:*17*
**affect** 27:*1* 38:*10* 123:*8*
**affixed** 150:*13*, *16*
**afraid** 14:*6* 95:*13* 138:*19*
**ago** 12:*13* 32:*2* 35:*4* 36:*4* 39:*10* 56:*6* 63:*14*, *21* 109:*13*
**agree** 27:*2*, *7*, *15*, *17*, *18*, *20* 28:*13* 29:*7* 42:*20* 47:*23* 49:*24* 61:*3*, *5*, *13*, *18* 62:*10* 66:*25* 80:*3* 81:*3* 100:*6*, *10* 104:*9* 106:*15* 115:*13* 116:*14*, *18*, *21* 117:*23* 118:*5*, *11*, *24* 119:*4*, *8*, *15*, *16* 121:*1*, *11*, *16* 122:*1* 123:*4*, *7*, *15* 131:*18*, *25* 132:*7*, *11* 133:*9* 135:*25* 136:*5*, *16*, *23* 139:*19* 140:*4*, *7*, *16*, *20*, *22* 141:*20* 142:*1*, *12*, *25* 143:*4*, *10*, *11*, *14* 146:*5*
**ahead** 7:*16* 9:*6* 13:*23* 54:*3* 116:*24* 122:*22* 148:*2*
**aim** 58:*2*
**air** 70:*7*
**alcohol** 8:*5* 58:*13*, *15* 82:*14*
**alert** 64:*8*, *10*, *14*
**alerts** 64:*1*
**allowed** 101:*10*
**Amanda** 131:*11*
**ambiguous** 25:*16*
**amount** 18:*11* 37:*13* 40:*8* 72:*11* 90:*25* 110:*21* 111:*3* 119:*25* 147:*10*

**analysis** 67:20, 25 68:3, 6, 8 69:1 127:8
**and/or** 97:5
**Ann** 131:11
**announced** 8:13
**annual** 74:12 101:13, 20 102:7, 12, 16
**answer** 7:15, 18 12:2 27:11 28:2 84:5 102:11 116:15, 19 118:11 122:8, 13, 15 123:13, 20 141:14, 16 146:13
**answered** 6:11 117:9, 19 139:7
**answers** 15:12
**anticipation** 105:1, 3
**anybody** 14:7 20:3, 9 24:19 26:2 29:16 30:17 37:11 48:14 51:21 53:6, 11, 22 57:20 67:16 99:23 128:18
**anymore** 34:21 82:16 98:19
**anyway** 51:10
**anyways** 80:15 133:4
**apologies** 77:9
**apologize** 32:18 43:20 46:24 106:20 107:18 112:23 122:7
**Appearances** 2:1
**appears** 104:5
**application** 46:8 49:1
**applying** 146:25 147:8
**appreciate** 6:25 12:8 71:5 103:24 114:7 121:24 148:9, 12
**approximately** 131:4
**April** 150:17
**archive** 122:11
**archived** 122:10
**area** 83:7
**argue** 144:22 145:10
**arising** 69:9
**Arthur** 2:11 4:9
**ascertain** 29:3 85:18
**Ashley** 26:6, 14 27:3, 8, 16, 19 28:7, 10 29:7, 13, 17 30:12, 15 32:12
**asked** 6:3, 12 44:9 67:10 117:1, 5 126:7
**asking** 5:20, 24 15:11 16:5, 6 17:14 78:13 80:12 87:8 113:8, 19 114:14, 17 142:10, 22 146:25
**associated** 107:13, 14
**assume** 23:5
**assuming** 50:3 129:21
**at-fault** 67:14
**attached** 106:16
**attempt** 70:6
**attention** 125:11
**attorney** 5:2 7:11, 16 53:7 143:17
**attorneys** 13:25 14:8
**audit** 58:20 131:1 133:21
**audited** 130:22
**authorities** 117:25 118:2
**authority** 8:24, 25 23:20 24:3, 10 25:2
**auto** 80:19 81:16 126:19
**automatically** 74:21 88:5 91:10 94:1
**available** 15:14 22:24 28:15, 25 29:8 30:7 43:3 56:9 122:16, 17, 20 123:16
**availed** 150:14
**avoid** 6:17 112:19
**aware** 38:7, 9 61:7, 9 64:21 85:20 92:17 128:19, 20
**awareness** 125:8
**awry** 37:18

< B >
**back** 16:23 21:11 23:4 34:21 35:15 39:8 41:11 43:23 44:19 51:24 52:15 53:19, 25 66:16 67:21 78:4 81:18 86:7 90:24 98:6 99:16, 21 101:6 106:13 115:24 116:10 117:1 119:13, 24 127:11 128:14 130:7, 14 134:5
**background** 46:10, 17 54:5
**backing** 79:1, 7 81:16
**bad** 65:6
**based** 22:13 49:1 83:15 91:4 97:22 101:1 111:16 143:18 144:11
**basically** 73:13
**basics** 5:14
**Beach** 150:17
**beams** 34:4, 7
**beginning** 8:13 80:10 108:4
**begun** 5:19
**BEHALF** 2:1, 5 4:14 9:12 11:8, 9, 17 28:22
**behavior** 95:8 118:13 120:17 125:12
**behaviors** 118:8
**behind-the-wheel** 50:15, 18, 25
**beholder** 145:14
**believe** 11:18, 19 13:10 34:20 41:20 42:1, 15 50:9 51:3 52:19, 20 55:5 63:21 70:21 77:25 94:25 100:22 101:3, 22 112:12 115:10 117:19 122:19 146:9
**Belle** 2:4
**belongs** 98:7
**best** 6:17, 20 42:4 52:8, 12 54:9, 12, 14, 17, 22 80:15 92:17 115:11 118:17
**better** 25:13 47:2 65:5, 6 67:10 69:23, 24 70:6, 11 94:13 98:20 111:3 121:24 145:11
**beyond** 17:20
**big** 46:13 103:21
**Bigger** 45:21
**biggest** 73:6
**binding** 15:7, 8
**bit** 14:23 25:15 41:14 47:2 54:2 55:16 90:4 96:14 107:20 116:24 132:21 134:14 145:15 146:24
**biweekly** 21:6
**blah** 129:10
**Blake** 21:6, 25 22:3, 5
**BLANTON** 1:18 4:9 150:3, 21
**blue** 113:9
**boarding** 43:16 44:12 48:9 52:12
**BOLEN** 1:18 2:12 4:10
**bonus** 39:21 45:13, 21, 24
**bonuses** 39:21
**book** 40:22, 25 41:1, 2
**booked** 11:2
**bottom** 106:10

**bought** 73:2, 3
**Boulevard** 2:8
**box** 98:21
**brakes** 65:16
**break** 6:5, 7, 9 53:1, 3, 13, 21, 23 99:14, 15, 24 125:14 130:6
**breaks** 6:7
**Brian** 9:3 23:15, 21 24:1, 9 25:24 26:4 27:19, 22 28:6 29:14, 18, 19, 24 30:9, 15 48:11
**bring** 45:13
**brings** 125:11
**brink** 86:13
**broad** 17:6 51:14 58:1
**broken** 19:2
**brought** 74:10
**Brown** 109:9, 10, 22
**Bruce** 21:1, 14, 24 23:5, 11
**brung** 74:6
**bunched** 102:3
**Burton** 131:11
**business** 15:23 77:20, 24 78:9, 17
**busy** 21:7 85:10
**Butler** 109:8
**buy** 72:16

< C >
**calculation** 111:12
**call** 23:13 30:21 48:20 49:7 52:4 72:8 94:13 95:18 120:12
**called** 22:18 41:8 59:7 64:24 75:5 86:3 89:23 95:21 105:10, 13
**call-in** 71:22, 25 125:11
**call-ins** 129:17
**calm** 127:14
**cam** 59:22 74:19
**camera** 60:11, 15, 22 61:1 62:8, 12, 18, 19, 25 63:5, 16 76:11 83:24 95:25 105:20 129:15 144:16
**cameras** 59:24 60:2, 3, 4, 5, 8 61:5, 12, 20, 24 63:11, 24 124:7 143:12
**Canada** 34:19, 24
**candidate** 46:22 48:9
**candidates** 47:8
**capability** 35:1
**capable** 66:24
**captive** 109:1, 2, 7, 22
**captures** 110:10
**car** 96:19 97:1, 2
**card** 70:25 71:6 73:22, 25 74:2, 3, 21 75:6 76:14, 20 77:5, 7, 10 78:5 106:2 110:4, 6 111:24 112:16 139:16
**cards** 74:25 75:1 101:18
**care** 19:6 137:9
**careless** 52:17
**cares** 135:21
**cargo** 79:21 126:18
**CAROLINA** 1:1 5:12 13:21 150:1, 4, 17, 23
**Carrier** 15:24 40:24 45:1 124:11, 21 130:23 132:13 133:15, 18
**carries** 126:17, 25
**CASE** 1:4 8:9 64:11, 17 67:8 69:6 75:6 78:16 82:20 101:12 111:19 121:2, 14 128:2 141:19 146:3, 20
**Casey** 108:18, 22
**catch** 70:12 136:17
**catching** 135:17, 18
**categories** 110:22
**categorize** 39:22
**caught** 12:18 87:3, 4 98:3 117:24 118:2 135:14 136:2, 3 137:4, 6
**cause** 5:22 6:18 28:2 30:7, 14 39:24 43:15 44:8 67:11 68:8 72:6 95:11 97:7 110:20 120:10 127:16 132:21 142:7 146:25 150:6, 15
**caused** 67:17 140:21
**causing** 67:1
**caution** 146:8, 11, 17 147:16
**caveat** 130:20
**CDL** 40:20
**certain** 12:2, 4 37:13 40:9 60:9 78:14 91:8 139:11
**certainly** 61:14 118:14 141:15
**CERTIFICATE** 3:5 150:1
**certify** 150:4, 15
**cetera** 46:15
**chance** 102:14
**changed** 35:3
**charge** 25:19 46:9 48:8
**CHARLESTON** 1:19 2:5
**chase** 43:10
**chassis** 33:20 72:17 73:14
**cheap** 73:10
**check** 46:17 50:16, 20 51:2
**checking** 46:14 124:7
**checklist** 55:2, 11, 17, 22, 23 56:3 104:6
**checklists** 55:4
**checks** 46:10 54:5
**chief** 24:21
**chose** 84:3
**chunks** 64:25 65:12
**circling** 138:20
**circumstances** 40:10 60:9 66:3 79:20 82:3
**citation** 36:25 37:1, 19 136:6
**citations** 138:1, 16, 21
**cited** 137:24 139:22, 23, 25
**claim** 28:3 79:21 80:20
**claims** 10:7 20:20
**clarification** 5:25
**clarified** 32:2
**clarify** 5:25 7:4 74:17 112:25
**clarifying** 30:2
**CLARK** 1:18 2:12 4:10
**clean** 39:21 93:23
**clear** 7:5 12:5 39:23, 25 67:5 118:11 142:11 147:3
**ClearingHouse** 46:24 47:13 58:17
**click** 129:9
**clip** 110:13
**clips** 64:2 129:16
**close** 82:23 101:4
**closely** 140:8
**coach** 93:20
**coachable** 98:10
**coached** 71:9 119:3
**coaches** 99:2
**coaching** 70:24 84:17 90:2 120:17
**collaboration** 74:5
**collected** 126:3
**collision** 35:10, 13 67:2 125:24
**come** 25:19 26:18 44:19 48:15 50:7 89:19 90:5 99:16 105:15 107:2, 21, 23 125:15 130:7
**comes** 19:7 22:20 51:24 64:25 109:22

**coming** 65:15 104:23 148:9, 12
**comma** 101:19
**commercial** 21:21 35:19, 23 44:24 54:7 59:20 141:12
**Commercially** 32:15
**Commission** 150:23
**companies** 18:23 61:4, 8 74:19
**company** 10:8 16:21 17:16 22:18 23:20 24:11 34:3 39:16 49:4, 10 56:22 68:11 74:4 93:18 99:3 109:3 117:15 127:19 138:22
**complaint** 71:22, 25
**complete** 46:12 68:5, 6, 7 82:12 97:2 106:25 150:9
**completed** 10:5 68:12 69:1
**completely** 28:1 58:14 65:17 94:19
**compliance** 23:14 44:25 124:6, 11
**compliant** 21:13 118:16 124:20 133:7
**computer** 65:13 105:16
**computer-aided** 150:8
**concluded** 149:4
**concludes** 148:16
**conducting** 54:4
**confidential** 76:21
**configuration** 79:14
**confirmed** 96:16
**conflict** 135:4, 8
**confusing** 96:14 115:5
**confusion** 107:20
**connection** 5:23
**consequences** 36:25 37:17
**consequential** 135:12
**consider** 17:7 25:7, 10
**considered** 19:14 69:14
**consumed** 8:5
**contacted** 98:4 125:13
**contain** 37:9 39:15 71:7, 14, 18 150:11
**contained** 36:13
**container** 33:16
**contains** 37:5
**contention** 67:10, 16
**contentions** 67:7
**continually** 143:3
**continuance** 95:7
**contract** 34:14
**contracted** 34:5
**contractor** 10:13
**contractors** 45:6 61:22
**control** 146:22
**conversation** 6:16, 19 26:18 69:12, 18 70:9, 11 74:9 84:8, 9, 25 85:4 86:4 96:23 97:3 137:12
**conversations** 69:23
**conveyance** 21:16, 20, 25 36:21 37:24 69:24 70:2 97:13, 16 124:16
**COOPER** 2:4 4:13 5:1 17:13 71:3 103:14
**Cooper.klaasmeyer@forthepoeple.com** 2:5
**co-owner** 24:16, 19 32:3
**copy** 148:20, 23
**corner** 12:18 98:21
**corporate** 15:21 17:16 18:8 25:6, 10 35:8, 12 36:12 44:1
**CORPORATION** 1:4 4:4, 5 8:21, 24 9:7, 12, 15 15:8 28:16 29:8 67:6 74:6 148:17
**Correct** 10:19 23:24 24:15 31:25 45:11 63:17 68:24 69:2 71:12 75:3, 4 80:23 82:1 109:23 115:10 127:17 131:9 132:6 139:14 140:1, 6 141:1, 4 144:2, 5 145:20 150:12
**corrected** 138:8
**corrections** 21:10
**corrective** 96:18 113:10, 11, 15
**correctly** 110:2
**cost** 110:21
**costs** 73:19
**Cottingham** 109:8
**counsel** 4:12 150:15
**count** 69:15
**counter** 106:8
**COUNTY** 150:2, 17
**couple** 33:5 34:23, 24 52:1 134:15 148:10
**course** 10:8 18:11 58:13 70:3 77:19, 23 78:19, 23 83:3 118:15
**COURT** 1:1 4:8 6:14
**cover** 127:1
**coverage** 126:25
**covered** 7:8, 22 37:3 84:25
**covers** 85:19 125:8
**crash** 12:14 13:14 19:10 20:6 60:11 67:12, 17, 20 78:7 81:1, 5 100:25 127:8 130:21 131:19 134:10 140:20 145:22
**crashes** 11:14, 15
**create** 77:14, 17
**created** 74:2, 3 81:25 115:20, 21, 23 116:11
**credit** 45:18
**crossing** 133:2
**CSA** 75:7 76:3 87:11 101:18 110:22
**current** 45:5 131:1
**cursor's** 86:23
**cut** 5:22 137:14

**< D >**
**d/b/a** 1:4 4:6
**dad** 23:15
**dam** 126:18
**dangerous** 135:13 141:22 142:15 143:8 145:25
**dash** 59:22 61:19, 23 62:7, 12, 18, 19 63:23 74:19 76:11
**dashboard** 65:10
**data** 22:23, 24 49:2, 12, 14 64:24 65:14 71:17, 19 90:5, 8 115:16, 24 116:10 121:18 122:6, 16, 17 123:16, 18, 19, 24 126:4 128:10, 23 135:5 136:18, 19
**DATE** 1:12 4:7 11:18, 22 12:10 13:3, 11 35:10, 11, 13 78:7 83:15 100:3, 13, 16 103:2 104:7, 12, 16 130:24 131:4
**dates** 69:22 74:13 80:2, 6 101:24 128:8
**Daugomah** 2:11 4:9
**Dave** 4:3 17:14 114:9 148:16
**DAVID** 1:2, 12 4:20 5:7
**day** 20:6 26:22 31:12 60:11 95:10 131:19
**days** 72:12
**day-to-day** 17:18

**DD15** 73:3
**deal** 31:1 46:13
**deals** 30:18, 24, 25
**debt** 58:5
**decade** 35:4
**deceleration** 64:6
**decent** 73:11
**decision** 68:19 94:9 114:22
**defendant** 44:25 54:7
**Defendants** 1:10 2:5
**defendant's** 15:20, 22 35:8 44:1, 25 52:24 54:4
**define** 47:1
**definitely** 12:9 41:13 112:23 130:3
**definition** 33:15 142:9
**delegated** 19:8
**delete** 90:15, 18
**deleted** 58:23 90:16
**deliberately** 34:15 90:17
**departments** 19:6 31:17
**depend** 120:25
**depending** 31:11 45:19 51:18 64:6 76:6 79:19 122:12 140:17
**depends** 21:7 48:25 51:17 72:10 86:11 92:2 136:14, 15
**DEPONENT** 1:12
**deposing** 28:22
**DEPOSITION** 1:2 4:3 5:9, 15, 18 7:11, 24 8:2, 6, 9, 10, 14, 16 9:11 11:7 13:24 14:3, 9, 12, 13, 16 15:4, 5 27:23 28:8, 11 29:1, 5 53:8 121:16 122:2, 22, 23 134:15 148:16 149:4 150:5, 6, 10, 12, 13
**description** 98:20 127:25
**desk** 21:2
**detail** 54:3 57:13
**details** 84:19
**determination** 83:4
**determine** 118:7
**determined** 79:4 83:2 84:1
**Detroit** 73:7
**device** 59:22, 23 76:7 95:25 142:13, 17, 23 143:5
**devices** 74:20
**diagram** 25:10
**Dickmeyer** 24:21
**difference** 65:14 87:2, 8 117:14 132:22 135:16 136:1, 6 138:17 145:21 147:12
**differences** 144:23 146:10, 21
**different** 19:5 20:11 22:21 32:8, 10 34:10 47:13 55:16 58:14 59:3 100:15 110:22 112:24 134:15 144:19, 20 145:2, 15 146:3, 24
**differentials** 72:18
**differently** 112:10
**difficult** 61:2, 12
**directly** 19:7, 18 20:7, 21 24:20 25:22 26:5 29:18, 19, 23 30:18 31:15 70:5
**director** 9:19, 21, 24 10:11, 18 18:14, 16 31:2, 24 92:15 94:4 131:7, 10
**dis** 66:9
**disagree** 62:17
**disagreeing** 62:19
**disciplinary** 69:8, 11, 14
**discontinued** 72:22
**discussed** 24:6
**discussing** 43:25
**dispatch** 19:12, 22, 23 20:4 26:11, 12, 15, 23 30:8, 24, 25 32:4, 7, 8, 10, 11 66:9
**dispatched** 19:16, 17, 25
**dispatcher** 19:16, 24, 25 20:4
**disputing** 131:21
**disqualify** 51:13 52:6, 13
**disseminate** 109:16
**distance** 40:8 125:6
**distances** 40:4
**distract** 143:1
**distracted** 142:4, 10
**distraction** 143:2
**distractive** 141:24 142:16
**DISTRICT** 1:1
**DIVISION** 1:2
**divvied** 24:5
**document** 15:2 40:12 75:2 77:12, 15 83:8 101:14 103:1, 4, 9, 11 104:22 109:25
**documented** 70:18 103:5, 7 106:1
**documents** 14:2, 4, 24 15:3 16:25 76:21 78:14, 21 99:9 104:4 105:1
**doing** 6:24 9:2 22:15 28:21 38:2 58:5 68:3 78:23 82:17 102:4 132:22, 23 137:23
**dollar** 126:19, 23 127:3
**DOT** 40:19 110:10 117:25 118:2 124:17 130:17 133:21, 23, 25
**doubt** 80:5
**download** 100:20 134:9
**downwards** 23:18
**draw** 140:13
**drawing** 25:9
**dredge** 33:21
**drew** 72:5
**Drive** 2:4 10:6 40:3, 14 51:15 98:6, 7 129:21 146:1 147:13
**drive-ins** 33:7
**driven** 86:22, 25 88:25 147:9
**driver** 10:12, 16 12:16 21:8 26:10 35:9 37:6 39:10 41:6, 22 42:4 44:2, 25 46:4, 22 48:20 49:4, 7 50:5 51:13 52:7, 13 54:7 56:21 57:24 58:23 60:7, 14, 22 61:1 62:6, 12, 16, 18, 21 63:1, 4 66:22 67:1, 13 68:4, 22 69:5, 23 70:20, 23 71:8, 9, 22 72:1, 5 73:24 75:20 76:2, 9 77:5, 9 82:11, 12 86:9, 16 87:3, 10, 18, 19 88:6 89:19 91:9 93:1 96:2 97:3 99:1 101:15 104:5 110:21 111:2 112:1 114:24 117:14, 24 118:21 119:22 120:25 124:25 125:13 127:24 128:11 129:19, 21 135:1, 3, 6 136:11, 15, 18, 20 137:4, 5, 7 138:2, 4, 7, 14, 16 140:17 141:21 145:3, 16, 25 146:5, 14 147:5, 19
**drivers** 10:1 11:1 18:11, 15, 20, 22, 25 19:1, 7 22:14 29:23 30:8, 18 37:6 38:15 40:20

41:5 42:17 44:24 45:3, 4, 9, 12, 20, 22, 23 48:15 50:14, 21 51:1 54:7 59:1 61:3, 5, 13 62:24 63:9, 15 92:16 97:23 102:3 105:9, 14 107:6, 9 108:24 109:17, 21 118:7, 16 124:18, 20 132:10, 12, 15 134:1, 18, 21 135:17, 18 137:23 138:11, 18 141:11 144:22 145:3, 9
**driver's** 12:19 21:12 35:19, 23 47:20 55:12 56:18 62:23 78:23 107:1
**driving** 10:1 21:20 39:16, 20 52:17 64:23 69:25 70:8 75:12 82:24 95:21 96:15 117:16 118:1, 8, 13, 25 125:3, 14 135:11, 20 138:6 141:21, 23 142:2, 4, 10, 15 143:25 146:14, 18 147:5
**drop** 65:11
**drove** 88:16, 20 89:5 97:17, 19, 24 118:22 119:14, 24 138:13, 15 147:21
**drug** 58:15 82:14
**drugs** 8:5 58:13
**dry** 33:1 59:20
**DUI** 75:22
**duly** 4:21 150:5
**duties** 9:23
**duty** 124:17 132:1, 8
**DVIRs** 134:1
**DVR** 134:9
**DVRs** 72:11
**DWI** 51:20 52:16

**< E >**
**earlier** 31:17 32:6 50:6 56:25 71:15 72:14 98:21 110:7 111:23 116:23 117:2 120:11 125:5 134:8 136:14
**early** 80:17
**easier** 74:11
**ECM** 65:7 100:21
**effect** 35:10 64:6 97:20 127:24
**egregious** 92:3 94:6
**either** 11:22 35:25 45:5 52:3 120:19 125:13
**ELD** 50:12
**elderly** 133:1
**ELDs** 129:14
**electronic** 44:17 123:18
**eligible** 49:13
**e-log** 64:25
**e-logs** 23:2
**email** 119:21 126:12 127:23
**emailed** 90:10 107:3
**emails** 90:13, 15, 19 108:13 128:14
**employed** 57:4
**employee** 131:20
**employees** 18:9, 19 45:5
**employers** 49:17 51:24
**employment** 54:6 57:7 78:24 139:3
**engaging** 118:1, 8
**engine** 73:15
**ensure** 124:11, 20 141:10
**entire** 35:24 55:13, 14 75:4
**entity** 135:18 137:5
**equally** 135:13
**equipment** 59:18 61:22 64:7 111:16, 19
**equipped** 60:10 62:3
**e-sign** 107:6
**e-signed** 107:5
**ESQ** 2:4, 8
**essentially** 31:14 65:19 68:21 78:17 90:1 111:2, 8 139:9, 18
**estimate** 101:1
**et** 46:15
**etran** 148:24
**evaluating** 54:6
**event** 65:22 76:14 82:13 98:10 120:17 139:14
**events** 129:20 150:16
**Everybody** 28:16 29:19 40:21 56:22 102:17 114:20
**evidence** 78:15 118:25 125:23 126:2
**exact** 12:10 13:3, 11 23:1 69:22 74:8, 13 91:12 100:13, 16 104:16 135:22 136:24 137:10, 23
**exactly** 34:22 72:11 78:1 99:9 103:11 104:21
**EXAMINATION** 3:2 4:23 14:20 15:18 76:2 143:22 150:8, 10
**examined** 4:21
**example** 34:2 37:12 40:3 47:6 49:3 51:20 55:25 64:22 91:3 132:25 145:19
**exceeded** 138:22
**exceeds** 129:21
**Excel** 94:22
**excess** 126:25
**excessive** 139:18
**excuse** 64:3
**exercise** 28:21
**Exhibit** 14:20, 24 138:6
**exist** 44:7 74:18
**exists** 40:12 44:4
**exit** 57:20
**expanded** 97:19
**expect** 27:5 108:10 145:6
**experience** 16:20 50:22 92:15
**experienced** 97:6
**expires** 150:23
**explain** 5:14 84:18 96:13 101:25 110:21
**explained** 40:16 81:15 96:19 99:3, 4 121:5
**explains** 39:20
**explanation** 29:2
**extended** 142:24
**extra** 52:4 146:7, 11, 17 147:6, 16
**extrapolate** 83:17
**extreme** 88:9
**extremely** 85:10 146:2
**eye** 145:14
**eyes** 145:15

**< F >**
**face** 60:5, 21
**face-to-face** 127:12
**facing** 37:6 59:24 60:1, 3, 4, 8, 15, 22 61:1, 5, 12, 19, 23 62:7, 12, 18, 19, 25 63:5, 11, 16, 23 76:10, 11 143:12 144:16
**factor** 122:13
**factory** 65:7
**fail** 70:7
**failure** 84:16
**fair** 6:12 7:20, 21 8:19 12:6, 7 13:12 18:5 24:14 25:16 27:21 31:23 35:5 36:14 37:4 38:4 40:25 45:10 53:13, 14 68:16 85:24 88:17, 18 89:12

91:23 94:10, 14 112:13 115:9, 17, 19 116:2 119:18 121:13 122:6 124:2 131:7 139:13 142:4, 19 147:1
**fairly** 5:13 8:2 144:12
**fall** 142:9
**false** 65:19 71:14, 20
**falsified** 37:2
**familiar** 46:18 77:11 146:7, 15 147:6
**family** 23:9
**far** 6:24 16:23 23:22 68:5 77:6 147:12
**faster** 96:25
**fault** 68:2 79:6, 17 81:22, 23 82:25 83:4
**February** 13:10, 15 95:12
**Federal** 15:24 40:22, 24 45:1 124:11, 21 130:22 132:13 133:14, 18
**federally** 51:2, 3, 8
**feel** 48:12 89:21
**feels** 48:9
**felt** 93:20
**fence** 79:2
**fiddling** 143:2
**field** 79:8
**fields** 80:16, 25
**figure** 44:6 62:16
**figured** 58:6
**file** 55:12, 14, 18, 20 56:18, 19, 25 58:9, 12 59:3, 12 116:4 126:6
**fill** 46:7, 11 56:2 98:19 106:13 107:4
**filled** 55:4, 24 56:3, 6 80:20 83:12 85:8 94:19 104:18 116:5, 7
**filling** 78:3
**financial** 87:10
**find** 42:22 45:3 47:10 49:8 55:21 58:7 71:24 81:8, 10 96:8 99:12 107:25 115:24 117:17 126:4 134:4
**finding** 45:9
**finds** 37:19
**fine** 11:25 16:13 17:2, 23 39:5 84:17, 20, 21 89:24
**fined** 85:3
**finish** 137:16
**fire** 136:11 137:3, 5
**fireable** 139:10
**fired** 86:10, 16 91:10
**first** 4:21 15:18, 20 23:18 89:17, 20 102:1, 2 109:12 128:4, 5
**fit** 48:13 51:25 52:2
**five** 9:22 10:17 17:20 36:4 52:18 56:5 59:13 92:21 93:1 130:21 139:17
**fixed** 98:4
**flag** 21:9 134:3
**flatbed** 33:6, 16, 19
**flatbedders** 34:23
**flatbeds** 33:8
**flexed** 25:3
**fluctuate** 18:12 45:19, 25
**FMCSA** 41:1, 2 110:10 133:25
**follow** 132:13 140:10
**following** 40:4 60:19 82:23 100:22
**follows** 4:22
**follow-up** 83:17, 20 132:18 144:11
**follow-ups** 143:18
**force** 63:10
**forced** 63:16
**foregoing** 150:4, 9
**forever** 138:20
**forgot** 46:23 91:16 97:16
**form** 7:13 15:16 80:1, 25 102:9 108:6 115:7 123:21 148:1
**formal** 57:16 120:9
**formally** 100:8 134:16, 17
**former** 49:17
**Forward** 59:24 60:1 63:23
**forwarded** 128:3
**found** 82:24 131:1
**four** 52:1 72:12 121:2, 9, 11 139:17 140:5
**fourth** 102:22
**free** 30:5
**freedom** 89:21
**freight** 32:15, 23 34:5
**front** 21:2 61:19, 23 62:7, 17 66:23 96:24
**fuel** 73:11
**full** 8:1 45:22 150:9
**further** 82:5 94:5 150:15

< G >
**gal** 46:8 66:6 108:18
**gaps** 46:13
**gate** 79:2
**gather** 96:24
**general** 19:23 22:6 58:25 92:14 125:1
**generally** 57:19
**generate** 65:16, 19 74:21 76:2, 3, 8, 12, 13 101:17 113:6 129:23
**generated** 22:9 56:13 64:2, 11, 17, 20 66:13 76:3 81:19, 21 113:23 119:11 124:24 129:3
**generates** 112:20
**generating** 84:10
**generator** 105:21
**getting** 11:1 12:23 31:5 39:21 59:15 65:5 72:22 73:1 87:3, 4, 25 92:5 137:21
**giant** 56:23
**give** 6:6 8:1 13:23 27:25 28:1 45:12 52:15 63:24 65:8 69:21 73:23 80:6, 8 123:12 130:24 131:4 134:18, 21 148:11
**given** 5:9 9:10 11:7 81:22 83:24 86:3 123:19 126:3 150:12
**gives** 24:2 86:21 96:5 114:19
**giving** 109:11 122:3
**Glider** 64:24 72:15 73:1, 6
**Gliders** 72:23
**go** 6:10 7:16 9:5 10:2 16:24 21:11 23:4, 17 34:16 39:8 44:15 46:5 47:12 49:5 53:4 54:3 55:19 86:7 90:24 96:8 98:6 103:23 104:2 110:14 114:21 115:24 119:23 121:17 122:5 130:5 148:1
**goal** 45:4
**goes** 37:18 58:17 71:6, 17 78:4
**going** 9:1 28:17 35:6, 7 44:20 51:9 52:14 53:8, 25 60:20 62:4, 23 63:10 73:21 81:17 82:9 83:3, 6 84:1

96:25 101:5 108:17 110:18 113:6, 7 117:1, 21 121:21 125:18 127:11 138:19 144:11 147:11 148:3, 10
**Good** 4:25 5:8 6:21 10:25 27:5 48:9, 12 51:25 52:2 53:1 125:2 131:24 138:5, 6 145:3 147:18
**gotten** 95:1, 2 116:9
**governed** 15:24
**government** 135:18 136:7 137:5
**GPS** 122:10, 19, 25 123:11
**great** 6:24 53:2 57:13
**green** 40:21, 25 41:1, 2
**grounds** 138:1, 3
**GROUP** 2:5
**guess** 25:14 57:25 62:15 87:7, 8 88:12 115:4 137:2, 20, 21 140:24 148:3
**guidance** 40:4 92:15 134:6
**guy** 21:2 24:3 68:15 93:3 94:8 106:6 138:21, 24
**guys** 33:5, 25 34:13 78:18 101:7 108:23
**guy's** 21:4

< H >
**habit** 65:6 82:24 125:1 141:25
**habits** 10:1 69:25 124:25 125:3, 16 135:11, 20 136:8 137:8 138:6, 7 140:10
**Hampton** 2:8
**hand** 38:20 150:16
**handbook** 35:14, 16 36:17, 18 37:3, 5 38:9, 12 39:7, 9, 11, 14 40:2, 10, 17 41:3 43:7, 21
**handbooks** 35:9 41:6 44:2
**handful** 20:12 26:19 33:6 131:14
**hands** 142:14 143:6
**handsfree** 142:5
**happen** 7:10 35:2 39:17 63:18 83:16 88:8 94:19 136:8
**happened** 63:20 66:20 71:8, 10, 16 84:18 127:9, 15, 25 134:10 139:1, 4
**happens** 48:5, 7 57:23 64:4 84:20 89:25 105:17 149:3
**happily** 5:25
**happy** 6:6 60:17
**hard** 6:18
**haul** 32:15 33:4, 16 34:3, 14, 18
**hauled** 36:2
**hauling** 30:23 33:18 111:6
**HAZMAT** 33:12
**head** 7:1, 2 13:3 19:12, 22 20:4 24:24 26:12 32:3, 7, 8, 10, 11 42:18 116:13 128:8
**headers** 106:9
**headset** 142:6
**hear** 5:21 63:12 117:10 145:9 147:25
**heard** 4:25
**held** 10:10, 21
**he'll** 89:24
**help** 10:3 17:13 77:14 82:4 85:9 123:20 133:3 143:12
**helps** 66:9, 10
**HENSCHE** 1:2, 12 4:3, 20 5:7, 8 148:16
**hereunto** 150:16
**Hey** 17:12
**hierarchy** 29:22
**high** 86:2 115:14 120:22
**highest-produced** 73:8
**highway** 13:20
**himself/herself** 150:14
**hire** 32:15, 23 50:15, 19 51:21 52:17
**hired** 50:4 51:1, 13
**HireRight** 46:11, 18 47:7, 14, 19 56:12
**hires** 50:21
**hiring** 44:23 50:17 54:24
**history** 73:9 75:14, 17 76:14 138:5
**hit** 36:7 130:1
**hold** 59:11 106:7 107:24 134:7
**home** 58:7
**honest** 25:1 26:8 28:1 41:18
**hopefully** 130:7
**HORRY** 150:2, 17
**hour** 99:14 129:22
**hours** 85:17 129:19
**how's** 95:21
**huge** 143:1 144:23
**hundreds** 146:19
**hypothetical** 138:25

< I >
**I-694** 96:15
**idea** 74:10
**imagine** 38:2
**immediate** 92:11
**immediately** 67:22 92:7
**implement** 63:4
**implemented** 77:25
**importance** 92:18
**important** 99:11 129:13 147:25
**inappropriate** 37:20
**inception** 78:4
**incident** 12:25 13:19 70:15 77:23 79:1, 5 95:10 97:15 127:20
**incidents** 69:10 85:23 98:22 115:14 120:14 121:2 139:22
**include** 17:4 126:11 142:18
**includes** 135:20
**including** 15:22, 23 44:24 53:6 54:7 61:23
**independent** 10:12 45:6 61:21
**INDEX** 3:1
**indicate** 86:19
**indicates** 88:14
**Indicating** 14:17 65:12 73:25 77:2 79:9 80:22 83:7 98:23 104:1 110:3, 17 113:2 120:13
**indirectly** 19:22
**individual** 75:8
**inexperienced** 147:8
**inform** 132:18
**informal** 120:12
**information** 28:14, 24 29:8 39:15 40:2 43:2 46:21 47:8 48:10 49:8 50:1 56:8 58:13, 16 59:8 65:7 78:4 79:15 80:4 81:8, 10 95:14 96:24 99:12 123:2, 8
**information's** 90:11
**initial** 127:23
**inspection** 39:22 75:15 112:21 134:3
**inspections** 75:8 84:13 110:11
**inspects** 111:2
**installation** 62:25
**installed** 64:7
**instance** 66:12 70:14, 21, 23 118:20 146:10

**instances** 11:*13* 70:*18* 71:*7* 82:*5*
**instruct** 53:*5* 136:*13*
**instructed** 7:*14*
**instructions** 148:*12*
**insurance** 10:*7* 20:*20* 68:*10* 109:*3* 126:*16* 127:*19*
**intended** 83:*15*
**interact** 26:*9*
**interested** 150:*16*
**intermediate** 18:*19*
**intermodal** 33:*14*, *18*
**interrelated** 140:*8*
**interrupt** 32:*19*
**interstate** 15:*23*
**interview** 48:*21*, *23* 68:*3* 71:*25* 127:*12*
**investigate** 71:*24*
**investigation** 127:*9*
**involved** 37:*11* 42:*24*
**involving** 133:*23*
**Inward** 60:*4* 61:*5*, *11* 62:*25* 63:*5*, *10*, *16* 76:*10* 83:*24* 143:*12* 144:*16*
**irrelevant** 51:*9*
**irritation** 72:*6*
**issue** 16:*10* 125:*1* 134:*4*
**issued** 39:*12* 122:*3*
**issues** 57:*12* 84:*10* 140:*11* 145:*18*
**items** 125:*19*
**it'll** 49:*1*, *5* 59:*1* 64:*3*
**its** 40:*20* 41:*4* 45:*3* 50:*25* 77:*19* 79:*14* 118:*7* 135:*4*, *17*, *18*
**itty-bitty** 98:*20*

**< J >**
**January** 108:*2*
**Jessica** 24:*21*, *23* 25:*13*, *24* 26:*4* 27:*8*, *22* 28:*7* 29:*15*, *18*, *20*, *24* 30:*15* 48:*11*
**job** 6:*24* 9:*9* 11:*4* 17:*18* 18:*21* 20:*23* 27:*6* 38:*21* 46:*6* 66:*11*
**jobs** 31:*18*
**JONATHAN** 1:*9* 4:*16* 19:*9* 49:*20* 57:*6*, *8*, *15* 77:*10* 82:*21* 96:*16*, *19* 100:*4* 120:*4* 131:*19*
**JR** 2:*8*
**July** 79:*1*
**jury** 21:*18* 147:*25*

**< K >**
**keep** 7:*4* 11:*21* 29:*20* 40:*8* 58:*20* 77:*22* 78:*8*, *19*, *22* 79:*16* 80:*2* 83:*3* 84:*16* 93:*23* 118:*16* 128:*8* 133:*6*
**keeps** 77:*19* 80:*5*
**kept** 116:*4* 128:*12*
**kind** 7:*1* 8:*13* 9:*5*, *25* 12:*14*, *23* 17:*5* 22:*2* 23:*4* 26:*3* 29:*13*, *14*, *17* 32:*21* 33:*21* 42:*22* 43:*23* 45:*22* 46:*20* 54:*1* 59:*16* 72:*10* 87:*7* 89:*21* 95:*7* 102:*3* 108:*6* 112:*21* 116:*23*, *24* 125:*21* 130:*4* 142:*3* 143:*13* 147:*7*
**kinds** 33:*3*, *8*
**KLAASMEYER** 2:*4* 3:*3*, *4* 4:*13*, *24* 5:*1* 53:*2*, *20* 71:*4* 76:*18*, *23* 99:*22* 103:*16*, *19* 114:*6* 129:*24* 130:*15* 131:*23* 143:*15* 144:*10*, *14* 148:*8*, *22* 149:*2*
**know** 5:*20*, *22* 6:*3*, *6*, *10* 7:*1*, *18* 8:*4* 11:*25* 12:*3*, *25* 13:*5*, *8*, *18* 15:*11* 16:*15*, *19*, *20*, *25* 17:*6*, *19* 18:*1*, *3*, *24*, *25* 19:*1*, *23* 20:*8* 21:*18* 22:*15*, *16*, *25* 23:*19* 24:*1*, *4* 25:*3*, *8*, *9* 26:*7*, *8*, *15*, *16*, *24* 30:*5*, *12* 33:*4* 34:*21* 35:*4* 36:*8*, *19* 37:*10*, *15* 39:*3*, *15*, *17* 40:*8*, *19* 41:*5*, *18* 42:*10* 43:*6* 44:*3*, *4*, *5* 45:*13* 46:*3* 47:*5* 48:*17* 49:*22* 50:*8*, *12* 51:*19* 52:*1* 53:*10* 55:*20* 56:*5* 57:*11* 60:*19* 61:*6* 62:*16* 64:*10* 65:*14*, *22* 68:*8*, *14* 69:*16*, *18*, *22* 70:*14* 71:*16*, *17* 73:*15* 74:*3*, *13*, *22* 75:*13*, *21*, *23* 78:*13*, *18* 79:*15* 81:*2*, *6* 83:*13* 84:*4*, *19* 86:*6* 88:*3*, *12*, *25* 89:*5*, *10* 90:*23* 91:*2*, *3*, *7* 92:*25* 93:*22* 94:*7* 95:*5*, *19* 96:*11* 97:*9*, *21* 100:*11*, *16* 101:*20* 102:*6*, *11*, *15* 103:*4*, *11* 105:*8*, *14* 108:*16* 110:*10* 111:*1*, *5* 114:*11*, *12* 116:*4*, *12* 117:*2*, *25* 118:*23* 119:*9*, *11*, *20* 120:*10* 122:*4* 123:*24* 125:*5*, *14*, *20*, *21*, *22* 126:*15*, *18*, *22*, *24* 128:*15* 129:*7*, *12* 130:*24*, *25* 131:*3* 132:*13*, *16* 133:*10*, *20* 136:*21* 139:*16*, *18* 141:*13*, *18* 142:*3*, *8*, *13*, *21*, *23*, *25* 143:*1*, *6* 144:*19*, *20* 145:*13*, *16*, *17*
**knowing** 102:*19* 138:*2*
**knowledge** 15:*13* 16:*11*, *12*, *14* 43:*1* 55:*9* 72:*21* 100:*17* 104:*12* 115:*11*
**known** 15:*13* 28:*14*, *24* 43:*4*
**knows** 27:*3*, *8*, *15*, *19* 47:*24* 49:*25* 50:*2* 80:*4* 81:*4* 100:*7* 116:*19* 117:*15* 131:*15*

**< L >**
**lane** 66:*23* 84:*16*, *22* 85:*2* 96:*17*
**lanes** 97:*4*
**Large** 150:*4*, *23*
**larger** 24:*1*
**LAW** 2:*5*
**laws** 118:*17*
**lawsuit** 17:*1*
**lawyer** 27:*25*
**lawyerly** 29:*2*
**lead** 91:*21*, *25* 96:*20* 97:*6*
**leaks** 70:*7*
**leaning** 16:*14*
**learn** 128:*5*, *6*
**leasing** 144:*21*
**leave** 131:*12*
**leaves** 30:*16* 58:*23*
**leaving** 12:*16* 125:*6*
**left** 68:*23* 72:*23* 131:*16* 145:*4*
**left-hand** 66:*22*
**legal** 8:*18* 29:*2*
**length** 86:*11* 122:*12*
**level** 25:*8*, *12* 29:*17* 86:*7*
**liability** 80:*19* 81:*16* 126:*18*, *20*, *23* 127:*4*
**license** 35:*19*, *23* 36:*1*
**lights** 70:*7*
**limit** 86:*17*, *25* 88:*21* 126:*19*
**limits** 138:*23*
**line** 23:*22* 95:*9* 98:*7* 140:*13*

**lines** 94:25 123:24 125:9
**link** 90:23 129:8
**list** 54:1 55:25 58:25 59:2 113:21, 22 114:1, 3, 10, 11 125:19 126:3, 4
**listed** 15:18 124:13
**litigation** 78:19
**little** 14:23 25:15 28:17 40:21 41:14 47:1 54:2 55:16 65:12 79:10 90:4 96:14 98:16, 20 107:19 116:24 129:16 132:21 134:14 138:10 145:15 146:24
**load** 19:17 20:1 33:4, 8, 19 36:3 103:22
**loads** 11:3 30:22, 23, 24, 25 31:6, 7 32:17, 21, 23, 25 34:1, 14, 18, 24 111:6
**local** 117:25 118:2
**LOCATION** 1:15 129:19 140:19 150:6
**log** 44:17 85:17 98:2
**logs** 21:12 37:2 119:12 122:9 124:7, 15, 17
**long** 6:7 9:20 59:5, 11 71:21 72:7 78:2 84:8 128:10, 12, 13
**longer** 27:4 36:5 56:21 57:6 122:11
**look** 5:24 14:15 21:9 22:21 38:1 45:16 46:23 48:24 49:2 50:4 72:9 75:2 76:17 90:22 96:3 99:9, 10 119:24 121:18 122:5 123:1 124:1
**looked** 109:12 119:13 125:12 129:8 139:16
**looking** 48:12 65:9 101:16 103:15 106:2, 5 110:1, 17 112:17 119:9 123:12 124:25 126:21
**looks** 78:25 83:14 95:17 104:3 111:11, 19
**lose** 5:22
**lost** 111:14
**lot** 6:19 12:16 20:11, 15 31:18 65:5 73:4 89:16, 17, 18 95:20 124:5 147:9
**lower** 34:12, 14
**Lytx** 59:23 74:20, 23

**< M >**
**main** 7:9 22:9
**maintain** 73:10
**maintenance** 70:4 73:18
**major** 144:20
**making** 42:16 74:11 108:22 125:6
**manage** 18:10
**management** 15:22 37:10, 11, 16, 19 38:17, 19 123:18 140:9, 11, 21, 23 141:5, 8
**manager** 18:25 19:5 23:14 134:5
**managers** 19:6
**managing** 20:6 30:19
**mandatory** 41:21 43:9 63:6 84:3
**manner** 65:15
**manual** 36:14 40:19, 20 54:10, 13, 14 134:19, 22, 23
**manually** 65:23
**manuals** 35:9 41:7 44:3
**MARCH** 1:12 4:7
**MARCINAK** 2:5
**Mark** 9:3 24:6, 13, 20 25:22, 24 26:4, 13 27:15, 22 28:6 29:14, 18, 20, 24 30:6, 9, 15 32:2 38:20 48:11
**marked** 76:20
**material** 109:21
**materials** 109:16
**matter** 4:4 18:2 102:19
**mean** 8:17 27:9, 25 32:18 33:1 42:3 44:5 46:25 58:24 62:13 68:19 72:15 79:8 80:5 83:23 85:5, 15 88:8 94:21, 24 96:21 98:10 111:10 116:7 118:14 123:22 132:4 137:14 141:3, 15, 16 144:3
**means** 65:9 77:17 78:22
**meant** 97:10 101:14 112:16
**measure** 60:22 106:8
**mechanical** 73:16
**MELTON** 1:4 4:5, 14 5:3
**member** 23:9
**members** 30:13
**memorialized** 54:18
**memorize** 123:22
**memory** 52:15 100:19 104:15, 21
**mention** 36:24
**mentioned** 50:6 125:4 143:24
**mess** 86:14
**Mexico** 34:19, 20
**mid** 102:18
**mileage** 73:11 91:9
**miles** 86:22, 25 87:18 88:15, 19, 20, 25 89:3, 5 91:3, 8 111:25 114:25 118:22 119:2, 10, 13, 23, 25 120:22 128:11 135:6 138:13, 15 146:19 147:10
**military** 29:22
**million** 126:19, 23 127:3
**mind** 106:20
**minimize** 92:18
**minute** 127:14 130:6
**minutes** 130:1
**mirror** 60:5
**misheard** 47:4
**misinterpreted** 150:11
**missed** 128:25
**mistake** 138:6
**misuse** 37:1
**mobile** 141:21
**model** 59:19 147:11
**modern** 73:5
**moment** 63:14 72:7 96:10 122:23 127:13 135:22 137:10 143:7
**money** 57:13 84:10 111:5
**monitor** 9:25 117:22 118:6, 9, 13, 15 129:19 143:13
**monitoring** 22:17
**month** 41:22 74:12 89:2 96:6 107:23 114:12 121:3
**monthly** 41:10 43:13, 17 105:25 106:11 107:22 108:7
**months** 83:17, 20, 21 122:10
**MORGAN** 2:1
**morning** 4:25 5:8
**MOSELEY** 2:5, 8 3:3 4:15 15:16

16:9 17:12 52:25 71:2 76:22 103:14, 18 113:8, 13, 18, 25 114:4 123:21 128:22, 25 129:5, 11 131:21 143:20, 23 144:8 148:1, 19
**Motive** 59:23
**motor** 13:14 15:24 21:21 40:24 45:1 47:21 54:5 59:20 72:18 124:11, 21 130:22 132:13 133:14, 18 141:12
**motors** 73:8
**move** 10:23 31:5, 7 44:20
**moved** 59:3
**moving** 10:13 52:18, 23 91:15 96:17 135:2
**multiple** 31:10 106:12
**MVR** 75:24
**Myrtle** 150:17

**< N >**
**name** 5:4, 5 22:1 59:4 66:8 84:17 127:24
**named** 66:6
**name's** 4:9 5:1 113:7
**Naomi** 66:6, 14
**Naomi's** 66:7
**narrow** 138:9
**narrowly** 44:9
**nature** 15:22 82:5
**NCRA** 150:21
**necessarily** 18:2 61:18 82:20 85:8 98:19
**necessary** 70:24 97:4
**need** 6:2, 5, 7, 8, 9 16:15 17:6 18:1, 3 28:17 34:16 39:22 45:19, 21, 23, 24 54:19 56:1 60:18 93:2 95:8 99:8 129:25 130:5 138:7 146:10 147:16
**needed** 11:1 71:11 90:1 94:20 99:4 119:6 132:19
**needing** 50:18
**needs** 25:18 66:11 89:15
**negligible** 146:22
**neither** 150:15
**never** 24:5 28:2 37:25 38:25 67:21 85:16 90:24 106:19 108:9 127:15 128:14 129:8 131:13 145:7
**new** 73:14 89:19
**newer** 72:23
**newsletter** 109:12
**night** 71:3
**nine** 83:21
**nod** 7:2
**non** 49:5, 9
**nondelegable** 132:1, 4
**nonnegotiable** 138:23
**nonverbal** 7:1
**Nope** 85:20 93:4
**normal** 6:16, 18 77:23 78:9 144:15, 18 146:16
**normally** 147:20
**North** 2:5
**Notary** 150:3, 22
**note** 85:13
**noted** 65:22 114:25
**notes** 16:5 130:6
**Nothing's** 87:15
**notice** 8:9 14:12, 15, 17 15:19 17:10 29:1 94:18 122:2 145:7 147:12
**noticed** 29:4 122:23
**notification** 76:4 96:9
**notifications** 64:1
**notified** 75:25
**notify** 75:19 96:1
**nuances** 145:20
**number** 58:24 91:12 113:6 114:19 134:25
**numbers** 59:1

**< O >**
**Oaks** 2:4
**object** 7:11, 12 15:16 123:21 148:1
**Objection** 7:13, 17
**objections** 150:7, 10
**obligation** 28:23
**observations** 22:14
**observes** 22:12
**obviously** 5:11 16:24 19:14, 22 31:1, 21 44:3 68:9 69:3 114:10 129:15 148:23
**occur** 95:11
**occurred** 12:25 13:6, 15, 19
**off-duty** 21:21
**offense** 139:10
**offered** 11:4 73:17
**office** 10:14, 24 17:21 20:13, 21 22:10 30:1, 13, 15 49:22 55:9 56:4 74:8 105:18 107:2 108:14 125:15
**officer** 24:22 55:1 76:5, 6 135:21 137:9 139:23
**officers** 74:7
**official** 103:4 136:7 150:17
**oh** 12:3 13:8 36:4 42:15 47:25 51:23 53:2 70:3 79:10, 11 82:17 85:6 92:24 106:6, 19 113:4 119:24
**Okay** 5:7, 11, 16 6:5, 23 7:8, 22 8:4, 8, 12, 23 9:4, 10, 14, 17, 20, 23 10:9, 15, 20 11:6, 13, 16, 20, 24 12:8, 21, 23 13:4, 12, 17, 18, 22 14:2, 7, 11, 15, 19, 22 15:1, 6, 10, 17 16:13, 15, 18 17:9, 15, 25 18:7, 14, 18, 23 19:9, 13, 19 20:3, 8, 14, 17, 22, 25 21:14, 17, 24 22:4, 11, 16, 23 23:3, 8, 11, 16, 23, 25 24:8, 18, 23 25:15 26:1, 12, 14 27:2, 7, 12, 18, 21 28:4, 13 29:12 30:10, 25 31:13, 20 32:1, 6, 13, 16, 25 33:3, 7, 10, 20 34:8, 10, 13, 25 35:18, 22 36:2, 6, 18 37:4, 21 38:8, 14, 17 39:2, 5, 14 40:11, 18, 23 41:2, 12, 24 42:6, 20, 25 43:1, 19 44:11, 18 45:7, 12, 16, 21 46:2, 16 47:15, 18, 23 48:4, 22 49:16, 20, 24 50:3, 10, 14, 21, 24 51:6, 11 52:5, 9, 11, 22 53:25 54:16 55:3, 6, 11, 22 56:8, 11, 17, 24 57:2, 8, 11, 15, 19, 23 58:11, 15, 19 59:10, 15, 21 60:1, 6, 10, 21, 25 61:4, 7, 10, 15, 23 62:1, 10, 15, 22 63:3, 7, 19, 22 64:10, 13, 16, 19 65:1, 18, 21, 25 66:3, 7, 12, 17, 19, 25 67:4, 15, 19, 24 69:3 70:13, 17 71:1, 6, 13 72:3, 13, 20, 25 73:12, 20 74:16 75:9, 18 76:7, 13, 17, 23 77:4, 9, 14, 18 78:6, 12, 25 79:4, 8, 25 80:8, 11, 24 81:3, 7, 20, 24 82:13 83:6, 11, 14, 23 84:11, 15, 23 85:5, 11, 22, 25 86:5,

15, 18 87:2 88:22 89:23 90:8, 15, 18 91:13, 20, 22 92:4, 8, 14, 19, 22 93:5, 14, 21 94:7, 12, 16 95:10, 15, 17, 24 96:11, 13 97:8, 11, 15, 21 98:8, 15, 22, 25 99:5, 8 100:2, 10, 24 101:5, 13 102:6, 10, 15, 21, 24 103:8, 13, 19, 23 104:2, 11, 19, 22, 25 105:5, 17, 19, 25 106:6, 15, 21 107:6, 9, 18, 21, 24 108:5, 11, 15, 20 109:5, 10, 15, 20, 24 110:6, 9, 25 111:9, 18 112:6, 9, 20 113:4, 18 114:4, 18, 23 115:3, 11, 19 116:2, 6, 8, 14, 18, 22 117:12, 23 118:5, 10, 18 119:17, 20 120:2, 8, 21 121:7, 15, 23 122:14, 21 123:4 124:1, 4 125:18 126:1, 5, 8, 11, 14, 22 127:3, 6, 16, 18, 22 128:4, 10, 16, 18, 21 129:11, 14, 24, 25 130:19 131:3, 6, 12, 15, 18 132:7, 11, 20 133:9, 13, 21 134:1, 8, 13, 18, 24 135:16, 23 136:16 137:2 138:9 139:2, 5, 15, 21 140:2, 7, 12, 15, 18, 23 141:2, 7, 9, 20 142:19 143:11, 15, 19 144:6, 8, 10 145:1, 12, 24 146:13, 23 147:14, 22 148:5, 14
**Olson** 26:6 27:3 28:7
**on-board** 23:2 52:8 105:24
**on-boarding** 10:3 38:13 43:18 44:10 46:9 49:19 55:1 56:19 108:19
**Once** 33:15 70:2 88:8 128:24 129:2
**on-duty** 21:8 22:2, 6 36:21 37:23
**ones** 21:9 22:21 30:16 99:1 105:20 107:23
**one's** 80:19
**one-to-one** 140:13
**Ongoing** 41:9
**online** 46:8
**OP1** 133:14, 17
**operate** 24:25 33:10 34:11 44:17 50:12 59:18
**operating** 73:19 132:17 135:24 141:12, 21 142:12, 23 143:5 146:8
**operations** 15:21, 23 38:10
**opportunity** 11:3 150:12, 14
**oral** 47:1
**ORANGEBURG** 1:2
**order** 16:25 62:5
**ordinarily** 136:12
**ordinary** 66:3 77:19
**organization** 15:21
**orientation** 39:13 44:15 105:23
**original** 79:14 148:23 149:1
**originally** 82:19
**outline** 107:4
**outlines** 91:12
**Outside** 38:12 64:5 69:11 87:9 132:17
**outsider** 44:5
**outstanding** 48:16, 18
**outward** 76:10
**overall** 42:16
**overlap** 31:18
**oversee** 20:19 36:16
**owed** 58:6, 7
**owner** 24:7
**owner-operator** 89:21
**owner-operators** 61:16
**owners** 9:3, 5, 6, 8 10:6 23:6, 23, 25
**owner's** 23:9

**< P >**
**p.m** 149:4
**package** 65:14
**packages** 64:24
**packet** 44:12
**page** 43:24 110:14
**pages** 71:21 106:12
**paid** 30:21 31:5, 8
**panel** 12:20
**paper** 83:5
**paperwork** 38:13 43:14 58:9 66:10 93:18 104:18 127:12 128:7
**parameters** 64:4, 5
**parking** 12:16
**part** 9:8 23:1 26:10 44:10, 14 50:17 55:11, 18 68:3 77:16, 23 78:8 79:24 85:16
**partial** 127:7
**particular** 19:15 34:1 64:22 75:6 82:20 121:14 146:3
**particularly** 32:17 89:15
**party** 150:15
**passed** 97:1 127:13
**passing** 97:1
**pay** 58:7 61:17, 19, 22 62:2
**payroll** 31:15
**PC** 21:1, 15 23:14 37:1 97:9, 25
**PDF** 56:23 103:21 107:8
**pending** 150:15
**people** 19:20 20:18 30:14, 20 31:10, 18 50:12 85:9 127:14 142:25 144:23
**PeopleNet** 23:1 59:25 60:1, 2 63:22 65:3 96:4 105:20 121:17 122:5, 16, 18 123:1, 17 126:9 129:22 134:2
**percent** 12:2, 4, 10 39:25 67:5 70:16 86:24 88:15, 20 89:1, 6, 11 91:8 112:6 113:5 114:21, 24 118:11, 22 119:22 138:12, 14 146:6
**percentage** 86:2, 19, 21, 22 87:18, 22 88:2, 3, 4, 7, 25 111:24, 25 113:20 117:6 120:22 128:11 129:3 135:5, 6 136:19 139:12
**percentages** 115:15, 25
**Perfect** 103:19
**perfectly** 26:8
**performance** 93:18 129:19 147:12
**period** 13:5 82:10 85:18 118:23 119:25 121:3 142:24
**person** 19:17 48:8 49:19, 20 66:1 86:1 133:1 146:17
**Personal** 21:16, 20, 25 36:20 37:24 69:24 70:1 75:20 97:12, 16 124:16
**personally** 94:3
**phone** 30:7 48:21, 23 58:24 59:1 68:4 125:13 141:21 142:5
**phones** 141:11
**photos** 128:1
**phrase** 95:5 112:10
**phys** 126:18

**pinch** 36:*7*
**place** 35:*13* 37:*21*
**placed** 83:*9*
**places** 46:*15*
**Plaintiff** 1:*4* 2:*1* 4:*14* 5:*2*
**plan** 79:*18* 81:*12*, *17*, *25* 82:*2* 83:*16*
**platform** 46:*21* 47:*6*, *7*, *9*
**platforms** 48:*6*
**please** 4:*12*, *18* 5:*24* 6:*6* 12:*2*, *3*
**plus** 50:*11*
**point** 7:*18* 33:*17* 68:*1* 82:*17* 94:*23* 130:*25*
**points** 28:*21* 75:*7* 76:*3*, *4* 87:*11* 101:*18*, *19* 110:*22*
**police** 137:*24*
**policies** 35:*8*, *12* 36:*13* 37:*5*, *6*, *9*, *21* 38:*9*, *18* 39:*17*, *19* 40:*17* 41:*6* 42:*8*, *13*, *21*, *23* 43:*5* 44:*2*, *16* 54:*9* 126:*16* 135:*4*, *7* 141:*17*
**policy** 20:*20* 36:*19* 38:*5* 41:*16* 42:*1*, *8*, *17* 52:*5* 78:*8*, *11* 86:*5* 87:*15* 91:*2*, *6*, *14* 92:*9* 117:*20* 126:*23* 127:*4* 134:*25* 138:*22* 139:*9*, *11* 141:*13*
**popped** 79:*10*
**portal** 46:*20* 47:*5*
**position** 9:*17* 66:*7*, *8* 99:*3* 147:*2*, *15*
**positions** 10:*10*, *21*
**positives** 65:*19* 71:*14*, *20*
**possible** 52:*2* 133:*8*
**possibly** 78:*15* 79:*19* 87:*13*
**post** 22:*14* 79:*2* 96:*5*
**postaccident** 82:*13*
**posted** 86:*25*
**potentially** 70:*11*
**power** 147:*11*
**prac** 43:*16*
**practice** 43:*18*
**practices** 52:*8*, *12*, *24* 54:*4*, *10*, *12*, *15*, *18*, *22* 56:*5* 69:*24*, *25*
**Pre** 137:*8*
**precautions** 147:*6*
**predecessor** 131:*11*
**prelude** 120:*19*
**preparation** 17:*8*
**prepare** 13:*23* 14:*3*, *8* 16:*2*, *3*, *7*, *10*, *22*, *25* 17:*15*, *17*, *21* 27:*23* 28:*8*, *11* 125:*3*
**prepared** 28:*23* 29:*3* 69:*7* 103:*9* 116:*15*
**preparing** 15:*3*
**prerogative** 107:*1*
**PRESENT** 2:*11* 125:*2*
**preserve** 125:*23* 126:*2*
**president** 24:*6*, *7*, *9*, *18* 31:*22*
**pressing** 45:*24*
**pretty** 27:*5* 86:*12* 94:*6* 118:*25* 121:*3* 140:*8* 141:*18* 147:*2* 148:*4*
**prevent** 49:*9* 62:*20* 82:*5*
**preventability** 67:*20*, *24* 127:*7*
**preventable** 49:*6*, *9* 79:*6*
**prevention** 79:*18* 81:*12*, *17*, *25* 82:*2*
**previous** 51:*24* 102:*4*
**primarily** 9:*25* 45:*8* 134:*5*
**primary** 45:*4*
**printed** 149:*1*
**prior** 8:*5* 10:*13* 16:*14* 54:*6* 69:*10* 104:*23* 121:*15*, *19*, *20* 130:*21* 131:*6*
**proactive** 137:*8*
**probably** 27:*10*, *11* 67:*9* 80:*6* 82:*22* 95:*4* 96:*25* 97:*19* 123:*8* 128:*2* 137:*18* 138:*19* 142:*9*
**probation** 60:*16* 83:*7*, *9*, *16* 86:*13* 120:*20*
**problems** 73:*4*
**procedure** 38:*6* 44:*22*
**procedures** 35:*9* 36:*16* 38:*18* 41:*6* 44:*2*, *16*
**proceed** 7:*23*
**process** 10:*3* 39:*13* 44:*10* 50:*4*, *17*
**Prochaska** 24:*6*
**produce** 20:*18*
**produced** 14:*24* 74:*14* 75:*3*
**produces** 20:*22*
**professional** 144:*22* 145:*16* 150:*3*, *21*
**program** 51:*21*, *22* 63:*4* 72:*16* 101:*23* 102:*1*
**programs** 72:*21*
**promote** 39:*20*
**proper** 84:*16*
**properly** 51:*15*
**proves** 141:*19*
**provide** 40:*18* 41:*4* 109:*21*
**PSP** 46:*10*, *17* 47:*13*
**Public** 150:*3*, *22*
**publish** 108:*24*
**pull** 21:*7*, *24* 22:*1*, *5* 33:*5*, *6* 47:*20* 73:*22* 75:*5* 106:*7* 122:*25* 123:*1*, *11* 128:*14* 145:*4*, *5*
**pulled** 48:*5*, *6*
**pulling** 33:*18* 47:*7* 135:*21*
**pulls** 21:*15* 129:*9*
**punishment** 141:*18*
**purposes** 93:*9*
**put** 56:*7*, *23* 58:*6*, *9* 70:*24* 72:*17* 73:*7*, *15* 76:*24* 78:*15* 85:*7* 98:*6* 107:*11* 112:*18*, *25* 114:*14* 115:*14* 125:*4* 126:*6* 134:*3*
**puts** 76:*5*

**< Q >**
**QORTA** 84:*17* 85:*5*, *10*
**Q-O-R-T-A** 85:*5*
**qualification** 44:*23*
**qualifications** 52:*6* 78:*16*
**quarter** 12:*19* 41:*23* 102:*22* 108:*4*
**quarterly** 41:*9*, *10*, *17* 42:*11* 43:*12*, *13*, *16* 50:*8* 101:*6*, *7* 106:*4*, *14* 107:*10*, *16*, *21*, *22* 108:*1*, *5*, *12*
**question** 6:*1*, *12* 7:*16* 12:*1* 17:*6*, *21* 29:*6* 39:*24* 44:*9* 48:*25* 51:*14* 54:*20* 55:*15*, *17* 58:*1* 67:*5*, *9* 72:*14* 87:*25* 88:*12* 116:*15*, *17*, *20* 117:*2*, *5*, *9*, *13* 121:*24* 122:*21* 123:*13* 137:*3* 139:*8* 142:*11* 143:*4*, *21* 146:*14*, *24* 147:*4*
**questionnaire** 106:*13*
**questions** 5:*19* 48:*14* 123:*20* 130:*4*, *5* 143:*17* 144:*9* 148:*10*
**queued** 49:*12*
**quick** 99:*11*, *15* 144:*12*

**quickly** 70:*12* 99:*9* 125:*20*
**quit** 57:*10*, *11*, *16* 62:*24* 63:*9*, *15* 67:*25* 68:*8*, *14*, *19* 83:*13* 84:*6* 97:*7* 99:*5*, *10* 100:*23* 102:*13* 104:*6* 127:*16*
**quite** 87:*25*
**quits** 57:*24* 58:*4* 59:*11*
**quitting** 57:*17*
**quiz** 43:*12*, *17* 50:*8* 106:*14*, *16*, *19* 107:*13*, *15* 108:*7*
**quizzes** 41:*9*, *10*, *17* 42:*12* 43:*13* 105:*9* 106:*4* 107:*10*, *17*, *21* 108:*2*, *6*, *12*

< **R** >
**radio** 142:*18*, *25*
**rarely** 66:*6*
**rating** 130:*17*
**reach** 88:*4*
**reached** 88:*8*
**reaches** 49:*17*
**read** 5:*14* 35:*16* 52:*14* 89:*22* 110:*24* 129:*10* 150:*12*
**reading** 148:*21*
**reads** 104:*8*
**real** 64:*1* 90:*24* 96:*3* 99:*15*
**really** 5:*24* 13:*2* 24:*25* 66:*8* 82:*16* 90:*14* 110:*23* 142:*3*
**rear** 12:*19* 60:*3*, *5*, *21* 62:*11*, *19* 97:*5*
**reason** 7:*25* 8:*3* 25:*5* 78:*12* 89:*13* 101:*22*
**reasonable** 12:*11*
**reasonably** 15:*14* 28:*14*, *25* 43:*3* 73:*11*
**reasoning** 84:*24*
**reasons** 61:*14*, *15* 62:*24* 117:*21*
**recall** 12:*9* 42:*19*
**receive** 108:*11* 109:*1* 135:*1*, *3*
**received** 108:*9* 136:*21*
**recess** 53:*17* 99:*19* 130:*12*
**reckless** 52:*17*
**recollection** 13:*5*, *7* 96:*22*
**record** 4:*3* 6:*10* 7:*4* 48:*16*, *18* 49:*5*, *9* 53:*16*, *19* 72:*2* 78:*17* 88:*24* 93:*7* 99:*18*, *21* 130:*11*, *14* 136:*15* 148:*18* 150:*9*
**recorded** 83:*5* 88:*19* 150:*8*
**recording** 72:*12*
**records** 47:*21* 54:*6* 112:*1*
**recover** 95:*14*
**redirected** 134:*7*
**reduced** 73:*19*
**reefer** 33:*6*, *7*
**reefers** 33:*4*
**REEXAMINATION** 144:*13*
**refer** 46:*4*
**Referrals** 45:*11* 46:*14*
**referred** 37:*2* 45:*5* 54:*11* 55:*24* 56:*24* 110:*19*
**referring** 82:*14* 112:*12*
**reflect** 119:*2*
**reform** 6:*1*
**reframe** 43:*23*
**regard** 70:*15*
**regarding** 37:*22* 52:*6* 115:*25* 128:*11* 134:*25* 135:*4*, *5*
**regardless** 135:*14*
**regards** 85:*23*
**Registered** 150:*3*, *21*
**regular** 109:*14* 129:*13* 144:*4*
**regularly** 30:*9* 109:*19*
**regulation** 40:*22*
**Regulations** 40:*25* 124:*12*, *22* 132:*14*, *16*, *17* 133:*7*, *11*
**related** 140:*15* 150:*15*
**relationship** 100:*4*, *7*, *18* 103:*3* 104:*13* 120:*4*, *6*
**relay** 71:*17*
**release** 48:*10*
**released** 108:*3*
**relevant** 118:*23* 122:*5* 123:*2* 125:*23* 137:*19*
**rely** 45:*8*
**remedial** 60:*22* 69:*5*, *8* 70:*14*
**remember** 11:*18* 12:*15* 13:*2*, *11* 34:*22* 70:*5* 74:*8* 78:*1* 85:*1* 98:*11* 104:*16* 117:*8* 129:*7* 140:*24*
**REMOTE** 1:*15*
**removed** 49:*12*
**rental** 144:*1*
**renting** 60:*13*
**repaired** 100:*20* 111:*7*
**repeat** 54:*19*
**repercussions** 68:*22* 87:*10*
**rephrase** 54:*14* 68:*7* 70:*22* 82:*18* 88:*1* 123:*6* 136:*9*
**report** 21:*1*, *3*, *4*, *7*, *15*, *25* 22:*2*, *6*, *9*, *11*, *19*, *20* 25:*21*, *23*, *24* 26:*5* 29:*23* 36:*21*, *22* 46:*10* 56:*12* 70:*24* 71:*6*, *20* 74:*25* 76:*2*, *9* 77:*7*, *10* 78:*5* 85:*14*, *19* 88:*13*, *14* 91:*4*, *5* 106:*2* 110:*13* 112:*3*, *4*, *7*, *8*, *12*, *13*, *16*, *20* 113:*1* 114:*19*, *25* 115:*6*, *12*, *21*, *22* 116:*10* 119:*9*, *11*, *21* 122:*11*, *19*, *25* 123:*11* 129:*7*, *17*, *23* 134:*4* 138:*12*, *14* 139:*16*
**REPORTED** 1:*18* 95:*22* 127:*21*
**REPORTER** 3:*5* 4:*8* 6:*14* 148:*25* 150:*1*, *3*, *22*
**Reporting** 10:*6*
**reports** 10:*2* 20:*19*, *22* 22:*7*, *8* 29:*13*, *18*, *19* 36:*20*, *24* 37:*13*, *23*, *24* 42:*11* 56:*17* 64:*1* 75:*5*, *15* 86:*21* 90:*7* 96:*5* 119:*18* 126:*12* 139:*17*
**represent** 13:*13* 15:*13* 74:*24*
**representing** 5:*2* 8:*21* 10:*8*
**request** 43:*12*
**requested** 101:*11*
**require** 82:*12*
**required** 5:*14* 38:*1* 51:*2*, *4*, *8* 132:*9*, *12*, *15*
**requirement** 62:*9*, *11*
**requirements** 45:*2*
**requiring** 65:*6*
**resignation** 57:*16* 67:*23*
**respond** 31:*13*
**response** 7:*1*
**responsibilities** 26:*24*
**responsibility** 118:*6*, *12*, *16* 132:*5* 133:*3*, *6*, *10*
**responsible** 19:*20*, *23* 20:*5* 67:*1* 108:*22* 109:*11* 132:*2*, *23*
**restart** 123:*6*

**result** 88:5 91:23 92:11, 20 94:1 111:15 117:4, 6 120:9, 14 140:5, 10
**resulted** 71:9
**results** 87:20 110:10
**retrain** 68:15, 17
**retrained** 69:19
**returned** 100:23
**review** 14:2, 4, 19, 23 15:3 37:22 41:11 42:10 66:14, 17 101:14, 15 102:7, 12, 16 104:22, 25 124:3, 16, 17
**reviewed** 8:8 14:12, 17 65:23 66:21 68:9, 11 93:19 124:24
**reviewing** 36:20 37:13 54:5 96:14 123:16 124:7
**reviews** 66:1 74:12 101:21 108:15
**rid** 72:22
**ride** 50:16, 20 51:2, 7
**right** 4:17 5:8, 18 6:3, 14 7:8, 22 8:8, 12 9:4, 10 10:15, 23 11:6, 24 12:12, 23 13:18, 22 14:11, 16, 19 15:1, 6, 17 16:13, 18 18:7, 12 19:19 21:14 22:5 23:3, 8, 11, 16 24:8, 9, 12, 19 25:15, 17, 20 26:1, 2 27:14 29:12 30:10, 11 31:20 32:1, 4, 13, 14 33:7, 24 34:13, 25 35:6, 22 36:11, 18 37:4 38:8, 14 41:12, 24 42:6 43:1 44:1, 18, 19 45:7 46:3, 16 47:12 48:4, 22 49:2, 16, 24 50:3, 24 51:11 52:11, 22 53:9, 15, 18, 21, 25 54:10 55:3 56:11 57:2, 15 58:18, 22 59:15 61:10 62:1, 22 63:3, 7, 19, 22 64:16, 19 65:18, 21, 25 66:5, 19 67:15, 19, 24 68:13, 17, 25 69:3 71:1, 13 72:3, 13 73:21 74:16 76:17, 21, 23 77:1, 4, 6, 18 78:6, 12, 25 80:14, 24 81:3, 20 83:5, 6, 14 84:11, 15 85:11, 12, 22 86:18 88:23 89:4, 7, 8, 23 90:3, 8, 18, 21 91:1, 13 92:8, 19 93:10, 14 94:8, 11, 12, 15, 16, 17 95:11, 17, 24 96:5 97:8 98:5, 8, 9 99:5, 17, 23 100:24 101:5 102:10, 15, 21, 24 103:25 104:3, 11 105:7, 19 106:7, 15, 20, 21, 24 107:24 109:5, 10, 24, 25 110:9, 12, 15, 16 111:18, 22 113:1 114:5, 23 115:2, 3, 19 116:8, 12, 15, 18, 22 117:12 118:10, 18 120:2, 8 121:15 122:3, 4, 10, 21 123:4 124:4 125:18 126:11, 14, 15 127:6, 16, 18 128:21 129:24 130:9, 16, 18 131:6, 16, 23, 25 133:13, 21 134:10, 13 136:16 137:2 139:7, 15, 21 140:2, 15, 18 141:2, 9 142:21 143:11, 15, 16 144:3 145:5 147:14, 22, 23 148:5, 15, 19
**rise** 86:6
**road** 51:4, 8 69:19 70:8 84:12
**roadside** 84:12
**Rob** 71:5 76:18 103:24 114:7
**Rob.moseley@momarlaw.com** 2:10
**ROBERT** 2:8
**role** 30:18 35:25
**rolling** 72:17
**RONDA** 1:18 4:9, 18 148:19 150:3, 21
**room** 94:20 105:23
**root** 110:20
**rotate** 110:1
**RPR** 1:18 150:22
**Rule** 4:4 91:11
**rules** 5:13 7:9 21:22 85:2 129:22 133:7, 11
**run** 38:19 125:18
**running** 46:9, 10 78:20

< S >
**Saam** 47:16
**Saamba** 46:10, 17 47:17 56:15 75:4, 11, 19, 23 85:10 101:15, 17 110:5, 6
**safe** 38:10 39:16, 20 141:25
**safely** 40:3 135:24 147:13
**Safety** 9:19, 20, 23 10:11, 17 15:25 18:14, 16 20:9, 10 31:1, 2, 24 35:8, 12 36:13, 15, 16 40:25 41:5 42:9, 14 43:5 44:2, 15 45:1 50:9 69:10 70:15 76:9 77:9 92:15 94:4 101:7, 8 107:12 109:12, 16, 21 124:12, 21 129:20 130:17, 23 131:7, 10 132:13 133:15, 18
**sample** 89:11
**Samsara** 59:22 74:20, 24
**SAT** 51:21, 22
**satisfactory** 130:18 131:2
**save** 126:8
**saved** 56:18, 23 58:10 59:8
**saw** 95:19 110:12 119:13
**saying** 12:5 17:10 38:21 57:17 85:13 86:24 87:6, 24 89:10 111:1 113:3, 18 114:9, 18 121:25 136:4
**says** 37:16, 25 40:7 43:7 54:14 91:14 96:15, 18 104:10, 16 120:16 139:9, 11
**SC** 1:19 2:5, 9
**scenarios** 136:17
**score** 73:22, 24 74:2, 3, 21, 25 75:6 76:14, 20 77:5, 7 101:17 110:4, 6 111:24
**scores** 75:7
**screen** 76:25 77:2 103:25 112:19
**screened** 46:6
**screening** 44:23
**screw** 98:5
**scroll** 103:22
**scrolling** 103:20
**seal** 150:17
**sealed** 149:1
**search** 47:16
**second** 5:23 32:2, 12 39:10 73:23 103:22 105:6 109:13
**seconds** 64:8
**section** 85:16 96:18 113:9
**section's** 94:18
**see** 22:17 36:15 55:19 70:1 73:21 77:1 78:3 79:22 82:11 85:3 87:21 88:13 89:14, 16

90:1 94:4 95:11, 20 99:9 101:15, 24 103:20, 25 104:7 105:5 106:6, 20 107:24 110:1 111:22 114:7, 10, 12 118:9, 21 119:24 120:10 123:2 125:10 132:16, 25 137:11 148:6 149:3
**seen** 37:25 38:25 39:4 57:18 95:16 98:21 107:4 129:3
**semi** 76:1
**send** 41:11 64:8 109:19 128:1
**sending** 71:5
**sends** 22:19 64:14 108:19
**sense** 7:6 16:16 18:1 132:24 133:5 140:3
**sent** 71:3 129:4, 16
**separate** 58:14
**series** 10:2 44:13 73:7
**serious** 90:24
**service** 75:15 111:3, 4, 16 144:4
**set** 64:5
**setting** 10:6 96:11, 12
**settlement** 58:5
**settlements** 30:21 66:10
**severe** 141:18
**severity** 51:17 79:20
**shade** 36:4
**shake** 7:2
**share** 24:2 105:5
**shared** 20:16 24:4
**sheet** 94:22 101:6 102:12 129:9
**Sheetrock** 34:7
**she'll** 48:10, 17
**shop** 18:24 19:5 134:5 144:6
**short** 73:9 121:3 127:24 128:2
**shorter** 107:22
**show** 105:15
**showed** 85:14 128:7
**shows** 21:8 68:2
**shy** 9:22
**SIC** 117:17
**side** 12:17 106:13
**sidelines** 111:7
**sideswipe** 97:5
**sideswiped** 96:19
**sign** 41:11 95:20 150:14
**signature** 150:13, 14
**signed** 106:10 133:13, 17
**significance** 25:24
**significant** 118:25
**signing** 148:21
**similar** 47:19 106:9 144:25 146:11 147:20
**simple** 73:9 136:10
**simplified** 73:17
**single** 63:1 125:1 139:14
**sir** 5:4, 6 9:18 14:17 16:4 40:15 53:24 54:25 67:18 76:16 77:1, 3, 13 80:9 100:1 103:25 114:16 137:3 143:17 148:9
**sit** 100:11 103:8
**sitting** 111:6 119:9
**situated** 94:13
**situation** 33:21 60:14 71:15 87:17 117:14, 16 147:1, 9
**situational** 125:7
**six** 56:6 83:20 92:23 93:5
**size** 89:11
**skipped** 116:24
**slightly** 74:14 96:25
**Smaller** 45:22, 24
**Smith** 40:19 125:5, 8 134:14, 18, 21, 23
**somebody** 31:4 36:9 38:24 42:23 45:13 46:4 47:24 49:25 50:2, 3 56:9 58:4 59:10 65:15 70:9 80:3 81:4, 18 93:23 95:19 100:6 102:16 116:19 119:12 125:10 131:15 135:21 145:18 146:18 147:8, 9
**somebody's** 117:4, 7
**soon** 6:11 72:4 76:4
**Sorry** 32:18 39:3 43:16 53:3 54:19 60:21 63:12 79:11 81:9 85:6 91:17 92:23, 24 99:12 103:16, 20 105:11, 22 109:18 112:16 121:10 128:25 133:16 134:20 137:14 145:8 148:24
**sort** 6:25 36:19 38:5 40:18 41:9, 15 44:11 45:12 50:25 52:21 57:20 59:17, 21 63:24 71:14 76:8, 13 84:12 85:17 127:9 142:13 143:5
**sorts** 40:3 41:5 51:12
**sound** 6:21
**sounds** 13:17 24:13 31:14
**SOUTH** 1:1 5:12 13:20 150:1, 4, 17, 23
**space** 140:9, 11, 21 141:8
**speak** 8:24 11:8 14:7 16:2, 3, 7 30:9 56:20 70:16 99:23
**speaking** 9:12 13:24
**special** 24:3
**specialize** 33:25
**specific** 5:13 6:1 15:5 19:24 21:22 28:17 31:19 34:6 37:17 49:4 52:5 59:19 81:9 91:11, 14 96:23 106:16 121:21 123:12
**specifically** 7:14 15:11 18:21 20:5 27:13 30:19 32:22, 24 37:16 40:7, 13 43:11 44:1, 14 51:20 59:16 63:25 67:4 71:11 76:10 85:1 92:13 103:12 123:17 124:25 141:8
**specify** 28:5
**speculate** 63:1 80:12 102:13
**speculating** 94:2 101:2
**speculation** 97:2
**sped** 89:6
**speech** 44:15
**speed** 85:23 86:25 87:19 88:21 115:25 135:13 140:23 141:4
**SpeedGauge** 22:19, 23 36:22 37:22 86:20 90:7, 9 96:1, 5, 16 112:13 113:14, 25 114:3 117:16 119:18 123:17 126:12 129:5, 17 136:19
**speeding** 22:12 36:25 86:9, 15 87:3, 4, 5, 14, 15 88:15 91:7, 18 92:18 96:2, 10, 16 112:1 114:24 115:15 117:3, 15, 17, 24 118:21 119:22 120:22 128:12 135:1, 2, 7, 17, 18, 20 136:1, 2, 5, 12, 13, 18 137:4, 6, 11 138:12,

*15* 139:*12*, *18* 140:*8*, *10*, *25* 141:*3*
**speedometer** 65:*10*
**speeds** 138:*2*
**spend** 145:*9*
**split** 85:*25*
**Spoke** 96:*18*
**spoken** 71:*11*
**spot** 134:*2*
**spout** 35:*15*
**stabbing** 65:*16*
**staff** 30:*1*
**start** 23:*17* 46:*9* 92:*25* 94:*24* 120:*4*
**started** 10:*15* 78:*2* 89:*17* 101:*23* 102:*1* 115:*7*, *12*
**starting** 16:*1* 18:*9* 93:*16* 113:*23*
**starts** 114:*11*, *13*
**state** 34:*16* 40:*19* 82:*10* 150:*1*, *4*, *23*
**stated** 137:*1* 138:*4* 150:*7*
**statement** 68:*9* 136:*24* 137:*17* 141:*1*, *4*
**STATES** 1:*1* 34:*10* 82:*3* 83:*8* 93:*17*
**stating** 129:*23*
**status** 21:*8*, *22* 22:*2*, *6* 36:*21* 37:*23* 124:*17* 131:*1*
**statutory** 131:*20*
**stay** 84:*2*
**stayed** 81:*25* 83:*9*, *25*
**steel** 34:*4*, *6*
**stenographically** 150:*8*
**step** 12:*17*
**steps** 124:*9*, *19* 129:*18*
**stop** 66:*23* 105:*5* 136:*13*
**stopped** 90:*1*
**stopping** 66:*24*
**storage** 72:*12*
**street** 133:*2*
**strike** 123:*5*
**struck** 79:*2*
**structure** 15:*21* 17:*16* 18:*8* 25:*6* 29:*21*
**stuff** 16:*24* 17:*24* 39:*18* 41:*10* 47:*10* 49:*18* 73:*16*, *18* 79:*13* 110:*11* 124:*6* 126:*8*
**subject** 122:*12*
**submit** 57:*16*
**submitted** 133:*14*, *17* 134:*12*
**subordinates** 20:*9*
**subscribe** 150:*12*
**substance** 5:*16* 7:*24* 53:*7*, *12*, *22* 99:*24* 108:*23*, *25*
**substantial** 147:*10*
**substantive** 7:*9*
**substantively** 144:*19*
**subtleties** 145:*7*
**sudden** 64:*5* 66:*23*
**sued** 128:*6*
**suggested** 82:*7*, *8*
**suggesting** 88:*10*
**Suite** 2:*4*, *8*
**superfluous** 98:*17*
**supervise** 18:*20* 132:*8*, *10*
**supervising** 19:*21*
**supervisor** 19:*10*, *15*
**suppose** 26:*16* 32:*12* 128:*13*
**supposed** 15:*12* 38:*21* 40:*8*, *9* 43:*8* 97:*25*
**sure** 10:*3*, *5* 12:*5* 17:*2*, *11* 21:*12* 25:*4*, *20* 26:*21* 28:*4*, *19* 31:*9*, *23* 36:*6* 38:*23* 39:*23* 41:*21* 42:*4*, *16* 43:*23* 45:*23* 46:*14* 47:*3* 53:*4* 54:*21* 55:*15* 58:*2* 60:*19* 67:*5* 68:*20* 71:*4* 74:*17* 76:*19*, *24* 80:*13* 87:*12*, *23* 88:*11* 90:*23* 92:*17* 93:*8* 108:*16*, *22* 119:*5*, *7* 122:*14* 123:*14* 125:*6* 130:*1* 132:*12*, *20* 133:*10* 135:*24* 137:*13*
**surprised** 55:*7*
**survey** 57:*20*
**suspect** 80:*9*
**swear** 4:*18*
**switches** 97:*4*
**sworn** 4:*21* 150:*5*
**sync** 148:*23*
**synced** 148:*20*
**system** 23:*1* 40:*19* 56:*15* 58:*17* 63:*23* 64:*2*, *20* 65:*3*, *23* 75:*11* 76:*5* 90:*9* 96:*1*, *4* 105:*8*, *10*, *13* 123:*18* 125:*5* 134:*2*, *14*, *16*, *19*, *21*, *23*
**systems** 50:*13*

**< T >**
**take** 10:*4* 19:*6* 34:*22* 82:*9* 85:*15* 97:*16* 99:*15* 124:*20* 129:*18* 130:*6* 146:*7*, *17* 147:*6* 148:*20*, *22*
**taken** 53:*17* 59:*1* 68:*10* 69:*5*, *9* 70:*15* 99:*19* 125:*23* 126:*1* 130:*12* 150:*6*, *10*
**takes** 124:*10*
**talent** 45:*10*
**talk** 14:*22* 16:*22* 17:*8* 18:*22*, *23* 26:*10* 27:*22*, *24* 28:*6*, *10* 29:*4* 30:*5* 31:*5*, *14* 34:*2* 35:*7*, *8* 41:*12*, *13* 42:*23* 53:*6*, *11*, *22* 90:*3*
**talked** 19:*18* 28:*3* 29:*13* 39:*7* 41:*4* 42:*10* 54:*2* 69:*4* 70:*2*, *5* 71:*15* 99:*1*, *2* 119:*1* 124:*5*, *10*, *14*, *18*, *23* 127:*6* 131:*13* 133:*22* 134:*13* 136:*14* 147:*24*
**talking** 6:*17* 10:*25* 12:*24* 13:*1*, *14* 16:*23* 17:*3* 19:*7* 29:*25* 30:*20* 32:*7* 39:*9* 43:*21* 55:*23* 67:*2* 69:*15*, *16* 71:*20* 73:*22* 77:*6* 105:*20* 109:*7* 111:*23* 112:*15*, *24* 116:*23* 122:*13* 123:*23* 142:*5* 148:*13*
**tankers** 33:*10*
**tapped** 11:*8*
**tasks** 20:*15*
**Taylors** 2:*9*
**teams** 19:*2*
**technical** 22:*25*
**telematics** 59:*22* 74:*20* 95:*25*
**tell** 8:*1* 12:*3* 18:*7* 21:*19* 29:*11* 35:*6* 47:*22* 56:*7* 62:*7* 80:*15* 84:*21* 88:*18* 97:*25* 103:*9* 104:*17*, *20* 127:*22*
**telling** 29:*20* 90:*7* 98:*12* 110:*7* 115:*1*
**tells** 40:*13*
**ten** 19:*1* 92:*20*, *21*, *23* 93:*5*
**tendered** 67:*22*
**term** 8:*18* 54:*12* 58:*9*
**terminate** 68:*18* 93:*3* 100:*17* 136:*20*, *22*
**terminated** 57:*9* 92:*6* 103:*2* 104:*13* 120:*5* 139:*24* 140:*5*
**termination** 55:*20* 56:*25* 59:*12* 87:*20* 88:*5* 91:*21*, *25* 92:*12* 94:*1* 96:*20* 97:*6* 104:*5*, *7*

117:4, 7 120:20 138:1, 3
**terms** 23:25 117:3 124:6 135:23
**test** 51:5, 7, 8 82:14, 15
**test-drive** 10:4
**testified** 4:22
**testify** 28:24 69:7 104:23 150:5
**testimony** 11:17 15:2, 7 53:8, 12, 23 61:11 63:8 99:25 105:2, 3 123:9 150:7, 9
**text** 30:6 98:1
**Texting** 141:23 142:2
**Thank** 94:17 103:23 129:11 148:8
**theoretically** 111:13
**theory** 94:21
**thereof** 150:16
**thing** 6:23 7:10 16:16 32:19 33:21 52:21 55:10 71:2, 21 75:7 76:1 79:10 80:18 87:21 92:20 102:22 114:8 115:4 130:8 137:24
**things** 26:17 29:4 40:4 51:12 52:16 56:1, 21 67:6 70:7 74:6 75:16 79:25 112:24 124:7, 13
**think** 7:8, 22 12:13 22:1 23:13 32:1, 2 35:3 39:24 42:18 43:10, 22 47:3 54:8 55:15 56:24 63:2, 14 70:2 72:13 74:23 76:19 83:18 97:9 98:18 99:8, 11 102:11, 24 107:18, 19 112:11 115:7 117:9 129:25 132:21 134:8, 13, 24 135:7 139:7 142:8, 9, 25 144:11, 23 145:21 146:14, 16, 20, 23 147:2, 24 148:6, 7, 10
**thinking** 44:8
**third** 11:11
**thorough** 148:4
**thought** 11:4 29:25 43:20 112:14
**thousands** 123:23 146:19
**three** 22:21 52:1, 19, 20 79:25 80:16, 25 83:17 91:22, 23, 24 112:22 136:21 138:16, 21
**threshold** 112:2, 5
**thumbs** 7:2
**ticket** 75:21 93:11, 24 136:12
**tickets** 86:9, 15 91:15 117:3 135:1, 2 136:21
**tied** 75:11, 12
**TIME** 1:15 4:10 6:5 7:12 10:9 11:11, 16 12:12 13:5 19:9 25:25 35:24 36:2, 7 37:13, 17 48:15 49:11 53:1, 3, 15, 18 55:9 56:5 63:20 64:1 66:24 73:2 77:22 79:23 80:17 82:10 85:18 86:11 89:20, 24 90:25 96:3 97:3 98:7 99:17, 20 101:17 111:4, 24, 25 114:11 115:8, 23 118:23 119:10 120:3, 5 121:3 122:3, 12, 22 126:9 129:21 130:10, 13 134:3, 4 135:6 139:1, 4 140:25 142:17, 24 143:25 145:9, 10 148:9, 17 150:6, 7, 10
**timeline** 17:9 28:1 51:17 105:4
**timelines** 46:12
**times** 11:10 20:15 131:14 134:15
**tires** 70:7
**title** 20:23, 24 23:12 24:2 25:14 26:7
**titles** 31:19
**today** 6:15 8:1, 6, 10, 20, 24 9:6 12:24 13:1, 14, 23 14:3, 9 15:4, 7 27:23 28:8, 11, 21 29:5 67:2 69:8 100:12 103:8 104:23 105:2 119:21 121:16, 19, 20 123:9, 20 147:24 148:9, 13
**Today's** 4:7
**told** 9:1 54:8 57:12 63:9, 14 72:13 84:7 89:24 120:11 126:24 127:19 134:8
**tolerance** 87:14 117:20
**top** 13:3 23:19, 20 32:3 42:18 80:19 81:15 116:12
**topic** 15:18, 20 16:1, 2, 3, 7 17:8 23:4 35:7 43:17, 25 44:21, 22 52:23 106:11, 22 123:19
**topics** 14:20 28:25 41:10 43:13 50:9 54:1 101:7, 8 107:12, 22 108:7 125:19, 21
**track** 11:21 74:11 78:22 80:2, 5 100:2 128:8
**tracker** 96:4
**tracking** 74:11
**traffic** 97:1
**trailer** 12:17 33:19, 21
**train** 124:18 147:11
**trained** 132:5
**training** 41:9 44:24 50:4, 11, 15, 19, 25 98:10 105:8, 17, 21, 22 124:5 132:2 137:8
**trainings** 106:1
**transcribed** 150:8
**transcription** 150:9
**transmission** 72:18
**TRANSPORTATION** 1:9 4:6
**tree** 25:9
**trial** 78:15
**tried** 63:4 125:16 128:16, 19
**triggers** 113:10
**triumvirate** 26:4 29:14
**trouble** 133:1
**Truck** 11:14, 15 40:14 51:15 59:6, 7, 17 60:10, 13 61:1 62:3, 5, 8 64:23 72:10, 14 84:22 85:2 100:20 111:2 134:9 143:24 144:4, 15, 18, 21 145:4, 10, 11, 20, 22 146:1, 3, 6 147:17, 20
**trucking** 15:23 18:23
**trucks** 72:23 76:8 95:21 146:12 147:10
**true** 122:8 134:11 150:9
**truth** 8:1 150:5
**try** 6:17, 20 10:1 25:18 81:7 125:16 130:7 135:19 136:9
**trying** 29:3 44:6 46:11 62:15 99:12 100:2 110:20 114:8 128:23 135:24 136:7 137:22 148:6

**tune** 145:4, 17
**turn** 15:17 40:9
**turned** 55:13 68:10 126:7
**tweaked** 74:14
**Twice** 11:11
**two** 9:3, 5 22:21 23:25 42:9 43:4 50:9 52:20, 21 63:21 74:12 81:20 86:12, 15 91:14, 15, 16, 18, 19 92:1 94:25 99:6 101:3, 20 125:8 135:7 137:23 138:11, 17, 21 143:7
**two-stroke** 73:9
**type** 33:19 34:1
**typically** 22:8 37:1 46:8 59:13 60:16 72:12 108:3 127:25

**< U >**
**Uh-huh** 31:25 98:13
**umbrella** 126:25
**understand** 5:21 6:2 8:15, 20 11:24 12:9 15:6, 10 18:6 24:8 25:5, 11 26:1, 21 27:14 29:1 30:3, 10 33:24 34:17 35:18 36:11 40:24 41:25 42:6 44:8, 18 45:7 46:2 51:11 54:16 60:6 66:19 68:20, 25 72:3 73:12, 20 74:17 75:18 78:6 85:11 92:8 94:17 95:19 97:9 98:8 106:21 109:5, 24 110:25 111:9 115:3 116:8 118:19 120:8, 21 122:15 126:14 137:21, 22 140:3 141:9 145:2, 12 147:14, 22
**understanding** 51:6 80:15 84:8 115:5
**unfamiliar** 146:1 147:17
**unfounded** 65:17
**UNITED** 1:1
**unknown** 125:4
**unsafe** 118:1, 8, 13, 25 136:5
**unsubstantiated** 72:1
**untimely** 65:15
**untrained** 145:15
**unwritten** 42:7, 8, 13, 21 43:5
**updates** 20:20
**updating** 65:4
**upkeep** 20:19
**upwards** 23:17
**usable** 74:15
**use** 5:20 35:16 46:21 47:9 48:6 56:11 59:21 60:7, 14, 23 63:16 64:14 74:23 82:16 105:8 147:16
**usually** 45:18 66:2 84:20
**utilize** 60:2
**utmost** 92:18

**< V >**
**Van** 32:17, 23, 25 59:20
**vans** 33:1
**vary** 76:6
**vehicle** 13:14 21:21 47:21 54:5 59:20 71:23 75:20 76:2 97:5 146:15, 16, 22 147:5
**vehicles** 141:12
**verbal** 48:21 84:17 86:3 99:2
**verbatim** 35:16
**versus** 4:5 65:15 117:16 135:20 138:7
**vice** 24:7, 18 31:22
**video** 4:3 64:2, 8, 15, 16 65:10, 21 66:13, 14, 17, 20 68:2 71:24 72:9 124:24 128:3 148:16, 20
**VIDEOCONFERENCE** 1:15 2:1 150:11
**Videographer** 2:11 4:2, 10, 17 53:15, 18 99:17, 20 130:10, 13 148:15
**videos** 44:13 50:7 64:20 65:16 70:1 76:12 105:9, 14, 22
**video's** 68:9
**VIDEOTAPE** 1:2
**violation** 60:18 70:4, 10 85:17 92:19 93:21 95:1, 2 98:2 117:18
**violations** 51:18, 19 52:19 91:15, 19 111:17 135:3 139:10
**voluntary** 101:11
**VP** 32:3
**vs** 1:4

**< W >**
**Wade** 2:8
**wait** 106:19 149:3
**waiting** 100:19 111:7
**waive** 148:21
**waived** 150:14
**WALETICH** 1:4 4:4, 5, 6, 15 9:15, 21 10:10, 21 11:4, 9, 17 15:8, 13, 14 19:4 21:1, 14, 24 22:3, 4, 5 23:5, 21 24:9 28:15, 22, 25 29:9 32:14 35:24 37:12 40:11, 18 41:4 43:2, 3, 4 44:4 45:3 46:6 47:24 49:25 50:21, 24 51:13 56:9 57:5, 19 59:11, 21 60:2, 7 63:3, 24, 25 67:19 70:18 72:4 77:19 78:20 80:4 81:4 86:5 91:2, 6 100:4, 7 103:3 104:14 115:22, 23 116:2, 19 118:6, 12 120:5, 6, 23 123:16 124:10 126:17, 22, 24 128:5, 18 129:18 130:19, 22 131:15, 20 132:1, 7 133:14, 17, 24 134:16 135:17 141:10 148:17
**Waletich's** 23:15 44:22 54:8 67:10, 15 125:22 130:17 134:25
**walked** 12:18
**want** 48:19, 20 53:4 61:18 62:7, 17 76:19 78:13 94:4 108:24 125:20 148:25
**wanted** 72:19 73:16 76:24 79:15 84:4 101:23
**wanting** 17:19
**warn** 32:20
**warning** 83:1
**watch** 105:9
**way** 27:1 42:22 58:7 80:21 92:25 93:25 95:13 100:15 107:11 135:8 144:20 145:6
**web** 22:18
**website** 22:22 23:13 47:14 75:4
**week** 21:9 22:19 38:1 89:1 90:11 96:6 100:21, 22 128:24 129:2
**weekly** 21:6 90:10
**weeks** 63:21 99:6 100:25 101:3 139:3
**week's** 86:24
**Well** 8:17 9:25 16:5, 6 17:2, 4

19:12 20:12 22:15 23:4 25:13 27:9 28:4, 20 30:2, 6 31:21 32:4 34:15 39:8, 19 40:21 41:8 42:16 43:6 46:7 47:17 48:25 51:14 57:25 59:13 60:12 61:16 69:13 80:18 81:11 82:7 86:7, 20 87:21 90:3, 22 94:2, 21 97:18 98:11 101:16 108:18, 25 110:14, 18 112:8, 9 117:19 119:1 124:23 129:18 132:18 141:8, 13, 15 142:7 144:22 145:1, 8
**went** 12:18
**We're** 4:2 13:1, 13 28:21 35:6, 7 43:25 44:20 51:9 53:12, 16, 19 60:17 67:2 72:22 75:2 99:13, 18, 21 102:24 110:1, 17 112:23 114:9, 16 124:24 130:11, 14, 18 131:21 135:24 138:19 148:18
**WEST** 1:4 4:5, 14 5:3
**We've** 6:14 29:4, 13 39:7 41:3 42:9 55:1 62:24 77:5 79:14, 15 124:14, 17 127:6 134:13
**wheel** 142:14 143:6
**WILLIAMS** 1:9 4:16 19:9, 21 20:6 30:19 49:21 55:4 57:4, 6, 8, 16 59:8, 17, 18 60:10 64:19 65:3 67:11, 17 69:9 77:10 88:15 90:20 100:5 103:2 104:13 120:4 121:18 122:6 131:19 132:3, 8 139:15 143:25
**within-entitled** 150:6
**witness** 4:19 17:22 53:14 113:11, 16, 22 114:2 128:24 129:2, 6, 12 130:9 143:19 148:14 150:4, 7, 10, 11, 13, 16
**word** 5:21 64:14
**words** 92:13 150:11
**work** 9:14 20:13, 21 25:1, 17 26:20 31:11 46:12 61:6 73:10 94:4 138:5
**worked** 35:24 46:15 49:11
**working** 16:20 65:4 66:16 78:2
**works** 20:9 26:3, 23 30:7 48:2
**world** 87:16
**worried** 147:19
**worries** 43:22 137:16
**worse** 75:22
**wound** 127:14
**wrap** 130:7
**wrapping** 148:11
**wrap-up** 130:4
**write-up** 79:19 83:5 120:10, 13, 15, 19, 23 121:4, 12
**write-ups** 98:11, 24
**writing** 54:18 57:17
**written** 38:6, 11, 17, 18, 25 39:4 41:19, 20, 25 52:9 54:9, 22 56:1 78:11 83:1 92:10 95:6 120:10, 13, 15 121:12 136:6
**wrong** 39:18 142:17
**wrote** 79:23 82:22 88:9 95:3 103:12 120:18
**wrotten** 95:6
**WWW.CLARKBOLEN.COM** 1:20

**< Y >**
**y'all** 33:10 78:8 123:18 124:6
**y'all's** 104:4
**yard** 67:22 97:20 100:23
**Yeah** 6:13 9:1 10:12 11:15 12:7, 19 14:5 17:23 18:17 27:9 29:10 30:8 31:10 32:10 36:1 38:12 39:3, 12 43:22 44:13 45:11, 25 46:1 47:25 50:2 51:5 53:2, 14 55:13 62:6 63:7 64:3 65:2, 24 67:13 68:20 70:20 71:4 73:19 77:8 79:3, 12 81:14 83:10 84:14 86:17 88:1, 24 89:3, 8, 13, 23 90:21 92:24 93:8 95:13 97:18, 23 98:14 101:25 104:2, 10 106:22 108:3 110:8, 12 111:13, 15, 21 112:14, 16, 18, 23 113:3 114:6, 16, 18 116:17 118:14 121:20 123:22 129:2, 6 134:12 136:24 137:1 139:20 141:6, 14, 16, 17 142:19 143:9
**year** 11:19, 22, 23 12:13 52:20 80:7, 8 83:21 91:16 102:2, 4, 5, 18, 22 135:3 136:21 138:16
**years** 9:22 10:13, 16, 17 17:20 34:21 36:4 52:2, 18, 19, 21 56:6 59:13 86:12, 16 91:16, 19 112:22 130:21 138:22
**yellow** 85:16
**Yep** 79:7 106:8

**< Z >**
**zero** 87:14 92:25 93:1 112:5, 8 113:5, 23 114:20 117:20
**Zoom** 5:22